# EXHIBIT “1”

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER

RIDGEVIEW LENDER LLC

Plaintiff,

- against -

THE RIDGEVIEW REALTOR LLC; DAVID BRAUN; MOSHE ZEV DOPPELT; and JOHN DOE #1 through JOHN DOE # 99,

Defendants.

Index No.

Date Filed:

**SUMMONS**

**Premises:**
**5 Ridgeview Road**
**Kerhonkson, New York**

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to serve upon the plaintiff's attorney an answer to the Complaint in this action, within twenty (20) days after the service of this Summons, exclusive of the date of service, or within thirty (30) days after service is complete if the summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Plaintiff designates Ulster County as the place of trial. The basis for the venue is that the situs of the real property is located at 5 Ridgeview Road, Kerhonkson, New York.

Dated: Cedarhurst, New York
November 5, 2024

JACOBOWITZ NEWMAN TVERSKY LLP
*Attorneys for Plaintiff*
By: /s/ Aviva Francis
Evan M. Newman
Aviva Francis
377 Pearsall Avenue
Cedarhurst, New York 11516
(212) 612-1110
afrancis@jntllp.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER

---x

RIDGEVIEW LENDER LLC

Plaintiff,

- against -

THE RIDGEVIEW REALTOR LLC; DAVID BRAUN; MOSHE ZEV DOPPELT; and JOHN DOE #1 through JOHN DOE # 99,

Defendants.

---x

Index No.

**VERIFIED COMPLAINT**

**Premises:**
**5 Ridgeview Road**
**Kerhonkson, New York**

Plaintiff RIDGEVIEW LENDER LLC. ("Plaintiff" or "Lender"), by its attorneys Jacobowitz Newman Tversky LLP, for its verified complaint against defendants, alleges as follows:

1. This is an action to foreclose on commercial real property located in the County of Ulster arising from defendant's continuing failure to pay the amounts owed to Plaintiff pursuant to a note and mortgage.

**Parties**

2. Plaintiff is a New York Limited Liability Company. Plaintiff is the originating Lender and the holder and owner of all rights, title and interest in and to a certain note and mortgage (described below).

3. Plaintiff is the holder, owner and is in possession of the original loan documents described below.

4. Defendant The Ridgeview Realtor LLC (the "Borrower") is a New York limited liability company and is named a defendant in this action as the owner of the Property subject to

this action known as 5 Ridgeview Road, Kerhonkson, New York, Block 1, Lot 27.700, Section 68.1; Block 1, Lot 16.200, Section 68.3; Block 1, Lot 16.300, Section 68.3 (the "Property") as well as the borrower of the loan documents subject to this action. A legal description of the Property is attached to this complaint as **Exhibit A** and is incorporated by reference.

5. Upon information and belief, DAVID BRAUN resides in the state of New York and is named a defendant in this action by virtue of a guaranty executed in favor of the Plaintiff.

6. Upon information and belief, MOSHE ZEV DOPPELT resides in the state of New York and is named a defendant in this action by virtue of a guaranty executed in favor of the Plaintiff

7. Defendants John Doe #1 through John Doe # 99 are named as defendants herein to represent all other parties, including, but not limited to, tenants, other occupants of the Property, or lien holders who may have some interest in or lien upon the Property, which interest or lien is subordinate and subject to plaintiff's lien.

**FIRST CAUSE OF ACTION**
**(Foreclosure)**

8. For good and valuable consideration, on November 20, 2023, the Plaintiff provided a loan to the Borrower in the principal amount of $3,200,000 (the "Loan"). At the time, the Borrower received the full amount of the Loan.

9. For good and valuable consideration, the Borrower made, executed and delivered to the Plaintiff a mortgage note in the principal amount of $3,200,000 dated November 20, 2023 (the "Note"). *See* Exhibit B for a true copy of the original Note in Plaintiff's possession.

10. To secure the payment of the sum represented by the Note, the Borrower made, executed and delivered to the Plaintiff a mortgage, in the principal amount of $3,200,000 dated November 20, 2023 and recorded in the Office of the City Register of the County of Ulster on

November 27, 2023 in Book 13205, Page 305 (the "Mortgage") and the mortgage recording tax was duly paid at the time of recording. *See* Exhibit C.

11. To further secure the Note and the Mortgage, on November 20, 2023, Defendants David Braud and Moshe Zev Doppelt (collectively, the "Guarantors") the executed a payment guaranty in favor of the Plaintiff ("Guaranty"). *See* Exhibit D.

12. The Borrower defaulted under the Loan Documents by, *inter alia*, failing to pay the interest due for April, 2024's interest and failing to make any payments thereafter, including the amounts due on August 20, 2024, the "maturity date."

13. The maturity date was not extended past August 20, 2024.

14. Any applicable recording tax was duly paid at the time the Mortgage was recorded.

15. Pursuant to the Loan Documents, the Borrower assigned to Plaintiff its rights, title and interest to the Property, and the improvements and chattel located thereon.

16. The Loan Documents provided, among other things, that upon the default in payment of any payment due on the loan, the Lender may institute foreclosure proceedings and sell the Property according to the law.

17. Plaintiff is the sole, true and lawful owner and holder of the Loan Documents, including the originals thereof, as well as the original Note with an allonge endorsed to the Plaintiff physically affixed to the Note.

18. The Borrower defaulted under the terms of the Loan Documents by, *inter alia*, failing to pay the interest due for April, 2024's interest and failing to pay the amounts due on the maturity date.

19. Although not required, Plaintiff notified the Borrower of the default by notice

dated September 26, 2024.

20. As a result, pursuant to the terms of the Loan Documents, one or more defaults have occurred.

21. Pursuant to the terms of the Loan Documents, the Borrower is responsible for costs and expenses, including attorney's fees and costs, incurred by Plaintiff in enforcing its rights under the Loan Documents.

22. By reason of the foregoing, there is now due and owing from Borrower to Plaintiff, the unpaid principal balance of $3,200,000.00, plus accrued and accruing interest at the default rate set forth in the Loan Documents, escrow advances, exit fees, late fees and attorneys' fees and costs, less any partial payments made, if any.

23. The Mortgage being foreclosed is not a "high-cost home loan" or "subprime home loan," as such terms are defined in section six-l and six-m of the N.Y. Banking Law and is not a "home loan" for purposes of section 1304 of the N.Y. Real Property Actions and Proceedings Law ("RPAPL"). Accordingly, the requirements of CPLR §§ 3012-b, 3408, and RPAPL §§ 1302 and 1304 are not applicable to this action and no 90-day notice, Certificate of Merit, settlement conference or filing with the Superintendent is required.

24. The Property is one contiguous property and should be sold as one parcel.

25. To the extent that the amounts due pursuant to the Loan Documents are not satisfied by this foreclosure proceeding, the Borrower may be liable for such deficiencies.

26. In order to protect its security during the pendency of this action, Plaintiff and or its predecessors had or will have to make payments towards protective advances such as water or taxes. Plaintiff may be further compelled to pay sums for premiums on policies of fire and other hazard insurance, taxes, and assessments, and/or other charges affecting the Property. Plaintiff

prays that all sums so paid, together with interest at the default rate set forth in the Loan Documents from the date of such payments, together with plaintiff's costs and expenses in enforcing the sums secured by the Loan Documents, including Plaintiff's reasonable attorneys' fees, shall be added to Plaintiff's claim as secured by the Loan Documents, and be adjudged a valid lien on the Property such that the plaintiff should be paid such sums out of the proceeds of the sale of the Property.

27. Each of the above-named defendants has or claims to have or may claim to have some interest in or lien upon the Property.

28. No other action or proceeding has been commenced or maintained or is now pending at law or otherwise for the foreclosure of the Mortgage or for recovery of the sums secured by the Loan Documents.

29. In the event that Plaintiff possesses any other liens against the Property either by way of judgment, junior mortgage or otherwise, Plaintiff requests that such other liens shall not be merged in Plaintiff's causes of action set forth herein, but that Plaintiff shall be permitted to enforce said other liens and/or seek determination of priority thereof in any independent actions or proceedings, including, without limitation, any surplus money proceedings.

30. The Loan Documents provide that in any foreclosure action, the holder shall be entitled to the appointment of a receiver.

31. Plaintiff shall not be deemed to have waived, altered, released or changed the election to accelerate the loan and foreclose on the mortgage by reason of any payments made after the date of the commencement of this action.

**SECOND CAUSE OF ACTION**
**(Breach of Guaranty)**

32. Plaintiff repeats and realleges each of the allegations set forth in each preceding

paragraph, as if fully set forth herein.

33. The Guaranty is a valid and binding agreement, in which mutual consideration was exchanged between the Guarantor and the Plaintiff. *See*, Exhibit D for the Guaranty.

34. Plaintiff completed all performances required of it under the Guaranties.

35. Pursuant to the Guaranty, the Guarantors unconditionally guaranteed Plaintiff payment of the principal amount due on the Loan Documents and all accrued and unpaid interest thereon and all fees and expenses and other liabilities relating thereto.

36. As set forth above, the Borrower defaulted on the Loan Documents and the amounts due and owing under the Loan Documents is the unpaid principal balance in the amount of $3,200,000.00, plus interest at the rate set forth in the Loan Documents, late fees, other fees and attorneys' fees.

37. The Guarantor failed to pay the amounts currently due to Plaintiff under the terms of the Guaranty, thus the Guarantors breached the Guaranty. As a result of the Guarantor's breach of the Guaranty, Plaintiff has been damaged in the amount of at least $3,200,000.00plus interest at the rate set forth in the Loan Documents, late fees, other fees and attorneys' fees.

38. To the extent Plaintiff is unable to collect the amounts owed as a result of the First Cause of Action, Plaintiff is entitled to a judgment against the Guarantors for the balance.

**THIRD CAUSE OF ACTION**
**(Appointment of a Receiver)**

39. Plaintiff repeats and re-alleges the allegations of paragraphs above of this verified complaint as if fully set forth herein.

40. Due to the aforementioned default, Plaintiff has the contractual right under the Loan Documents to have a receiver appointed to assure adequate security, preservation, management and operation of the Properties pending its ultimate sale as a result of this

foreclosure action.

41. The Loan Documents entitle Plaintiff to the appointment of a receiver without notice and without regard to the adequacy of any security for the debt.

WHEREFORE, Plaintiff demands judgment on

(A) Plaintiff's First Cause of Action:

That the defendants and each of them and all persons claiming under any of them, subsequent to the commencement of this action and the filing of the notice of pendency thereof, be barred and foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption of, in and to the Property and each and every part and parcel thereof; that the Property may be decreed to be sold, according to the law; that the monies arising from the sale of the Property may be brought into Court; that Plaintiff may be paid the amount due under the Loan Documents as set forth herein, with interest and late charges to the time of such payment and the expense of such sale, plus reasonable attorneys' fees, together with the costs, allowances and disbursements of this action, together with any sum incurred by Plaintiff pursuant to any term or provision of the Loan Documents as set forth herein, or to protect the lien of Plaintiff's Mortgage, together with interest upon said sums from the dates of the respective payments and advances thereof, so far as the amount of such monies properly applicable thereto will pay the same; that this Court forthwith appoint a receiver of the rents and profits of the Property, during the pendency of this action with the usual powers and duties; that the Borrower be adjudged to pay the whole residue, or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after a sale of the Property and the application of the proceeds pursuant to the directions contained in such judgment; that in the event Plaintiff possesses any other liens against the Property either by way of judgment, junior mortgage or otherwise,

Plaintiff requests that such other lien shall not be merged in Plaintiff's causes of action set forth herein but that Plaintiff shall be permitted to enforce said other liens and/or seek determination of priority thereof in any independent actions or proceedings, including, without limitation, any surplus money proceedings, and that Plaintiff may have such other and further relief, as may be just and equitable; and

(B) Plaintiff's Second Cause of Action:

That, to the extent there are insufficient funds at a foreclosure sale, Plaintiff obtain judgment against the Guarantor for breach of the guaranty; and

(C) Plaintiff's Third Cause of Action:

That a receiver be appointed to receive and collect the rents and profits of the Property during the pendency of this action with the usual powers over the Property; and

(D) such other and further relief, as may be just and equitable.

Dated: Cedarhurst, New York
November 5, 2024

Jacobowitz Newman Tversky LLP.
*Attorneys for Plaintiff*

By: /s Aviva Francis
Evan M. Newman
Aviva Francis
377 Pearsall Avenue, Suite C
Cedarhurst, New York 11516
(516) 545-0343

**ATTORNEY VERIFICATION**

Aviva Francis, an attorney duly admitted to practice in the courts of the State of New York, hereby affirms the following pursuant to CPLR 2106:

I am the attorney for the Plaintiff (the "Plaintiff"). I have read the Plaintiff's Complaint and know the contents thereof; the same is true to my own knowledge except as to matters therein stated to be alleged on information and belief, and as those matters, I believe it to be true.

The grounds for my belief as to all matters not stated on my own knowledge are books and records in my possession, conversations with Plaintiff's representatives or their agents, and the public record. This verification is made by me and not by the Plaintiff because Plaintiff reside outside the county where my office is located.

Dated: Cedarhurst, New York
November 5, 2024

*/s/ Aviva Francis*
Aviva Francis

# EXHIBIT "A"

**FC24-NL180**

**Schedule A** – Legal Description

Parcel I:

ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being more particularly bounded and described as follows:

BEGINNING at an iron rod found on the assumed bounds of Lower Cherrytown Road on the southeasterly bounds of lands now or formerly of Cherrytown Road Lot 6 LLC, L. 7024 - P. 0054, being Lot 6 as shown on Filed Map No. 21-285;

THENCE from the point of beginning and following the bounds of the said lands for the following three courses:

1. North 45 degrees 20 minutes 41 seconds East a distance of 496.58 feet to an iron rod found,
2. North 56 degrees 10 minutes 08 seconds West a distance of 179.46 feet to an iron rod found in a stone wall and
3. North 39 degrees 57 minutes 10 seconds West a distance of 121.16 feet to an iron rod found at the easterly corner of lands now or formerly of Freeman, L. 7017 - P. 0068, being Lot 7 as shown on the said filed map;

THENCE following the bounds of the said lands North 39 degrees 51 minutes 39 seconds West a distance of 507.49 feet to an iron rod found on the southeasterly bounds of lands now or formerly of Breen-White & Langhorn, L. 6036 -P. 0201;

THENCE following the bounds of the said lands North 40 degrees 29 minutes 00 seconds East a distance of 455.37 feet to an iron rod found at the southerly corner of lands now or formerly of Donna Maria & McConnell, L. 6545 - p. 0322;

THENCE following the bounds of the said lands, along a stone row and wire fence for the latter part of the course, North 40 degrees 24 minutes 59 seconds East a distance of 443.93 feet to a point at the southerly corner of lands now or formerly of Mastandrea, L. 2991 - P. 0154;

THENCE following the bounds of the said lands, and the trend of a stone row and wire fence, North 39 degrees 05 minutes 28 seconds East a distance of 268.45 feet to an iron pipe found in a stone wall intersection at the westerly corner of lands now or formerly of Kelsey, L. 2481- P. 0399;

THENCE following the bounds of the said lands and the trend of the stone wall South 52 degrees 34 minutes 02 seconds East a distance of 351.75 feet to a point;

THENCE further along the same South 55 degrees 55 minutes 09 seconds East a distance of 300.09 feet to an iron pipe found in the stone wall at the westerly corner of lands now or formerly of LoPresti, L. 5588 - P. 0081;

THENCE following the bounds of the said lands and continuing along the trend of the stone wall South 55 degrees 47 minutes 30 seconds East a distance of 364.05 feet to a point at the end of another stone wall;

THENCE further along the same South 52 degrees 30 minutes 18 seconds East a distance of 203.19 feet to a point at the end of the said stone wall on the westerly side of Ridgeview Road;

THENCE passing over Ridgeview Road South 55 degrees 10 minutes 37 seconds East a distance of 84.71 feet to an iron rod found at the westerly corner of lands now or formerly of Brookhiser & Safer, L. 2959 - P. 0048;

THENCE following the bounds of the said lands South 55 degrees 38 minutes 11 seconds East a distance of 812.94 feet to an iron pipe found at the westerly corner of lands now or formerly of Rock & Edwards, L. 5274 - P. 0328;

THENCE following the bounds of the said lands, following the trend of a stone wall for the latter part of the course, South 58 degrees 21 minutes 16 seconds East a distance of 182.43 feet to a point in the stone wall;

THENCE further along the same South 56 degrees 24 minutes 31 seconds East a distance of 98.27 feet to an angle in the said stone wall;

THENCE continuing along and then leaving the said stone wall South 45 degrees 15 minutes 55 seconds East a distance of 49.08 feet to an iron pipe found at the northerly corner of lands now or formerly of Proudley, L. 7177 - P. 0001;

THENCE following the bounds of the said lands and the trend of a stone wall South 52 degrees 00 minutes 28 seconds West a distance of 186.97 feet to an iron pipe found at the northerly corner of lands now or formerly of Sherwood & Zapart, L. 6183 - P. 0041;

THENCE following the bounds of the said lands and continuing along the trend of a wide stone wall South 49 degrees 18 minutes 01 seconds West a distance of 159.80 feet to an iron pipe found in the stone wall at the northerly corner of lands now or formerly of New Horizons Resources INC, L. 4622 - P. 0217;

THENCE following the bounds of the said lands South 49 degrees 25 minutes 09 seconds West a distance of 216.38 feet to an iron pipe found in a stone wall intersection at the northerly corner of Lot 3 as shown on Filed Map No. 06-191;

THENCE following the bounds of the said lands South 66 degrees 54 minutes 07 seconds West a distance of 570.36 feet to a point in the approximate center of the old town road;

THENCE further along Lot 3 and approximate center line of said road South 22 degrees 05 minutes 36 seconds East a distance of 67.83 feet to a point in the approximate center of Ridgeview Road at the northwesterly corner of Lot 2 as shown on Filed Map No. 05-191;

THENCE following the approximate center line of the said road South 19 degrees 55 minutes 03 seconds East a distance of 161.13 feet to a point in the approximate center of Lower Cherrytown Road;

THENCE following the approximate center line of the said road for the following five courses:

1. North 55 degrees 56 minutes 40 seconds West a distance of 92.9? feet,
2. North 60 degrees 26 minutes 12 seconds West a distance of 79.12 feet,
3. North 63 degrees 11 minutes 12 seconds West a distance of 44.93 feet,
4. North 68 degrees 50 minutes 03 seconds West a distance of 63.13 feet and
5. North 75 degrees 29 minutes 18 seconds West a distance of 14.25 feet to a point in the approximate center of the said road;

THENCE leaving the road and following the bounds of lands now or formerly of the Mahmood Revocable Trust, L. 7129 - P. 0207, passing over an iron pipe found on line at 41.68 feet, South 66 degrees 59 minutes 55 seconds West a total distance of 876.52 feet to an iron rod found in a stone wall intersection at the northerly corner of lands now or formerly of Chindemi & Flynn, L. 6615 - P. 0239;

THENCE following the bounds of the said lands South 66 degrees 31 minutes 07 seconds West a distance of 190.06 feet to an iron rod found at the northerly corner of lands now or formerly of Chindemi, L. 4479 - P. 0152;

THENCE following the bounds of the said lands, passing over an iron rod found on line at 710.25 feet, South 66 degrees 31 minutes 07 seconds West a total distance of 756.78 feet to a point in the approximate center of the Mombaccus Creek;

THENCE following the center of the said creek for the following three courses:

1. North 04 degrees 34 minutes 36 seconds West a distance of 19.63 feet,
2. North 28 degrees 52 minutes 31 seconds East a distance of 129.05 feet and
3. North 18 degrees 23 minutes 08 seconds East a distance of 111.83 feet to a point in the center of the creek on the southerly bounds of lands now or formerly of 15 Railroad LLC, L. 7086 - P. 0047, being Lot 1 as shown on Filed Map #21-285B;

THENCE following the bounds of the said lands, passing over an iron rod found on line at 255.72 feet, North 49 degrees 46 minutes 38 seconds East a total distance of 274.89 feet to a point at the westerly corner of lands now or formerly of Faso, L. 2042 - P. 0319;

THENCE following the bounds of said lands for the following seven courses:

1. South 40 degrees 26 minutes 49 seconds East a distance of 74.92 feet to an iron pipe found,
2. North 49 degrees 46 minutes 15 seconds East a distance of 142.52 feet,
3. South 36 degrees 02 minutes 27 seconds East a distance of 94.35 feet,
4. South 78 degrees 19 minutes 40 seconds East a distance of 52.97 feet to an iron pipe found,
5. North 49 degrees 13 minutes 05 seconds East a distance of 122.26 feet to an iron pipe found,
6. North 29 degrees 16 minutes 37 seconds East a distance of 127.33 feet to an iron rod found and
7. North 01 degrees 29 minutes 43 seconds West a distance of 97.99 feet to a point in the approximate center of Lower Cherrytown Road;

THENCE following the approximate center line of said road for the following seven courses:

1. South 65 degrees 07 minutes 56 seconds West a distance of 36.34 feet,
2. South 88 degrees 07 minutes 05 seconds West a distance of 72.90 feet,
3. North 84 degrees 23 minutes 11 seconds West a distance of 70.59 feet,
4. North 75 degrees 48 minutes 08 seconds West a distance of 31.72 feet,
5. North 64 degrees 50 minutes 19 seconds West a distance of 36.01 feet,
6. along a curve to the right having a radius of 350.00 feet for an arc length of 195.38 feet with a chord bearing of North 48 degrees 50 minutes 48 seconds West, and a chord length of 192.85 feet and
7. North 32 degrees 51 minutes 09 seconds West a distance of 189.86 feet;

THENCE North 57 degrees 01 minutes 56 seconds East a distance of 25.00 feet to the point of beginning and containing approximately 83.68 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System, East Zone, NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

SUBJECT to all rights of the Town of Rochester, for highway purposes, to any lands adjacent to or lying in the beds of Ridgeview Road and Lower Cherrytown Road.

Excepting those portions of the subject premises used as streets.

BEING a portion of the premises conveyed by Suzanne B. Cusack as surviving spouse of James S. Cusack to Suzanne B. Cusack and Vincent F. Panettieri, as Co-Trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2016 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6502 of Deeds at page 0323.

The above description was prepared on August 15, 2023 by Medenbach & Eggers, Civil Engineering and Land Surveying, P.C., Stone Ridge, NY.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.1, Block 1, Lot 27.700, Ulster County and also known as Parcel 1; 5 Ridgeview Road, Rochester, NY 12446.

Parcel II:

ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being Lot 2 as shown on "Map of the Subdivision of Lands in Possession of Roderick & Cynthia Graham" dated November 13, 2005 and recorded in the Ulster County Clerk's Office on January 19, 2006 as Filed Map No. 06-191, and being more particularly bounded and described as follows:

BEGINNING at a point in the center of Lower Cherrytown Road at the northwesterly corner of lands now or formerly of Hapeman, L. 6485 - P. 0328, being shown as Lot #1 on the said filed map;

THENCE from the said point of beginning and following the approximate center line of the said road North 52 degrees 28 minutes 41 seconds West a distance of 167.08 feet to a point at the approximate intersection of Ridgeview Road and Lower Cherrytown Road;

THENCE following the approximate center line of Ridgeview Road North 19 degrees 55 minutes 03 seconds West a distance of 161.13 feet to a point at the southwesterly corner of Lot # 3 as shown on the said filed map;

THENCE following the bounds of Lot 3, passing over an iron rod found on line at 33.06 feet, North 65 degrees 20 minutes 59 seconds East a total distance of 128.35 feet to a point;

THENCE further along the same South 46 degrees 45 minutes 13 seconds East a distance of 245.61 feet to an iron rod found on the northerly bounds of said lands now or formerly of Hapeman and being Lot 1 as shown on the said filed map;

THENCE following the bounds of Lot 1, passing over an iron rod set on line at 145.96 feet, South 39 degrees 36 minutes 54 seconds West a total distance of 175.84 feet to the point of beginning and containing approximately 1.10 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System, East Zone, NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

SUBJECT to all rights of the Town of Rochester, for highway purposes, to any lands adjacent to or lying in the SUBJECT to all rights of the Town of Rochester, for beds of Ridgeview Road and Lower Cherrytown Road.

BEING a portion of the premises conveyed by Suzanne Cusack to Suzanne B. Cusack and Vincent F. Panettieri as co-trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2019 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6502 of Deeds at page 0338.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.3, Block 1, Lot 16.200, Ulster County and also known as Parcel II: N/A Cherrytown Road, Rochester, NY 12446.

Parcel III:

ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being Lot 3 as shown on "Map of the Subdivision of Lands in Possession of Roderick & Cynthia Graham" dated November 13, 2005 and recorded in the Ulster County Clerk's Office on January 19, 2006 as Filed Map No. 06-191, and being more particularly bounded and described as follows:

BEGINNING at a point in the center of Ridgeview Road at the northwesterly corner of Lot 2 as shown on the said filed map;

THENCE from the point of beginning and following the approximate center line of the said road North 22 degrees 05 minutes 36 seconds West a distance of 67.83 feet to a point on the southeasterly bounds of lands now or formerly of Cusack, L. 1455-P. 0127;

THENCE following the bounds of the said lands, along the trend of a stone wall for the latter part of the course North 66 degrees 54 minutes 07 seconds East a distance of 570.36 feet to an iron pipe found in a stone wall intersection at the northerly corner of lands now or formerly of Kostirkin, L. 6391 - P. 0175;

THENCE following the bounds of the said lands and the trend of the stone wall South 05 degrees 02 minutes 47 seconds East a distance of 129.65 feet to an iron pipe found at the northerly corner of lands now or formerly of Samuels, L. 5813-P. 0151;

THENCE leaving the trend of the wall and following the bounds of the said lands South 20 degrees 46 minutes 46 seconds East a distance of 95.59 feet to an iron rod found at the northerly corner of Lot #2 as shown on the said filed map;

THENCE following the bounds of Lot 2 South 53 degrees 41 minutes 55 seconds West a distance of 308.82 feet to an iron rod found at the easterly corner of Lot #2 as shown on the said filed map;

THENCE following the bounds of Lot 2 North 46 degrees 45 minutes 13 seconds West a distance of 245.61 feet to a point;

THENCE further along the same, passing over an iron rod found on line at 95.29 feet, South 65 degrees 20 minutes 59 seconds West a total distance of 128.35 feet to the point of beginning and containing approximately 2.42 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System East Zone NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

SUBJECT to all rights of the Town of Rochester for highway purposes, to any lands adjacent to or lying in the bed of Ridgeview Road.

BEING a portion of the premises conveyed by Suzanne Cusack to Suzanne B. Cusack and Vincent F. Panettieri as co-trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2019 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6502 of Deeds at page 0338.

The above descriptions were prepared on August 15, 2023 by Medenbach & Eggers, Civil Engineering and Land Surveying, P.C., Stone Ridge, NY.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.3, Block 1, Lot 16.300, Ulster County and also known as Parcel ID: N/A Cherrytown Road, Rochester, NY 12446.

# EXHIBIT "B"

**PROMISSORY NOTE**

$3,200,000.00 November 20, 2023

For value received, **The Ridgeview Realtor LLC**, a New York limited liability company, having an address at 23 Heyward St #1B, Brooklyn, NY 11249 ("**Borrower**"), promises to pay to the order of Ridgeview Lender LLC, a New York limited liability company, having an address at 4121 Avenue T, Brooklyn New York 11234 (together with its successors and assigns, "**Lender**"), or at such place as the holder hereof may from time to time designate in writing, the stated principal sum of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) (the "**Principal Sum**"), in lawful money of the United States of America, together with interest thereon, in like money, to be computed from the date of this Promissory Note (this "**Note**") at the rate per annum and on the terms hereinafter set forth. All sums hereunder are payable to Lender at the address set forth above or such other location as Lender shall designate. The term "**Debt**" shall refer to the then outstanding Principal Sum, together with all accrued and unpaid interest thereon and any other amounts due to Lender under any of the Loan Documents. The term "**Mortgage**" shall refer to that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof, executed and delivered by Borrower to Lender to secure the repayment of the Debt, as the same may be amended from time to time. The term "**Guaranty**" shall refer to that certain Payment Guaranty, dated as of the date hereof, executed and delivered each of David Braun and Moshe Zev Doppelt (collectively, "**Guarantor**"), to Lender, as the same may be amended from time to time. The term "**Environmental Indemnity**" shall refer to that certain Environmental Indemnity Agreement, dated as of the date hereof, executed and delivered by Guarantor to Lender, as the same may be amended from time to time. The term "**Loan Documents**" shall refer to this Note, the Mortgage, the Guaranty, the Environmental Indemnity and all other documents or instruments heretofore or hereafter executed and/or delivered to Lender for purposes of evidencing, securing, or perfecting the indebtedness evidenced by this Note.

This Note is secured by Borrower's fee interest in the premises known as 5 Ridgeview Road, Kerhonkson, New York and certain other premises, in each case,, as further described in the Mortgage.

1. **Interest Rate.** Until the Debt shall be repaid in full and so long as no Event of Default shall have occurred (in which case Default Interest shall be due in accordance with Section 5), the Principal Sum shall bear interest at the rate of eighteen percent (18%) per annum. Interest shall be calculated on the basis of a 360-day year and actual days elapsed for any partial months or periods. Whenever any interest payment to be made hereunder shall be stated to be due on a day that is not a Business Day (as defined below), the payment shall be made on the next succeeding Business Day. Said interest shall be payable hereunder as follows: (i) on the date hereof, the interest due for the period from the date hereof through November 30, 2023 shall be paid and (ii) on or before the first calendar day of each month thereafter (beginning with January 1, 2023), the accrued and unpaid interest for the prior calendar month shall be paid. Interest shall be calculated on the basis of a 360-day year and actual days elapsed for any partial months or periods. Whenever any interest payment to be made hereunder shall be stated to be due on a day that is not a Business Day (as defined below), the payment shall be made on the preceding Business Day.

2. **Term.** The entire amount of the Debt shall be due and payable on August 20, 2024 (the "**Initial Maturity Date**"' and such date, or such earlier date as the Debt shall become due and payable by acceleration or otherwise or, should Borrower exercise its one-time extension right in accordance with the

Case 1-26-43491-ess Doc 19-2 Filed 09/02/26 Entered 09/02/26 14:01:53

terms hereof, the Extended Maturity Date (as defined herein), hereby referred to as the "**Maturity Date**"). Borrower shall have a one-time right to extend the Maturity Date for six (6) additional months until February 20, 2025 (the "**Extended Maturity Date**"), upon delivery of written notice to Lender prior to the Initial Maturity Date and the simultaneous payment to Lender of a non-refundable fee equal to two percent (2%) of the Principal Sum (which shall not be deemed a repayment of the Debt).

3. **Manner of Payment**. All payments by Borrower hereunder shall be, whether at the Maturity Date or otherwise, paid in immediately available funds and by wire transfer to an account designated by Lender. All amounts payable under this Note are payable in lawful money of the United States during normal business hours on a Business Day. The term "**Business Day**" is defined to mean any day other than a Saturday, Sunday or other day on which banking institutions are authorized or obligated to close in New York City. Borrower shall receive credit for payments transferred to the account of Lender on the day of such transfer if such funds are received by Lender by 3:00 p.m. (New York time) on such day. In the absence of timely receipt, such funds shall be deemed to have been paid by Borrower on the next succeeding Business Day. Any amounts paid to Lender hereunder shall be applied (x) first, to any costs and expenses which Lender is entitled to receive hereunder or under the Mortgage, (y) second, to accrued and unpaid interest and (z) third, to the then outstanding Principal Sum. Notwithstanding the foregoing, at such times that an Event of Default has occurred, amounts paid to Lender hereunder shall be applied to the Debt in such priority as Lender determines in its sole discretion.

4. **Event of Default, Acceleration**. Upon and at any time following the occurrence of any Event of Default, at the option of Lender and without notice, the entire Debt shall at once become due and payable, and the Lender may exercise any and all of its rights and remedies hereunder, under the Mortgage or available at law or equity. The Lender may so accelerate such obligations and exercise such remedies at any time after the occurrence of any Event of Default, regardless of any prior forbearance.

Each of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"): (a) if any regular monthly payment of interest is not paid by Borrower within three (3) days of the date the same shall be due hereunder or if any other portion of the Debt (including the balance of the Debt upon maturity) is not paid by Borrower when the same shall be due hereunder;

(b) if any representation or warranty made in this Note, the Mortgage or any other Loan Documents, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false in any material respect as of the date the representation or warranty was made;

(c) if Borrower transfers or permits a transfer or otherwise encumbers any portion of the Property without Mortgagee's prior consent in violation of Article 6 of the Mortgage;

(d) the occurrence of any breach of any other covenant or agreement contained in this Note or any other Loan Document (except those specified in this Section 4, which shall be subject to the terms thereof), which is not cured within five (5) days after receipt of written notice of such default (except that no such notice or cure period shall apply if Lender reasonably believes for that such failure could result in a material impairment of the rights of Lender under this Note, the Mortgage or the other Loan Documents or if such failure is not reasonably susceptible to being cured during such five (5) day period);

(e) if a receiver, liquidator or trustee shall be appointed for Borrower or Guarantor, or if Borrower or Guarantor shall be adjudicated to be bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted;

(f) the failure of Guarantor to pay any sums due under the Guaranty or the Environmental Indemnity; or

(g) if there shall be the entry of a judgment against Borrower or a Guarantor in excess of $20,000.00 and the same is not paid in full or released within thirty (30) days.

5. **Late Fee; Default Rate**. (a) In the event any payment herein provided for shall become overdue for a period in excess of three (3) days or, if any check given by Borrower shall be dishonored, a late charge of five-hundredths of one dollar ($0.05) for each dollar so overdue shall become immediately due to Lender as liquidated damages for failure to make prompt payment. Said late charges shall be computed from the due date (after applicable grace periods, if any) to the date of payment and shall be payable with the next installment of principal and/or interest. Payment and/or acceptance of any late charges shall not constitute a waiver of any default.

(b) If an Event of Default shall have occurred, then notwithstanding anything to the contrary contained herein, from and after the date of such Event of Default, interest on the then outstanding Principal Sum shall instead accrue at the Default Rate. The "**Default Rate**" is a rate of interest equal to twenty-eight percent (28%) per annum.

6. **Prepayment**. The Debt shall not be prepayable until March 20, 2024 (the "**Lockout Date**"). From and after the Lockout Date, the Debt may be prepaid by Borrower on any Business Day without premium or penalty. All prepayment shall be applied first to any other amounts owed to Lender under any of the Loan Documents aside from interest and principal, then to accrued and unpaid interest due hereunder and then to the then outstanding Principal Sum. **Borrower acknowledges and agrees that the foregoing provisions of this Section 6 are a material inducement for Lender's agreement to make the loan in accordance with the terms hereof.**

7. **Interest Reserve.** On date hereof, Borrower shall deposit with Lender an amount equal to two months of interest payments (the "**Interest Reserve Funds**"). The Interest Reserve Funds may be held by Lender in an institution as selected by Lender (which may be non-interest bearing) and may be commingled with other funds of Lender. The Interest Reserve Funds shall be held by Lender for the entire term of the loan as additional collateral for the repayment of the Debt. Lender shall be authorized (but not obligated) to disburse to itself Interest Reserve Funds to satisfy any amounts then due and owing by Borrower to Lender pursuant to the Loan Documents. The existence of the Interest Reserve Funds shall not act to waive or excuse Borrower's obligation to pay amounts due to Lender under the Loan Documents. Any default arising from the failure of Borrower to pay amounts due to Lender shall not be cured or deemed cured due to the existence of any Interest Reserve Funds.

8. **Origination Fee**. On the date hereof, Borrower shall pay Lender a non-refundable origination fee of two percent (2%) of the Principal Sum. Such fee shall be deemed fully earned by Lender on the date hereof and shall not be refundable to Borrower or otherwise credited or applied to any amounts due and owing from Borrower to Lender under the Loan Documents.

9. **No Waiver**. No waiver by Lender of any of its rights or remedies hereunder or under the Mortgage or otherwise shall be considered a waiver of any other subsequent right or remedy of Lender; no delay or omission in the exercise or enforcement by Lender of any right or remedy shall ever be construed as a waiver of any right or remedy of Lender; and no exercise or enforcement of any such right or remedy shall ever be deemed to exhaust any right or remedy of Lender.

10. **Limitation on Interest.** It is the intention of Borrower and Lender to conform strictly to the usury laws in force that are applicable to this Note. Accordingly, all agreement between Borrower and Lender, whether now existing or hereafter arising, and whether written or oral, are hereby limited so that in no contingency, whether by reason of acceleration of the maturity of this Note or otherwise, shall the interest (and all other sums that are deemed to be interest) contracted for, charged or received by Lender exceed the maximum amount permitted by applicable law. If, from any circumstances whatsoever, interest would otherwise be payable to Lender in excess of the maximum amount permitted by applicable law, the interest payable to Lender shall be reduced to the maximum amount permitted by applicable law;

and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed interest by applicable law in excess of the maximum amount permitted by applicable law, the receipt of Lender of such excess interest shall be deemed a mistake and the same shall, at the option of Borrower, but so long as no Event of Default shall be continuing, either be refunded to Borrower or credited on the unpaid principal balance hereof; provided, however, that if an Event of Default shall have occurred and be continuing, and Lender shall receive excess interest during such period, Lender shall have the option, if permitted by applicable law, of either crediting such excess amount to the then outstanding Principal Sum, or refunding such excess to Borrower. If this Note is prepaid, unearned interest, if any, shall be canceled and, if theretofore paid, shall either be refunded to Borrower or credited on the balance hereof, as Lender shall elect, if permitted by applicable law. All interest paid or agreed to be paid to Lender shall, the extent allowed by applicable law, be amortized, prorated, allocated and spread throughout the full period until payment in full of the then outstanding Principal Sum (including the period of any extension) so that the interest for such full period shall not exceed the maximum amount permitted by applicable law.

11. **Notice and Waiver of Presentment.** Borrower hereby waives presentment, demand, protest and notice of any kind, all of which are hereby expressly waived. No waiver or forbearance on the part of Lender to exercise any right hereunder shall operate as a waiver of that right.

12. **Attorneys' Fees, Costs Of Collection**. Borrower shall pay to Lender on demand all out-of-pocket costs and expenses, including attorneys' fees, court costs and disbursements, incurred by Lender in collecting the indebtedness arising hereunder or under the Mortgage or secured thereby, or as a consequence of any breach or default by Borrower hereunder, or otherwise as a consequence of any right evidenced or secured by this Note or the Mortgage.

13. **Applicable Law; Consent To Jurisdiction, Waiver of Jury Trial**. This Note shall be governed and construed in accordance with the laws of the State of New York without giving effect to conflict of laws principles thereof. All judicial actions, suits or proceedings brought against Borrower and its respective property with respect to obligations, liabilities or any other matter under or arising out of or in connection with this Note or the Mortgage, or for recognition or enforcement of any judgment rendered in any such proceedings, shall be brought in any trial or appellate state or federal court of competent jurisdiction in the City of New York, Borough of Kings. Borrower accepts, generally and unconditionally, the exclusive jurisdiction of such courts and irrevocably waives, and agrees not to plead or claim, any objection that it may ever have to the venue of any such action or proceeding in any such court. Borrower irrevocably agrees that all process in any proceeding or any court arising out of or in connection with this Note or the Mortgage may be effected by mailing to Borrower a copy by registered or certified mail, return receipt requested, or any substantially similar form of mail, postage and fees fully prepaid, to Borrower at its address as set forth in the first paragraph hereof. Such service shall be effective upon receipt thereof, as evidenced by the return receipt. Such service shall be valid and binding service in every respect. Borrower shall not assert that such service did not constitute valid and binding service within the meaning of any applicable state or federal law, rule, regulation or the like. Nothing in this Note or the Mortgage shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction. Borrower, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, relinquishes and forever forgoes the right to a trial by jury in any action or proceeding based upon, arising out of, or in any way relating to this agreement or any conduct, act or omission of Lender, or any of its directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with Lender, in each of the foregoing cases, whether sounding in contract, tort or otherwise.

14. **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder or under the Mortgage shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address

set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties at the addresses hereinabove set forth or such other address designated by Borrower or Lender by 10 days prior notice.

15. **Time of the Essence**. Time shall be of the essence with respect to each of the obligations of Borrower contained herein.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

**THE RIDGEVIEW REALTOR LLC**

By: ____________________
Name: David Brown
Title: Managing Member

**ACKNOWLEDGMENT**

STATE OF NEW YORK )
) ss.:
COUNTY OF Kings )

On this, the 15 day of Nov, 2023, before me, the undersigned, personally appeared David Brown, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity as an authorized signatory of The Ridgeview Realtor LLC and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

____________________

(signature and office of individual taking acknowledgment)

MOSHE GOLDBERGER
NOTARY PUBLIC, State of New York
No. 01-GP6337740
Qualified in Queens Count
Certificate Filed in Kings County
Commission Expires 02/22/2024

# EXHIBIT "C"

ULSTER COUNTY – STATE OF NEW YORK
NINA POSTUPACK, COUNTY CLERK
244 FAIR STREET, KINGSTON, NEW YORK 12401

COUNTY CLERK'S RECORDING PAGE
***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***

BOOK/PAGE: 13205 / 305
INSTRUMENT #: 2023-13452

Receipt#: 2023032983
Clerk: SM
Rec Date: 11/27/2023 11:12:52 AM
Doc Grp: M
Descrip: MORTGAGE
Num Pgs: 28
Rec'd Frm: BETTER RESEARCH LLC NY

Party1: RIDGEVIEW REALTOR LLC
Party2: RIDGEVIEW LENDER LLC
Town: ROCHESTER

Recording:

| | |
|---|---|
| Cover Page | 5.00 |
| Recording Fee | 155.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Sub Total: | 180.00 |
| Mortgage Tax | |
| Basic | 16000.00 |
| Additional | 0.00 |
| Special Additional | 8000.00 |
| Local | 0.00 |
| Sub Total: | 24000.00 |
| Total: | 24180.00 |

**** NOTICE: THIS IS NOT A BILL ****

***** Mortgage Tax *****
Serial #: DO-2568
Residential Commercial
Mtg Amt: 3200000.00

| | |
|---|---|
| Basic | 16000.00 |
| Special Additional | 8000.00 |
| Total: | 24000.00 |

WARNING***
*** Information may be amended during the verification process, and may not be reflected on this cover page.

THIS PAGE CONSTITUTES THE CLERK'S ENDORSEMENT, REQUIRED BY SECTION 316-a (5) & 319 OF THE REAL PROPERTY LAW OF THE STATE OF NEW YORK.

Record and Return To:

ELECTRONICALLY RECORDED BY SIMPLIFILE

Nina Postupack
Nina Postupack
Ulster County Clerk

**The Ridgeview Realtor LLC,**
a New York limited liability company, as mortgagor

(Mortgagor)

to

**Ridgeview Lender LLC**
a New York limited liability company, as mortgagee

(Mortgagee)

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Dated: As of November 20, 2023

| | |
|---|---|
| County: | Ulster |
| Section: | 68.3 |
| Block: | 1 |
| Lots: | 27.700 |

| | |
|---|---|
| County: | Ulster |
| Section: | 68.3 |
| Block: | 1 |
| Lots: | 16.200 |

| | |
|---|---|
| County: | Ulster |
| Section: | 68.3 |
| Block: | 1 |
| Lots: | 16.300 |

PREPARED BY AND UPON
RECORDATION RETURN TO:

Szenberg & Okun PLLC
499 Chestnut Street, Suite 106
Cedarhurst, New York 11516
Attention: Daniel J. Muller, Esq.

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "**Mortgage**") is made as of November 20, 2023, by **The RIDGEVIEW REALTOR LLC**, a New York limited liability company, having an address at 23 Heyward St #1B, Brooklyn, NY 11249 ("**Mortgagor**"), to **RIDGEVIEW LENDER LLC**, a New York limited liability company, (together with his successors and assigns, "**Mortgagee**"), having an address at 4121 Avenue T, Brooklyn, NY 11234.

W I T N E S S E T H:

**WHEREAS**, Mortgagor is the owner of the Land (as hereinafter defined) located in the County of Ulster, State of New York, as more particularly described on **Exhibit A** attached hereto and made a part hereof;

**WHEREAS**, this Mortgage is given to secure a loan (the "**Loan**") in the principal sum of THREE MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($3,200,000.00), evidenced by that certain Promissory Note, dated as of the date hereof (such promissory note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter collectively referred to as the "**Note**"; all capitalized terms used herein and not defined shall have the meanings assigned to such terms in the Note), made by Mortgagor to Mortgagee; and

**WHEREAS**, Mortgagor desires to secure the payment of the principal amount of the Loan, together with all interest accrued and unpaid thereon and all other sums due to Mortgagee in respect of the Loan under the Note, this Mortgage and all other documents or instruments heretofore or hereafter executed and/or delivered to Mortgagee by Mortgagor or any guarantor (the "**Loan Documents**") for purposes of evidencing, securing, or perfecting the indebtedness evidenced by the Note (such amount, collectively, the "**Debt**"), and the performance of all of Mortgagor's obligations under the Note, this Mortgage and all other Loan Documents.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated into the operative provisions of this Mortgage by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, Mortgagor hereby agrees as follows.

## ARTICLE 1

## GRANTS OF SECURITY

Section 1.1 Property Mortgaged. Mortgagor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Mortgagee the following property, rights, interests and estates to the extent now owned or hereafter acquired by Mortgagor (collectively, the "**Property**"):

(a) Land. The real property described in **Exhibit A** attached hereto and made a part hereof (collectively, the "**Land**");

(b) Additional Land. All additional lands, estates and development rights now or hereafter acquired by Mortgagor for use in connection with the Land and the development of the Land and all additional lands and estates therein;

(c) Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d) Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e) Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Mortgagor, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Mortgagor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**");

(f) Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which Tenants are entitled to remove pursuant to leases except to the extent that Mortgagor shall have any right or interest therein;

(g) Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code), other than Fixtures, which are

now or hereafter owned by Mortgagor and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Mortgagor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state in which the Property is located (as amended and in effect from time to time, the "**Uniform Commercial Code**"), superior in lien to the lien of this Mortgage, and all proceeds and products of any of the above;

(h) Leases and Rents. All leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") (collectively, the "**Leases**") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the Tenants of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt; provided, however, that so long as no Event of Default (hereinafter defined) has occurred, Mortgagor shall have a license (which license shall terminate automatically and without further notice upon the occurrence of an Event of Default) to collect the Rents under the Leases and, where applicable, subleases, such Rents to be held in trust for Mortgagee, and to otherwise deal with all Leases;

(i) Condemnation Awards. Mortgagor's right, title and interest in and to all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j) Insurance Proceeds. Mortgagor's right, title and interest in and to all proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(k) Tax Certiorari. Mortgagor's right, title and interest in and to all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(l) Rights. The right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Mortgagee in the Property;

(m) Agreements. Mortgagor's right, title and interest in and to all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(n) Uniform Commercial Code Property. All documents, instruments, chattel paper and intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and general intangibles relating to the Property;

(o) Minerals. All minerals, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above Land;

(p) Proceeds. All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise; and

(q) Other Rights. Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (p) above.

AND without limiting any of the other provisions of this Mortgage, to the extent permitted by applicable law, Mortgagor expressly grants to Mortgagee, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Mortgage be deemed conclusively to be real estate and mortgaged hereby.

Section 1.2 Assignment of Rents; Tenant Authorization. Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to all Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, prior to an Event of Default or upon waiver thereof by Mortgagee, Mortgagee grants to Mortgagor a revocable license, revocable at any time during the continuance of an Event of Default upon receipt by Mortgagor of written notice thereof from Mortgagee, to collect, receive, use and enjoy the Rents and act under and with respect to the Leases, in accordance with the Loan Documents, and Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums. Mortgagor hereby irrevocably authorizes and directs the tenants under all Leases to pay all amounts owing to Mortgagor thereunder to Mortgagee following receipt of any written notice from Mortgagee that states that an Event of Default remains uncured and that all such amounts are to be paid to Mortgagee. Mortgagor further authorizes and directs all such tenants to pay all such amounts to Mortgagee without any right or obligation to inquire as to the validity of Mortgagee's notice and regardless of the fact that Mortgagor has notified any such tenants that Mortgagee's notice is invalid or has directed any such tenants not to pay such amounts to Mortgagee.

Section 1.3 Security Agreement. This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Property. By executing and delivering this Mortgage, Mortgagor hereby grants to Mortgagee, as security for the Obligations (as hereinafter defined), a security interest in the Fixtures, the Equipment, the Personal Property and the other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**"). If an Event of Default shall occur and be continuing, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession

of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee after the occurrence and during the continuance of an Event of Default, Mortgagor shall, at its expense, assemble the Collateral and make it available to Mortgagee at a convenient place (at the Land if tangible property) reasonably acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all out-of-pocket expenses, including reasonable attorneys' fees and costs, incurred or paid by Mortgagee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default but excluding any special, punitive or consequential damages. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper. Mortgagor's (debtor's) principal place of business is as set forth on the first page hereof and the address of Mortgagee (secured party) is as set forth on the first page hereof.

Section 1.4 Fixture Filing. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Mortgage, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement (naming Mortgagor as the Debtor and Mortgagee as the Secured Party) filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt in full, these presents and the estate hereby granted shall cease, terminate and be void.

## ARTICLE 2

## DEBT AND OBLIGATIONS SECURED

Section 2.1 Debt. This Mortgage and the grants, assignments and transfers made in Article 1 hereof are given for the purpose of securing the Debt.

Section 2.2 Other Obligations. This Mortgage and the grants, assignments and transfers made in Article 1 hereof are also given for the purpose of securing the following (the "**Other Obligations**"):

(a) the performance of all other obligations of Mortgagor contained herein;

(b) the performance of each obligation of Mortgagor contained in the Note; and

(c) the performance of each obligation of Mortgagor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note.

Section 2.3 Debt and Other Obligations. Mortgagor's obligations for the payment of the Debt and the performance of the Other Obligations may be referred to collectively herein as the "**Obligations**."

## ARTICLE 3

## MORTGAGOR COVENANTS

Mortgagor covenants and agrees that:

Section 3.1 Payment of Debt. Mortgagor will pay the Debt at the time and in the manner provided in the Note.

Section 3.2 Mortgage and/or Intangible Tax. Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Mortgagee from and against any and all losses and liabilities imposed upon or incurred by or asserted against Mortgagee and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Mortgage or the Note, but excluding any income, withholding, backup withholding, branch profits, franchise or other similar taxes or fees in lieu of such taxes.

Section 3.3 Maintenance of Property. Mortgagor (a) shall not commit waste or permit impairment or deterioration of the Property, (b) shall not abandon the Property, (c) shall restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (d) shall keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in good repair, (e) shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property, and (f) shall give notice in writing to Mortgagee of and, unless otherwise directed in writing by Mortgagee, appear in and defend any action or proceeding purporting to affect the Property, the security of this Mortgage or the rights or powers of Mortgagee. Neither Mortgagor nor any tenant or other person shall remove, demolish or alter any improvement now existing or hereafter erected on the Property or any fixture, equipment, machinery or appliance in or on the Property except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind.

Section 3.4 Taxes, Assessments and Charges. Mortgagor shall when due pay all taxes, assessments, sewer rents or water rates, and all charges for labor or material in connection with any work performed in, on or relating to the Property. Mortgagor shall promptly discharge any lien filed against the Property.

Section 3.5 Insurance. Mortgagor shall keep the Property (together with the Improvements now existing or hereafter erected on the Property) insured by carriers at all times satisfactory to Mortgagee, against loss by fire, hazards included within the term "extended coverage", rent loss and such other hazards, casualties, liabilities and contingencies as Mortgagee shall require and in such amounts and for such periods as Mortgagee shall require, including, during any period of construction at the Property, builder's risk insurance in amounts satisfactory to Mortgagee. The policies evidencing such insurance shall be duly endorsed in favor of Mortgagee with such loss payable rider and additional insured rider as Mortgagee may designate and such policies shall be delivered to Mortgagee and shall provide for at least thirty (30) days prior written notice to Mortgagee of the exercise of any right of cancellation or reduction of coverage and right to cure monetary defaults.

Should Mortgagor fail to furnish Mortgagee with such insurance, Mortgagee shall have the right to effect same and charge the cost thereof to Mortgagor, together with interest thereon at the Default Rate (as defined in the Note). Such cost, including interest, shall be additional obligations hereunder and secured by this Mortgage. Mortgagor shall provide Mortgagee with insurance certificates naming Mortgagee as loss payee with respect to property insurance and as additional insured with respect to liability insurance. Mortgagor hereby appoints Mortgagee as Mortgagor's attorney-in-fact to adjust all insurance claims and endorse all checks and drafts in settlement thereof.

Section 3.6 Control of Proceeds. Mortgagee shall have the right to control or direct the proceeds of all policies of insurance on the Property, whether or not required by the terms of this Mortgage, as provided in Section 3.7 below, and all proceeds of all such policies are hereby assigned to Mortgagee as security for the obligations secured by this Mortgage. Mortgagor shall be responsible for all uninsured losses and deductibles.

Section 3.7 Damage and Destruction.

(a) In the event of any damage to or loss or destruction of the Property (a "**Casualty**"): (i) if it could reasonably be expected to cost more than $25,000 to repair the Casualty, Mortgagor shall give prompt written notice of the Casualty to Mortgagee and to Mortgagor's insurer, and shall make a claim under each insurance policy providing coverage therefor; (ii) Mortgagor shall take such actions as are necessary or appropriate to preserve and protect the Property; (iii) if the aggregate proceeds of any and all insurance policies insuring the Property, whether or not required by this Mortgage, that are payable as a result of the Casualty (collectively, the "**Insurance Proceeds**") could reasonably be expected to exceed $25,000, or if a Default exists, Mortgagor shall take such actions as are necessary or appropriate to ensure that all Insurance Proceeds are paid to Mortgagee forthwith to be held by Mortgagee until applied to the obligations secured hereby or disbursed in accordance with this Section 3.7; and (iv) unless otherwise instructed by Mortgagee, regardless of whether the Insurance Proceeds, if any, are sufficient for the purpose, Mortgagor shall promptly commence and diligently pursue to completion in a good, workmanlike and lien-free manner the restoration, replacement and rebuilding of the Property as nearly as possible to its value, condition and character immediately prior to the Casualty (collectively, the "**Restoration**"). If the Restoration will cost more than $25,000 to repair, Mortgagor shall submit the proposed plans and specifications for the Restoration, and all construction contracts, architect's contracts, other contracts in connection with the Restoration, and such other documents as Mortgagee may reasonably request to Mortgagee for its review and approval. Mortgagor shall not begin the Restoration unless and until Mortgagee gives its written approval of such plans, specifications, contracts and other documents, with such revisions as Mortgagee may reasonably require. Notwithstanding the foregoing, Mortgagee shall not be responsible for the sufficiency, completeness, quality or legality of any such plans, specifications, contracts or other documents. Mortgagor shall pay, within ten days after demand by Mortgagee, all costs reasonably incurred by Mortgagee in connection with the adjustment, collection and disbursement of Insurance Proceeds pursuant to this Mortgage or otherwise in connection with the Casualty or the Restoration.

(b) Mortgagee shall have the right and power to receive and control all Insurance Proceeds required to be paid to it pursuant to subsection (a)(iii) above. Mortgagor hereby authorizes and empowers Mortgagee, in its own name or as attorney-in-fact for Mortgagor (which power is coupled with an interest and is irrevocable so long as this Security Interest remains of record), to make proof of loss, to settle, adjust and compromise any claim under insurance policies on the Property, to appear in and prosecute any action arising from such insurance policies, to collect and receive Insurance Proceeds, and to deduct therefrom Mortgagee's expenses incurred in the adjustment, collection and disbursement of such Insurance Proceeds or otherwise in connection with the Casualty or the Restoration. Each insurance company concerned is hereby irrevocably authorized and directed to make payment of all Insurance Proceeds directly to Mortgagee. Notwithstanding anything to the contrary, Mortgagee shall not be

responsible for any such insurance, the collection of any Insurance Proceeds, or the insolvency of any insurer.

(c) If, at any time while Mortgagee holds any Insurance Proceeds, an Event of Default exists or Mortgagee determines in its reasonable discretion that the security for the obligations secured hereby is impaired, Mortgagee shall have the option, in its sole discretion, to apply the Insurance Proceeds to the obligations secured hereby in such order as Mortgagee may determine (or to hold such proceeds for future application to those obligations). Without limiting the generality of the foregoing, Mortgagee's security will be deemed to be impaired if: (i) an Event of Default exists; (ii) Mortgagor fails to satisfy any condition precedent to disbursement of Insurance Proceeds to pay the cost of the Restoration within a reasonable time; or (iii) Mortgagee determines in its reasonable discretion that it could reasonably be expected that (A) Mortgagor will not have sufficient funds to complete the Restoration and timely pay all expenses of the Property and all payments due under the Note and the other Loan Documents through the completion of the Restoration and any leaseup period thereafter, (B) the rental income from the Property will be insufficient to timely pay all expenses of the Property and payments due under the Note and the other Loan Documents on an ongoing basis after completion of the Restoration, or (C) the Restoration cannot be completed at least three months prior to the maturity date of the Note.

(d) If Mortgagee is not entitled to apply the Insurance Proceeds to the obligations secured hereby, Mortgagee (or at Mortgagee's election, a disbursing or escrow agent selected by Mortgagee and whose fees shall be paid by Mortgagor) shall disburse the Insurance Proceeds for the Restoration from time to time as the Restoration progresses, but only after satisfaction, at Mortgagor's expense, of such conditions precedent to such disbursements as Mortgagee may reasonably require.

(e) Any reduction in the obligations secured hereby resulting from the application of Insurance Proceeds or other funds pursuant to this <u>Section 3.7</u> shall be deemed to take effect only on the date of such application; provided that, if any Insurance Proceeds are received after the Property is sold in connection with a judicial or nonjudicial foreclosure of this Mortgage, or is transferred by deed in lieu of such foreclosure, notwithstanding any limitation on Mortgagor's liability contained herein or in the Note, the purchaser at such sale (or the grantee under such deed) shall have the right to receive and retain all such Insurance Proceeds and all unearned premiums for all insurance on the Property. No application of Insurance Proceeds or other funds to the obligations secured hereby shall result in any adjustment in the amount or due dates of installments due under the Note. No application of Insurance Proceeds to the obligations secured hereby shall, by itself, cure or waive any Default or any notice of default under this Mortgage or invalidate any act done pursuant to such notice or result in the waiver of any collateral securing the Note.

Section 3.8 <u>Estoppel</u>. Mortgagor shall within ten (10) days of a written request from Mortgagee furnish Mortgagee with a written statement, duly acknowledged, setting forth the sums secured by this Mortgage and any right of set-off, counterclaim or other defense which exists against such sums and the obligations of this Mortgage and attaching true, correct and complete copies of this Mortgage and any and all modifications, amendments and substitutions thereof.

Section 3.9 <u>Leases</u>. Mortgagor shall fulfill and perform all of Mortgagor's obligations as landlord or lessor under any lease; promptly send Mortgagee copies of any notices of default received from the tenant under any lease; and enforce (short of terminating such lease) the performance by the tenant of the tenant's obligations under any lease; not make, enter into, execute, cancel, materially amend or modify any lease without the prior written consent of Mortgagee; not approve any assignment of a lease, of any sublease, without the prior written consent of Mortgagee; not cancel or modify any guaranty of a lease, or release any security deposit or letter of credit constituting security

under a lease, without the prior written consent of Mortgagee; and not accept prepayment of any installment of rent from any tenants of the Property for a period of more than one (1) month in advance.

Section 3.10 Alterations. Mortgagor shall not undertake or commence any material alterations of any improvements on the Property, without the prior written consent of Mortgagee.

Section 3.11 Drilling. Mortgagor shall not permit any drilling or exploration for or extraction, removal or production of any mineral, natural element, compound or substance from the surface or subsurface of the Property regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.12 Fees and Expenses. Mortgagor shall pay on demand all out-of-pocket costs, fees and expenses and other expenditures, including, but not limited to, attorneys' fees and expenses, paid or incurred by Mortgagee incident to this Mortgage or the Note (including the payment by Mortgage of any taxes, assessments, sewer rents, water rates, charges for labor or material in connection with any work performed in, on or relating to the Property or any other amounts which constitute, or may constitute, a lien on the Property).or incident to the enforcement of the obligations secured hereby or the exercise of any right or remedy of Mortgagee hereunder or under the Note.

Section 3.13 Financial Information. Within ninety (90) days after the end of each fiscal year of Mortgagor, Mortgagor shall furnish to Mortgagee the following in such form as Mortgagee may require: (a) an itemized statement of income and expenses for Mortgagor's operation of the Property for that fiscal year; and (b) a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, all security deposits held (and the institution in which they are held) and any related information requested by Mortgagee. In addition, within ten (10) days after written request by Mortgagee, Mortgagor shall furnish to Mortgagee such financial statements and other financial, operating and ownership information about the Property, Mortgagor and Guarantor, as Mortgagee may reasonably request.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

Section 4.1 Due Organization, Authorization, No Conflicts, Enforceability. Mortgagor hereby represents and warrants that: (i) Mortgagor is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of New York and has the full right, power and authority to enter into this Mortgage and the Note, and to perform all of its obligations hereunder and under the Note, (ii) its execution, delivery and performance of its obligations under this Mortgage and the Note do not violate or conflict with any applicable laws, and do not violate or conflict with, breach, or constitute a default under, or require consent under any agreement or document binding or covering such Mortgagor or any of its assets, (iii) this Mortgage and the Note have been duly and validly executed and delivered by and on behalf of Mortgagor and (iv) this Mortgagor and the Note constitute a valid, binding and enforceable obligation of Mortgagor enforceable in accordance with its terms.

Section 4.2 Title. Mortgagor represents and warrants to Mortgagee that (i) Mortgagor has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of such Property, free and clear of all liens whatsoever except for the exceptions listed on Mortgagee's title insurance policy delivered to Mortgagee on the date hereof (the **"Permitted Encumbrances"**); (ii) this Mortgage, when properly recorded in the appropriate records,

together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to the Permitted Encumbrances and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty for which perfection may be achieved by the filing of such financing statement, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances; and (iii) to Mortgagor's knowledge, there are currently no claims for payment for labor and material affecting the Property which are past due and are or may become a lien prior to, or of equal priority with, the liens created by this Mortgage. The foregoing representations and warranties shall remain true and correct throughout the term of the loan.

Section 4.3 Leases. Mortgagor represents and warrants to Mortgagee that as of the date hereof, the Property is not subject to any Leases.

Section 4.4 Litigation. Mortgagor represents and warrants to Mortgagee that here are no actions, suits or proceedings at law or in equity by or before any governmental authority or other agency now pending or, to Mortgagor's knowledge, threatened in writing against Mortgagor or the Property.

Section 4.5 Compliance. Mortgagor and the Property (including the use thereof) comply in all material respects with all applicable legal requirements, including, without limitation, building and zoning ordinances and codes necessary to operate the Property and carry on its business.

Section 4.6 Physical Condition. To Mortgagor's knowledge, the Property, including, without limitation, all buildings, improvements, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components are in good condition, order and repair in all material respects.

Section 4.7 Environmental. To Mortgagor's knowledge (a) there are no Hazardous Substances (defined below) or underground storage tanks in, on, or under the Property, (b) there are no past or present Releases (defined below) of Hazardous Substances in violation of any Environmental Law or which would require Remediation by a governmental authority in, on, under or from the Property which have not been remediated in accordance with Environmental Law; (c) Mortgagor does not have actual knowledge of, and has not received, any written notice relating to the threat of any Release of Hazardous Substances migrating to the Property; (d) there is no past or present noncompliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been remediated in all material respects in accordance with Environmental Law; (e) Mortgagor has not received any written notice relating to Hazardous Substances or Remediation (defined below) thereof, of possible liability of any Person pursuant to any Environmental Law, any other environmental conditions in connection with the Property, or any actual or threatened in writing administrative or judicial proceedings in connection with any of the foregoing; and (f) Mortgagor has delivered to Mortgagee, in writing, any and all information relating to actual or alleged non-compliance by Mortgagor or the Property with any Environmental Law that is known to Mortgagor and any reports in the possession or control of Mortgagor relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property. The term **"Environmental Laws"** means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law that apply to Guarantor and/or the Property, relating to protection of human health or the environment, relating to Hazardous Substances, and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term **"Hazardous Substances"** means any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws, including, but not

limited to, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, mold, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws. The term "**Release**" with respect to any Hazardous Substance means any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances. The term "**Remediation**" means any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, or laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

Section 4.8 Broker. There is no broker, agent or other similar person owed any fee, commission or other amount in connection with the loan or any other the transaction contemplated by this Mortgage.

## ARTICLE 5

## FURTHER ASSURANCES

Section 5.1 Recording of Mortgage, etc. Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Mortgagee in, the Property. Mortgagor will pay all taxes, filing, registration or recording fees, and all reasonable expenses incident to the preparation, execution, acknowledgment and/or recording of this Mortgage, any note, deed of trust or mortgage supplemental hereto, any mortgage with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any deed of trust or mortgage supplemental hereto, any mortgage with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2 Further Acts, etc. Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Mortgagee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage, or for complying with all legal requirements. Mortgagor, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Mortgagee to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Mortgagee may lawfully do so, one or more financing statements (including, without limitation, initial financing statements and amendments thereto and continuation statements) with or without the signature of Mortgagor as authorized by applicable law, to evidence more effectively the security interest of Mortgagee in the Property. Mortgagor grants to Mortgagee an irrevocable power of

attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including without limitation such rights and remedies available to Mortgagee pursuant to this Section 5.2.

## ARTICLE 6

## DUE ON SALE/TRANSFER

Section 6.1 No Encumbrances; No Sale or Transfer.

(a) Mortgagor shall not, without the prior written consent of Mortgagee, further encumber the Property or any interest therein, sell, transfer, or otherwise convey the Property or any interest therein or cause or permit, directly or indirectly, whether beneficial or legal, any change in the entity, ownership, or control of Mortgagor without first repaying the Debt in full.

(b) In the event of that there shall occur any transfer, mortgage, conveyance, sale, assignment, pledge or further encumbrance, by operation of law or otherwise, of all or any part of the Property or any interest therein in violation of the terms of this Section 6.1, the same shall constitute an immediate Event of Default, and, at Mortgagee's option, the entire Debt shall become immediately due and payable without demand or notice. Without limiting the foregoing, any such purchaser, transferee, pledge, mortgagee or assignee shall be deemed to have assumed and agreed to pay the Debt and to have assumed and agreed to be bound by the terms and conditions of this Mortgage; it being expressly agreed that no such transference, mortgage, conveyance, sale, assignment, lease, pledge or encumbrance and no assumption by any such transferee, pledge, mortgagee or assignee shall operate to release, discharge, modify, change or affect the liability of Mortgagor either in whole or in part under this Mortgage, the Note, or any of the other Loan Documents.

(c) Notwithstanding the foregoing, Mortgagee's consent will not be required, for any transfer that occurs by devise, descent or operation of law upon the death of Guarantor (a "**Decedent Transfer**"); provided that in the case of a Decedent Transfer, within 30 days after written request by Mortgagee, one or more other persons or entities having credit standing and financial resources equal to or better than those of the decedent, as determined by Mortgagee in its reasonable discretion, shall guarantee such loan by executing and delivering to Mortgagee a guaranty agreement in the same form as the Guaranty delivered to Mortgagee in connection with the making of the loan or otherwise in such from satisfactory to Mortgagee in its sole discretion. In the case of any Decedent Transfer, Mortgagor or the transferee shall pay all costs and expenses reasonably incurred by Mortgagee in connection with such Decedent Transfer, and shall provide Mortgagee with such information and documents as Mortgagee reasonably requests in order to make the determinations called for by this Mortgage and to comply with applicable laws, rules and regulations.

Section 6.2 Mortgagor Existence. Mortgagee is making this loan in reliance on Mortgagor's continued existence, ownership and control in its present form. Mortgagor will not alter its name, jurisdiction of organization, structure, ownership or control without the prior written consent of Mortgagee and will do all things necessary to preserve and maintain said existence and to ensure its continuous right to carry on its business.

## ARTICLE 7

## RIGHTS AND REMEDIES UPON DEFAULT

Section 7.1 Event of Default. Each of the following events shall constitute an event of default hereunder (each, an "Event of Default"):

(a) if any regular monthly interest payments with respect to the Debt is not received within three (3) days of the date the same shall be due or if any other portion of the Debt (including the balance of the Debt upon maturity) is not paid when the same shall be due;

(b) if any representation or warranty made in the Note, this Mortgage or any other Loan Documents, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Mortgagee shall have been false in any material respect as of the date the representation or warranty was made;

(c) if Mortgagor transfers or permits a transfer or otherwise encumbers any portion of the Property without Mortgagee's prior consent in violation of Article 6 hereof;

(d) the occurrence of any breach of any other covenant or agreement contained in this Mortgage, the Note or any other Loan Document (except those specified in this Section 7.1, which shall be subject to the terms thereof), which is not cured within thirty (30) days after receipt of written notice of such default (except that no such notice or cure period shall apply if Mortgagee reasonably believes for that such failure could result in a material impairment of the rights of Mortgagee under the Note, this Mortgage or the other Loan Documents or if such failure is not reasonably susceptible to being cured during such thirty (30) day period);

(e) if a receiver, liquidator or trustee shall be appointed for Mortgagor or Guarantor, or if Mortgagor or Guarantor shall be adjudicated to be bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Mortgagor or Guarantor, or if any proceeding for the dissolution or liquidation of Mortgagor or Guarantor shall be instituted; or

(f) the failure of Guarantor to pay any sums due under the Guaranty; and

(g) if there shall be the entry of a judgment against Mortgagor or against a Guarantor in excess of $20,000.

Section 7.2 Remedies. Upon the occurrence and during the continuance of any Event of Default, Mortgagor agrees that Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(a) declare the entire unpaid Debt to be immediately due and payable;

(b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Mortgage under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

Case 1-26-43491-ess Doc 19-2 Filed 09/02/26 Entered 09/02/26 14:01:53

(c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Mortgage for the balance of the Debt not then due, unimpaired and without loss of priority;

(d) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in the Note;

(f) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage;

(g) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Mortgagor, any guarantor or Guarantor with respect to the Loan or of any Person liable for the payment of the Debt;

(h) the license granted to Mortgagor under Section 1.2 hereof shall automatically be revoked and Mortgagee may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Mortgagee upon demand, provided that Mortgagor, at its sole cost and expense, shall be entitled to copies of any such books, records and accounts and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Mortgagee deems advisable; (iii) make renewals, and replacements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict Tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof, (v) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) actually incurred in connection with the aforesaid operations and all amounts necessary to pay the Impositions, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees; provided, that such license shall be reinstated upon the cure of such Event of Default.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Mortgage shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.3 Application of Proceeds. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Mortgagee

pursuant to the Note or this Mortgage, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its discretion shall deem proper and as permitted by applicable law.

## ARTICLE 8

## WAIVERS

Section 8.1 Waiver of Counterclaim. To the extent permitted by applicable law, Mortgagor hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Mortgagee arising out of or in any way connected with this Mortgage, the Note or the Obligations.

Section 8.2 Marshalling and Other Matters. To the extent permitted by applicable law, Mortgagor hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Mortgage and on behalf of all persons, in each case to the extent permitted by applicable law.

Section 8.3 Waiver of Notice. To the extent permitted by applicable law, Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Mortgage specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagee is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Mortgage does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

Section 8.4 Waiver of Statute of Limitations. To the extent permitted by applicable law, Mortgagor hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

## ARTICLE 9

## APPLICABLE LAW

**Section 9.1 GOVERNING LAW. (A) THIS MORTGAGE WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY MORTGAGOR AND ACCEPTED BY MORTGAGEE IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS MORTGAGE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.**

(B) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST MORTGAGOR ARISING OUT OF OR RELATING TO THIS MORTGAGE SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF KINGS, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND MORTGAGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND MORTGAGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. MORTGAGOR DOES HEREBY AGREE AND CONSENT THAT ALL SERVICE OF PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO MORTGAGOR AT THE ADDRESS FOR NOTICES SPECIFIED IN THE NOTE, AND THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO MORTGAGOR IN THE MANNER PROVIDED THEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON MORTGAGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. MORTGAGOR (I) SHALL GIVE PROMPT NOTICE TO MORTGAGEE OF ANY CHANGED ADDRESS HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH AN AGENT IF MORTGAGOR CEASES TO HAVE AN OFFICE IN THE STATE OF NEW YORK.

Section 9.2 WAIVER OF JURY TRIAL. MORTGAGOR (AND BY ITS ACCEPTANCE HEREOF) MORTGAGEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS MORTGAGE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF THE PARTIES HERETO, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO HEREBY AUTHORIZES THE OTHER PARTIES HERETO TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.

Section 9.3 Provisions Subject to Applicable Law. All rights, powers and remedies provided in this Mortgage may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Mortgage invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Mortgage or any application thereof shall be invalid or unenforceable, the remainder of this Mortgage and any other application of the term shall not be affected thereby.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

Section 10.1 No Oral Charge. This Mortgage, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Mortgagee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 10.2 Successors and Assigns. This Mortgage shall be binding upon and inure to the benefit of Mortgagor and Mortgagee and their respective successors and assigns forever.

Section 10.3 Notices. All notices or other written communications hereunder shall be delivered in accordance with the provisions of the Note.

Section 10.4 Subrogation. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Mortgagee shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Mortgagee and are merged with the lien and security interest created herein as cumulative security for the repayment of the l Debt, the performance and discharge of Mortgagor's obligations hereunder, under the Note and the performance and discharge of the Other Obligations.

Section 10.5 Entire Agreement. The Note and this Mortgage constitute the entire understanding and agreement between Mortgagor and Mortgagee with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Mortgagor and Mortgagee with respect thereto.

Section 10.6 Indemnity. Mortgagor shall indemnify, defend and hold Mortgagee harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the fees and actual expenses of counsel, which may be imposed upon, asserted against or incurred by Mortgagee relating to or arising out of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about any of the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways, (b) any inspection, review or testing of or with respect to the Property, (c) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Mortgagee is designated a party thereto, commenced or threatened at any time (including after the repayment of the Debt) in any way related to the execution, delivery or performance of any Loan Document or to the Property, (d) any proceeding instituted by any Person claiming a lien or other claim, (e) any breach of any representation, warranty, covenant or agreement made by Mortgagor or Guarantor herein or in any of the other Loan Documents and (f) any brokerage commissions or finder's fees claimed by any broker or other party engaged or claimed to be engaged by Mortgagor in connection with the Debt, the Property, or any of the transactions contemplated in the Loan Documents, except in each case to the extent any of the foregoing is caused by Mortgagee's gross negligence or willful misconduct.

## ARTICLE 11

## NEW YORK STATE-SPECIFIC PROVISIONS

Section 11.1 Principles of Construction. In the event of any inconsistencies between the terms and conditions of this Article 11 and the other terms and conditions of this Mortgage, the terms and conditions of this Article 11 shall control and be binding.

Section 11.2 Section 291-f of the Real Property Law. Reference is hereby made to Section 291-f of the Real Property Law of the State of New York for purposes of obtaining for Mortgagee the benefit of said Section in connection with this Mortgage, to the extent of Mortgagee's approval rights with respect to Leases as set forth in the Loan Agreement.

Section 11.3 Sections 254 and 273 of the Real Property Law. All covenants hereof shall be construed as affording to Mortgagee rights additional to and not exclusive of the rights conferred under the provisions of Sections 254 and 273 of the Real Property Law of the State of New York, or any other applicable law.

Section 11.4 Lien Law. Mortgagor, in compliance with Section 13 of the Lien Law of the State of New York, will receive the advances secured by this Mortgage, and will hold the right to receive such advances as a trust fund to be applied first for the purposes of paying the cost of improvement and will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

Section 11.5 Article 14 of Real Property Actions and Proceedings Law. Reference is hereby made to Article 14 of the Real Property Actions and Proceedings Law of the State of New York, as the same may be amended from time to time, for purposes of obtaining for Mortgagee the benefit of said Article in connection with Mortgagee's rights with respect to foreclosure of this Mortgage by power of sale.

Section 11.6 Assignment of Mortgage. Mortgagee agrees that it shall, in consideration of an amount equal to that necessary for a full repayment of the Debt in accordance with the terms of the Security Documents, assign the Note, the Mortgage and the other Security Documents to a Mortgagee designated by Mortgagor, and Mortgagee shall execute and deliver to Mortgagor or such Mortgagee such instruments and other documents as shall be necessary or appropriate in compliance and in accordance with all applicable laws to evidence any such assignment of the Mortgage and the Loan. Mortgagor shall pay Mortgagee's then customary fee and all costs and expenses, including without limitation, legal fees and expenses, in connection with any assignment pursuant to this Section 11.6.

Section 11.7 Maximum Indebtedness. The maximum amount of principal indebtedness secured by this Mortgage at execution or which under any contingency may become secured hereby at any time hereafter is $3,200,000.00, plus all amounts expended by Mortgagee hereunder in respect of insurance premiums and real estate taxes, and all legal costs or expenses required to protect and preserve the lien of this Mortgage plus accrued but unpaid interest on the Obligations secured hereby.

Section 11.8 Property Type. This Mortgage covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, this Mortgage has been executed by Mortgagor as of the day and year first above written.

**MORTGAGOR:**

**THE RIDGEVIEW REALTOR LLC**

By: [signature]
Name: David Braun
Title: Managing Member

**ACKNOWLEDGMENT**

STATE OF NEW YORK )
) ss.:
COUNTY OF Kings )

On this, the 15 day of Nov, 2023, before me, the undersigned, personally appeared DAVID BRAUN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity as an authorized signatory of The Ridgeview Realtor LLC and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

[signature]

(signature and office of individual taking acknowledgment)

MOSHE GOLDBERGER
NOTARY PUBLIC, State of New York
No. 01-GP6337740
Qualified in Queens County
Certificate Filed in Kings County
Commission Expires 02/29/2024

**EXHIBIT A**

**LEGAL DESCRIPTION**

# RIVERSIDE ABSTRACT, LLC
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
## LEGAL DESCRIPTION

Title No.: RANY-60834

**Parcel I:**
ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being more particularly bounded and described as follows:

BEGINNING at an iron rod found on the assumed bounds of Lower Cherrytown Road on the southeasterly bounds of lands now or formerly of Cherrytown Road Lot 6 LLC,
L. 7024 – P. 0054, being Lot 6 as shown on Filed Map No. 21-265;

THENCE from the point of beginning and following the bounds of the said lands for the following three courses:
1. North 45 degrees 20 minutes 41 seconds East a distance of 496.58 feet to an iron rod found,
2. North 58 degrees 10 minutes 08 seconds West a distance of 179.46 feet to an iron rod found in a stone wall and
3. North 39 degrees 57 minutes 10 seconds West a distance of 121.16 feet to an iron rod found at the easterly corner of lands now or formerly of Freeman, L. 7012 – P. 0068, being Lot 7 as shown on the said filed map;

THENCE following the bounds of the said lands North 39 degrees 51 minutes 39 seconds West a distance of 507.49 feet to an iron rod found on the southeasterly bounds of lands now or formerly of Breen-White & Langhorn, L. 6036 – P. 0201;

THENCE following the bounds of the said lands North 40 degrees 29 minutes 00 seconds East a distance of 455.32 feet to an iron rod found at the southerly corner of lands now or formerly of Donna Maria & McConnell, L. 6546 – P. 0322;

THENCE following the bounds of the said lands, along a stone row and wire fence for the latter part of the course, North 40 degrees 24 minutes 59 seconds East a distance of 443.93 feet to a point at the southerly corner of lands now or formerly of Mastandrea, L. 2991 – P. 0154;

THENCE following the bounds of the said lands, and the trend of a stone row and wire fence, North 39 degrees 05 minutes 28 seconds East a distance of 268.45 feet to an iron pipe found in a stone wall intersection at the westerly corner of lands now or formerly of Kelsey, L. 2481 – P. 0199;

THENCE following the bounds of the said lands and the trend of the stone wall South 52 degrees 34 minutes 02 seconds East a distance of 351.75 feet to a point;

THENCE further along the same South 55 degrees 55 minutes 09 seconds East a distance of 300.08 feet to an iron pipe found in the stone wall at the westerly corner of lands now or formerly of LoPresti, L. 5503 – P. 0061;

THENCE following the bounds of the said lands and continuing along the trend of the stone wall South 55 degrees 47 minutes 30 seconds East a distance of 364.05 feet to a point at the end of another stone wall;

THENCE further along the same South 52 degrees 30 minutes 18 seconds East a distance of 203.19 feet to a point at the end of the said stone wall or the westery side of Ridgeview Road;

THENCE passing over Ridgeview Road South 55 degrees 10 minutes 37 seconds East a distance of 84.71 feet to an iron rod found at the westerly corner of lands now or formerly of Brookhiser & Safer, L. 2959 – P. 0048;

**RIVERSIDE ABSTRACT, LLC**
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
**SCHEDULE A continued**

THENCE following the bounds of the said lands South 55 degrees 38 minutes 11 seconds East a distance of 812.34 feet to an iron pipe found at the westerly corner of lands now or formerly of Rock & Edwards, L. 5274 – P. 0328;

THENCE following the bounds of the said lands, following the trend of a stone wall for the latter part of the course, South 58 degrees 21 minutes 16 seconds East a distance of 182.43 feet to a point in the stone wall;

THENCE further along the same South 56 degrees 24 minutes 31 seconds East a distance of 98.27 feet to an angle in the said stone wall;

THENCE continuing along and then leaving the said stone wall South 45 degrees 15 minutes 55 seconds East a distance of 40.08 feet to an iron pipe found at the northerly corner of lands now or formerly of Proudley, L. 7177 – P. 0001;

THENCE following the bounds of the said lands and the trend of a stone wall South 52 degrees 00 minutes 28 seconds West a distance of 186.57 feet to an iron pipe found at the northerly corner of lands now or formerly of Sherwood & Zapart, L. 6183 – P. 0041;

THENCE following the bounds of the said lands and continuing along the trend of a wide stone wall South 49 degrees 18 minutes 01 seconds West a distance of 159.60 feet to an iron pipe found in the stone wall at the northerly corner of lands now or formerly of New Horizons Resources INC, L. 4622 – P. 0217;

THENCE following the bounds of the said lands South 49 degrees 25 minutes 09 seconds West a distance of 216.38 feet to an iron pipe found in a stone wall intersection at the northerly corner of Lot 3 as shown on Filed Map No. 06-191;

THENCE following the bounds of the said lands South 66 degrees 54 minutes 07 seconds West a distance of 570.36 feet to a point in the approximate center of the old town road;

THENCE further along Lot 3 and approximate center line of said road South 22 degrees 05 minutes 36 seconds East a distance of 67.83 feet to a point in the approximate center of Ridgeview Road at the northwesterly corner of Lot 2 as shown on Filed Map No. 06-191;

THENCE following the approximate center line of the said road South 19 degrees 55 minutes 03 seconds East a distance of 161.13 feet to a point in the approximate center of Lower Cherrytown Road;

THENCE following the approximate center line of the said road for the following five courses:
1. North 55 degrees 56 minutes 40 seconds West a distance of 92.95 feet,
2. North 60 degrees 26 minutes 12 seconds West a distance of 79.12 feet,
3. North 63 degrees 11 minutes 12 seconds West a distance of 44.93 feet,
4. North 68 degrees 50 minutes 03 seconds West a distance of 63.13 feet and
5. North 75 degrees 29 minutes 18 seconds West a distance of 14.25 feet to a point in the approximate center of the said road;

THENCE leaving the road and following the bounds of lands now or formerly of the Mahmood Revocable Trust, L. 7129 – P. 0207, passing over an iron pipe found on line at 41.68 feet, South 66 degrees 59 minutes 55 seconds West a total distance of 876.52 feet to an iron rod found in a stone wall intersection at the northerly corner of lands now or formerly of Chindemi & Flynn, L. 6815 – P. 0239;

**RIVERSIDE ABSTRACT, LLC**
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
**SCHEDULE A continued**

THENCE following the bounds of the said lands South 66 degrees 31 minutes 07 seconds West a distance of 190.06 feet to an iron rod found at the northerly corner of lands now or formerly of Chiadami, L. 4479 – P. 0152;

THENCE following the bounds of the said lands, passing over an iron rod found on line at 710.25 feet, South 66 degrees 31 minutes 07 seconds West a total distance of 756.78 feet to a point in the approximate center of the Mombaccus Creek;

THENCE following the center of the said creek for the following three courses:
1. North 04 degrees 34 minutes 36 seconds West a distance of 19.63 feet,
2. North 20 degrees 52 minutes 31 seconds East a distance of 129.05 feet and
3. North 18 degrees 23 minutes 08 seconds East a distance of 111.83 feet to a point in the center of the creek on the southerly bounds of lands now or formerly of 15 Railroad LLC, L. 7086 – P. 0047, being Lot 1 as shown on Filed Map #21-285B;

THENCE following the bounds of the said lands, passing over an iron rod found on line at 255.72 feet, North 49 degrees 46 minutes 38 seconds East a total distance of 274.89 feet to a point at the westerly corner of lands now or formerly of Faso, L. 2042 – P. 0319;

THENCE following the bounds of said lands for the following seven courses:
1. South 40 degrees 26 minutes 49 seconds East a distance of 74.92 feet to an iron pipe found,
2. North 49 degrees 46 minutes 15 seconds East a distance of 142.52 feet,
3. South 36 degrees 02 minutes 22 seconds East a distance of 94.35 feet,
4. South 79 degrees 19 minutes 40 seconds East a distance of 52.97 feet to an iron pipe found,
5. North 49 degrees 13 minutes 05 seconds East a distance of 122.26 feet to an iron pipe found,
6. North 29 degrees 16 minutes 37 seconds East a distance of 127.33 feet to an iron rod found and
7. North 01 degrees 29 minutes 43 seconds West a distance of 97.99 feet to a point in the approximate center of Lower Cherrytown Road;

THENCE following the approximate center line of said road for the following seven courses:
1. South 65 degrees 07 minutes 58 seconds West a distance of 36.34 feet,
2. South 86 degrees 07 minutes 06 seconds West a distance of 72.90 feet,
3. North 84 degrees 23 minutes 11 seconds West a distance of 70.59 feet,
4. North 75 degrees 46 minutes 08 seconds West a distance of 31.72 feet,
5. North 64 degrees 50 minutes 19 seconds West a distance of 36.01 feet,
6. along a curve to the right having a radius of 350.00 feet for an arc length of 195.38 feet with a chord bearing of North 48 degrees 50 minutes 48 seconds West, and a chord length of 192.85 feet and
7. North 32 degrees 51 minutes 05 seconds West a distance of 189.86 feet;

THENCE North 57 degrees 01 minutes 56 seconds East a distance of 25.00 feet to the point of beginning and containing approximately 83.68 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System, East Zone, NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

SUBJECT to all rights of the Town of Rochester, for highway purposes, to any lands adjacent to or lying in the beds of Ridgeview Road and Lower Cherrytown Road.

Excepting those portions of the subject premises used as streets.

**RIVERSIDE ABSTRACT, LLC**
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
**SCHEDULE A continued**

BEING a portion of the premises conveyed by Suzanne B. Cusack as surviving spouse of James S. Cusack to Suzanne B. Cusack and Vincent F. Panettieri, as Co-Trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2016 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6602 of Deeds at page 0323.

The above description was prepared on August 15, 2023 by Medenbach & Eggers, Civil Engineering and Land Surveying, P.C., Stone Ridge, NY.
Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.1, Block 1, Lot 27.700, Ulster County and also known as Parcel I: 5 Ridgeview Road, Rochester, NY 12446.

**Parcel II:**
ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being Lot 2 as shown on "Map of the Subdivision of Lands in Possession of Roderick & Cynthia Graham" dated November 13, 2005 and recorded in the Ulster County Clerk's Office on January 19, 2006 as Filed Map No. 06-191, and being more particularly bounded and described as follows:

BEGINNING at a point in the center of Lower Cherrytown Road at the northwesterly corner of lands now or formerly of Hapeman, L. 6485 – P. 0329, being shown as Lot #1 on the said filed map;

THENCE from the said point of beginning and following the approximate center line of the said road North 52 degrees 26 minutes 41 seconds West a distance of 162.06 feet to a point at the approximate intersection of Ridgeview Road and Lower Cherrytown Road;

THENCE following the approximate center line of Ridgeview Road North 19 degrees 55 minutes 03 seconds West a distance of 161.13 feet to a point at the southwesterly corner of Lot # 3 as shown on the said filed map;

THENCE following the bounds of Lot 3, passing over an iron rod found on line at 33.05 feet, North 65 degrees 20 minutes 59 seconds East a total distance of 128.35 feet to a point;

THENCE further along the same South 48 degrees 45 minutes 13 seconds East a distance of 245.61 feet to an iron rod found on the northerly bounds of said lands now or formerly of Hapeman and being Lot 1 as shown on the said filed map;

THENCE following the bounds of Lot 1, passing over an iron rod set on line at 145.96 feet, South 39 degrees 36 minutes 54 seconds West a total distance of 175.84 feet to the point of beginning and containing approximately 1.10 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System, East Zone, NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

SUBJECT to all rights of the Town of Rochester, for highway purposes, to any lands adjacent to or lying in the beds of Ridgeview Road and Lower Cherrytown Road.

Case 1-26-43491-ess Doc 19-2 Filed 09/02/26 Entered 09/02/26 14:01:53

**RIVERSIDE ABSTRACT, LLC**
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
**SCHEDULE A continued**

BEING a portion of the premises conveyed by Suzanne Cusack to Suzanne B. Cusack and Vincent F. Panettieri as co-trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2019 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6502 of Deeds at page 0338.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.3, Block 1, Lot 16.200, Ulster County and also known as Parcel II: N/A Cherrytown Road, Rochester, NY 12446.

**Parcel III:**
ALL that certain plot, piece or parcel of land situate, lying and being in the Town of Rochester, County of Ulster and State of New York and being Lot 3 as shown on "Map of the Subdivision of Lands in Possession of Roderick & Cynthia Graham" dated November 13, 2005 and recorded in the Ulster County Clerk's Office on January 19, 2006 as Filed Map No. 06-191, and being more particularly bounded and described as follows:

BEGINNING at a point in the center of Ridgeview Road at the northwesterly corner of Lot 2 as shown on the said filed map;

THENCE from the point of beginning and following the approximate center line of the said road North 22 degrees 05 minutes 36 seconds West a distance of 67.83 feet to a point on the southeasterly bounds of lands now or formerly of Cusack, L. 1455 – P. 0127;

THENCE following the bounds of the said lands, along the trend of a stone wall for the latter part of the course North 66 degrees 54 minutes 07 seconds East a distance of 570.36 feet to an iron pipe found in a stone wall intersection at the northerly corner of lands now or formerly of Kostirkin, L. 6391 – P. 0175;

THENCE following the bounds of the said lands and the trend of the stone wall South 05 degrees 02 minutes 47 seconds East a distance of 129.65 feet to an iron pipe found at the northerly corner of lands now or formerly of Samuels, L. 5813 – P. 0151;

THENCE leaving the trend of the wall and following the bounds of the said lands South 20 degrees 46 minutes 46 seconds East a distance of 95.59 feet to an iron rod found at the northerly corner of Lot #2 as shown on the said filed map;

THENCE following the bounds of Lot 2 South 53 degrees 41 minutes 55 seconds West a distance of 308.82 feet to an iron rod found at the easterly corner of Lot #2 as shown on the said filed map;

THENCE following the bounds of Lot 2 North 46 degrees 46 minutes 13 seconds West a distance of 245.61 feet to a point;

THENCE further along the same, passing over an iron rod found on line at 95.29 feet, South 65 degrees 20 minutes 59 seconds West a total distance of 128.35 feet to the point of beginning and containing approximately 2.42 acres.

The above courses are in reference to Grid North, New York State Plane Coordinate System, East Zone, NAD 83/2011.

SUBJECT to all utility grants and easements of record affecting the premises described herein.

**RIVERSIDE ABSTRACT, LLC**
**As Agent for**
**AMTRUST TITLE INSURANCE COMPANY**
**SCHEDULE A continued**

SUBJECT to all rights of the Town of Rochester, for highway purposes, to any lands adjacent to or lying in the bed of Ridgeview Road.

BEING a portion of the premises conveyed by Suzanne Cusack to Suzanne B. Cusack and Vincent F. Panettieri as co-trustees of the Revocable Trust of Suzanne B. Cusack by deed dated July 10, 2019 and recorded in the Ulster County Clerk's Office on October 18, 2019 in Liber 6502 of Deeds at page 0336.

The above descriptions were prepared on August 15, 2023 by Medenbach & Eggers, Civil Engineering and Land Surveying, P.C., Stone Ridge, NY.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 68.3, Block 1, Lot 16.300, Ulster County and also known as Parcel II: N/A Cherrytown Road, Rochester, NY 12446.

**Statement Regarding the Property:**

☐ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security instrument covers real property principally improved, or to be improved, by a one or more structures containing, in the aggregate, not more than six residential dwelling units with each unit having its own separate cooking facilities.

☒ This Security Instrument DOES NOT cover real property principally improved, or to be improved, by a one or more structures containing, in the aggregate, not more than six residential dwelling units with each unit having its own separate cooking facilities.

# EXHIBIT "D"

# PAYMENT GUARANTY

**THIS PAYMENT GUARANTY** (this "**Guaranty**") is executed as of November 20 , 2023 by each of David Braun, an individual, residing at 672 Bedford Avenue, Brooklyn, NY 11211, and Moshe Zev Doppelt, an individual, residing at 41 Francis Place, Monsey, New York 10952 (the foregoing individuals, referred to herein individually or collectively as the context may require, "**Guarantor**") in favor of Ridgeview Lender LLC, with an address at 4121 Avenue T, Brooklyn, NY 11234 (together with his successors and assigns, collectively, "**Lender**").

**W I T N E S S E T H:**

A. Pursuant to that certain Promissory Note, dated as of the date hereof, executed by The Ridgeview Realtor LLC, a New York limited liability company ("**Borrower**"), and payable to the order of Lender in the original principal amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date with the Note (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Mortgage**"), which Mortgage encumbers, inter alia, certain real property located at, and owned by Borrower and more particularly described on Exhibit A to the Mortgage (said real property, buildings, structures and other improvements being hereinafter collectively referred to as the "**Property**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (all such other instruments and documents, together with the Note and Mortgage, collectively, the "**Loan Documents**").

B. Lender's willingness to make the Loan, or otherwise extend credit, to Borrower is dependent upon each of the Guarantor's unconditional guaranty of payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C. Each Guarantor represents that he is a member of Borrower, and that each Guarantor will directly benefit from Lender's making the Loan to Borrower.

D. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Documents.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and to extend such additional credit as Lender may from time to time extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor hereby agrees as follows:

## ARTICLE I
NATURE AND SCOPE OF GUARANTY

**Section 1.1 <u>Guaranty of Obligation</u>.**

(a) Guarantor hereby, jointly and severally, irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined below) as and when the same shall be due and payable, whether by lapse of time,

by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

(b) As used herein, the term "**Guaranteed Obligations**" means payment and performance of all of the obligations of Borrower under each of the Loan Documents, including, without limitation, for the repayment of the Debt (as defined in the Note) and all other amounts owed to Lender in accordance with the terms of the Loan Documents.

**Section 1.2** **Nature of Guaranty**. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**Section 1.3** **Payment By Guarantor**. If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, all such notices being hereby waived by Guarantor, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations is due and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**Section 1.4** **No Duty To Pursue Others**. It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantors hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations (if any), (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**Section 1.5** **Waivers**. Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or any other Loan Document, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory note or other document arising under the Loan Documents or in connection with the Property, (v) the occurrence of (A) any breach by Borrower of any of the terms or conditions of any of the Loan Documents, or (B) an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default

by Borrower, (ix) any other action at any time taken or omitted by Lender and (x) generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed.

**Section 1.6 Payment of Expenses**. In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, the Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder, together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender. The covenant contained in this Section 1.6 shall survive the payment and performance of the Guaranteed Obligations.

**Section 1.7 Effect of Bankruptcy**. In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

**Section 1.8 Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for the payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

## ARTICLE 2
## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTORS' OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**Section 2.1 Modifications, Sales**. Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any sale, assignment or foreclosure of the Note, the Mortgage, or any other Loan Documents or any sale or transfer of the Property or any failure of Lender to notify Guarantor of any such action.

**Section 2.2 Adjustment**. Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or Guarantor.

**Section 2.3** **Condition of Borrower or Guarantor**. The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the direct or indirect shareholders, partners or members, as applicable, of Borrower or Guarantor, or any reorganization of Borrower or Guarantor.

**Section 2.4** **Invalidity of Guaranteed Obligations**. The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including, without limitation, the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**Section 2.5** **Release of Obligors**. Any full or partial release of the liability of Borrower for the Guaranteed Obligations or any part thereof, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations or that Lender will look to other Persons to pay or perform the Guaranteed Obligations.

**Section 2.6** **Other Collateral**. The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**Section 2.7** **Release of Collateral**. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including, without limitation, negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**Section 2.8** **Care and Diligence**. The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in

connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**Section 2.9 Unenforceability**. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

**Section 2.10 Merger**. The reorganization, merger or consolidation of Borrower or Guarantor into or with any other Person.

**Section 2.11 Preference**. Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

**Section 2.12 Other Actions Taken or Omitted**. Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of Guarantor that Guarantors shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

**Section 2.13 Offset**. The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and to extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**Section 3.1 Benefit**. Guarantor is an owner of a direct or indirect interest in Borrower and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**Section 3.2 Familiarity and Reliance**. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**Section 3.3** **No Representation By Lender**. Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

**Section 3.4** **Guarantor's Financial Condition**. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor (a) is and will be solvent, (b) has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and (c) has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.

**Section 3.5** **Legality**. This Guaranty has been duly executed and delivered by or on behalf of Guarantor and is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or general principles of equity. The execution and delivery of this Guaranty by Guarantor and the performance of its obligations hereunder will not conflict with any provision of any law or regulation to which Guarantor is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of Guarantor's organizational documents or any material agreement or instrument to which Guarantor is a party or by which it is bound, or any order or decree applicable to Guarantor. The execution and delivery of this Guaranty by Guarantor and the performance of its obligations hereunder do not, and will not, contravene or conflict with any applicable law, statute or regulation of any court or governmental agency or body having jurisdiction over Guarantor, or constitute a default under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which any Guarantor is a party or which may be applicable to any Guarantor. There are no actions, suits or proceedings pending or, to the actual knowledge of Guarantor, threatened before or by any tribunal against or affecting Guarantor, which, if adversely determined, would materially and adversely affect Guarantor's ability to perform its obligations hereunder. All financial statements and information heretofore furnished to Lender by Guarantor do, and all financial statements and information hereafter furnished to Lender by Guarantor will, accurately present the financial condition of Guarantor as of their dates and the results of Guarantor's operations for the periods therein specified in all material respects, and, except as heretofore disclosed in writing to Lender, has Guarantor incurred any material liability, direct or indirect, fixed or contingent, which would materially and adversely affect Guarantor's ability to perform its obligations hereunder.

**Section 3.6** **Consents**. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Guarantor of, or compliance by Guarantor with, this Guaranty or the other Loan Documents to which Guarantor is a party, or the consummation of the transactions contemplated hereby or thereby, other than those which have been obtained by Guarantor.

**Section 3.7** **Litigation; Full and Accurate Disclosure**. There is no action, suit, proceeding or investigation pending or, to the best of Guarantor's knowledge, threatened against Guarantor in any court or by or before any other Governmental Authority which, if adversely determined, might materially and adversely affect the condition (financial or otherwise) or business of Guarantor (including the ability of Guarantor to carry out the obligations contemplated by this Guaranty). There is no material fact presently known to Guarantor which has not been disclosed to Agent which adversely affects, nor as far as Guarantor can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

**Section 3.8** **Financial Statements and Other Information**. All financial statements of Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading. Guarantor is not insolvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation and the execution, delivery and performance of this Guaranty will not render Guarantor insolvent.

**Section 3.9** **Survival**. All representations, warranties and covenants made by Guarantor herein are a material inducement to Lender to enter into the other Loan Documents and shall survive the execution hereof and any bankruptcy, foreclosure, transfer of security or other event affecting Borrower, Guarantor, any other party, or any security for all or any part of the Guaranteed Obligations.

**ARTICLE 4**
SUBORDINATION OF CERTAIN INDEBTEDNESS

**Section 4.1** **Subordination of All Guarantor Claims**. As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be, created, or the manner in which they have been, or may hereafter be, acquired by Guarantor. The Guarantor Claims shall include, without limitation, all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. So long as any portion of the Obligations or the Guaranteed Obligations remain outstanding (other than those which by their terms survive repayment of the Loan), Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other Person any amount upon the Guarantor Claims.

**Section 4.2** **Claims in Bankruptcy**. In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceeding involving Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Obligations and the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**Section 4.3** **Payments Held in Trust**. Notwithstanding anything to the contrary contained in this Guaranty, in the event that Guarantor should receive any funds, payments, claims and/or distributions which

are prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims and/or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**Section 4.4** **Liens Subordinate**. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's rights it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including, without limitation, the commencement of, or the joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on the assets of Borrower held by Guarantor. The foregoing shall in no manner vitiate or amend, nor be deemed to vitiate or amend, any prohibition in the Loan Documents against Borrower granting liens or security interests in any of its assets to any Person other than Lender.

## ARTICLE 5
## COVENANTS

**Section 5.1** **Prohibited Transactions**. Guarantor shall not, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any affiliate that would reduce the net Wworth of Guarantor (including the payment of any dividend or distribution to a shareholder, or the redemption, retirement, purchase or other acquisition for consideration of any stock or other ownership interest in Guarantor) or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of Guarantor's assets, or any interest therein.

**Section 5.2** **Financial Statements**. Guarantor shall deliver to Lender:

(a) within 90 days after the end of each fiscal year of Guarantor, a complete copy of Guarantor's annual financial statements audited by a nationally recognized certified public accounting firm or other independent certified public accountant acceptable to Lender, prepared in accordance with GAAP or such other accounting method consistently applied, including statements of income and expense and cash flow and a balance sheet for Guarantor, together with a certificate of the chief financial officer of Guarantor (A) setting forth in reasonable detail Guarantor's net worth and liquid assets as of the end of such prior calendar year and based on such annual financial statements, and (B) certifying that such annual financial statements are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Guarantor;

(b) within 45 days after the end of each fiscal quarter of Guarantor, financial statements (including a balance sheet as of the end of such fiscal quarter and a statement of income and expense for such fiscal quarter) certified by the chief financial officer of Guarantor and in form, content, level of detail and scope reasonably satisfactory to Lender, together with a certificate of the chief financial officer of Guarantor (A) setting forth in reasonable detail Guarantor's net worth and liquid assets as of the end of such prior calendar quarter and based on the foregoing quarterly financial statements, and (B)

Case 1-26-43491-ess Doc 19-2 Filed 09/02/26 Entered 09/02/26 14:01:53

certifying that such quarterly financial statements are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Guarantor in a manner consistent with GAAP or such other accounting method consistently applied; and

(c) within 5 days after request by Lender, such other financial information (including copies of tax returns and personal financial statements) with respect to Guarantor or the Property as Lender may reasonably request.

**Section 5.3** **Additional Covenants**

(a) Litigation. Guarantor shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, Borrower or Guarantor.

(b) Patriot Act. Guarantor will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Guarantor, including those relating to money laundering and terrorism.

(c) Further Assurances. Guarantor shall, at Guarantor's sole cost and expense:

(i) cure any defects in the execution and delivery of the Loan Documents to which Guarantor is a party and execute and deliver, or cause to be executed and delivered, to Agent such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to correct any omissions in the Loan Documents to which Guarantor is a party, as Lender may reasonably require; and

(ii) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Guaranty and the other Loan Documents to which Guarantor is a party, as Lender may reasonably require from time to time.

## ARTICLE 6
## MISCELLANEOUS

**Section 6.1** **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**Section 6.2** **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder shall be in writing sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address set forth above, or to such other address as such party may hereafter specify in accordance with the provisions hereof. Any Notice shall be deemed to have been received: (a) three (3) Business Days after

the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), (c) on the next Business Day if sent by an overnight commercial courier and (d) upon delivery (as confirmed by electronic receipt) if delivered by electronic mail, in each case addressed to the parties at the addresses hereinabove set forth or otherwise provided to Lender or such other address designated by Guarantor or Lender by ten (10) days prior notice.

**Section 6.3** **Governing Law; Jurisdiction**. This guaranty shall be governed by and construed in accordance with the laws of the State of New York. ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY, AT LENDER'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK, AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**Section 6.4** **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**Section 6.5** **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party against whom such amendment is sought to be enforced.

**Section 6.6** **Parties Bound; Assignment**. This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives. Lender may sell, assign, pledge, participate, transfer or delegate, as applicable to one or more Persons all or a portion of its rights and obligations under this Guaranty in connection with any assignment, sale, pledge, participation or transfer of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Guaranty. Guarantor shall not have the right to delegate, assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and any attempted assignment, delegation or transfer without such consent shall be null and void.

**Section 6.7** **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**Section 6.8** **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**Section 6.9** **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective

Case 1-26-43491-ess Doc 19-2 Filed 09/02/26 Entered 09/02/26 14:01:53

signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**Section 6.10** **<u>Rights and Remedies</u>**. If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. Lender shall have, and may exercise, in addition to all other rights, privileges, or remedies available to it under this Guaranty and by law, the specific rights and remedies to sue for and obtain specific performance by the Guarantor of Guarantor's covenants and agreements set forth herein. Guarantor hereby agrees and acknowledges that this Guaranty is an instrument for the payment of money, and hereby consents that Lender, at its sole option, in the event of a default by Guarantor in the payment of any of the moneys due hereunder, shall have the right to bring a motion and/or action under New York CPLR Section 3213.

**Section 6.11** **<u>Entirety</u>**. **THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN ANY GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN ANY GUARANTOR AND LENDER.**

**Section 6.12** **<u>Waiver of Right To Trial By Jury</u>**. **GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.**

**Section 6.13** **<u>Reinstatement in Certain Circumstances</u>**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise and such payment satisfied any Guaranteed Obligations, Guarantor's obligations hereunder with respect to such Guaranteed Obligations shall be reinstated as though such payment has been due but not made at such time.

**Section 6.14** **Joint and Several**. All of the obligations and liabilities of any Guarantor hereunder shall be joint and several obligations of each of the Guarantors.

**Section 6.15** **Cooperation**. Guarantor acknowledges that Lender and its successors and assigns may (i) sell this Guaranty, the Note and the other Loan Documents to one or more investors as a whole loan, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Note and the other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or one or more interests therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "**Secondary Market Transaction**"). Subject to the terms, conditions and limitations set forth in the Loan Agreement, Guarantor shall cooperate with Lender in effecting any such Secondary Market Transaction. Guarantor shall provide such information and documents relating to Guarantor, Borrower, the Property and any tenants of the Property as Lender may reasonably request in connection with such Secondary Market Transaction. In addition, Guarantor shall make available to Lender all information concerning its business and operations that Lender may reasonably request. Lender shall be permitted to share all such information with the investment banking firms, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by Guarantor to Lender including any and all financial statements provided to Lender pursuant to terms hereof may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors or potential investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

David Braun

NYS Driver ID # 686363942

**ACKNOWLEDGMENT**

STATE OF NEW YORK )
) ss.:
COUNTY OF Kings )

On this, the 15 day of Nov, 2023, before me, the undersigned, personally appeared David Braun, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their individual capacity and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

(signature and office of individual taking acknowledgment)

MOSHE GOLDBERGER
NOTARY PUBLIC, State of New York
No. 01-GF6337740
Qualified in Queens Count
Certificate Filed in Kings County
Commission Expires 02/20/2026

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

Moshe Zev Doppelt

NYS Driver ID # 657636008

**ACKNOWLEDGMENT**

STATE OF NEW YORK )
) ss.:
COUNTY OF Kings )

On this, the 15 day of Nov, 2023, before me, the undersigned, personally appeared Moshe Zev Doppelt, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their individual capacity and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

(signature and office of individual taking acknowledgment)

MOSHE SCHLAGER
NOTARY PUBLIC, State of New York
No. 01-SC6037740
Qualified in Queens County
Certificate Filed in Kings County
Commission Expires 02/29/2024