Hearing Date: October 14, 2026 at 10:30 a.m.
Objection Deadline: October 7, 2026 at 4:00 p.m.

**ABRAHAM KLEINMAN**
407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com
*Creditor and Party in Interest, Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| THE RIDGEVIEW REALTOR LLC, | Case No. 26-43491 (ESS) |
| Debtor. | |

----------------------------------------------------------x

**NOTICE OF MOTION OF ABRAHAM KLEINMAN FOR AN ORDER (I) DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a), OR, IN THE ALTERNATIVE, (II) CONVERTING THE CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b), AND (III) EXTENDING THE PERIOD UNDER 11 U.S.C. § 362(d)(3)**

PLEASE TAKE NOTICE that upon the annexed motion (the "Motion") and the Declaration of Abraham Kleinman with exhibits filed herewith (the "Kleinman Decl."), Abraham Kleinman ("Kleinman"), a creditor and party in interest, pro se, will move before the Honorable Elizabeth S. Stong, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of New York, Courtroom 3585, 271-C Cadman Plaza East, Brooklyn, New York 11201, on **October 14, 2026 at 10:30 a.m.**, or on such other date and at such time as the Court may deem just and its calendar permits, for entry of an order (i) directing the United States Trustee to appoint a chapter 11 trustee pursuant to section 1104(a) of title 11 of the United States Code (the "Bankruptcy Code"); or, in the alternative, (ii) converting the above-captioned chapter 11 case

to a case under chapter 7 pursuant to section 1112(b) of the Bankruptcy Code; (iii) extending, for cause, the period under section 362(d)(3) of the Bankruptcy Code; and (iv) granting such other and further relief as is just and proper.

PLEASE TAKE FURTHER NOTICE that responses or objections to the Motion, if any, must be in writing, conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Eastern District of New York, be filed with the Court electronically (or, for parties not able to file electronically, with the Clerk of the Court), and be served upon the undersigned so as to be actually received no later than **October 7, 2026 at 4:00 p.m.**

PLEASE TAKE FURTHER NOTICE that pursuant to section 1112(b)(3) of the Bankruptcy Code, the Court shall commence the hearing on this Motion not later than 30 days after its filing and shall decide the Motion not later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance or compelling circumstances prevent the Court from meeting those time limits. The return date stated above is the earliest date the notice rules permit and falls within that 30-day period. Kleinman, appearing pro se, defers to the Court on the date and time at which the Motion is actually heard, and expressly consents, for purposes of section 1112(b)(3), to any continuance the Court's calendar requires, including to the date already fixed for the hearing on Ridgeview Lender LLC's motion for relief from the automatic stay (ECF Nos. 19, 22).

PLEASE TAKE FURTHER NOTICE that the hearing will be conducted in person. Participants must register with eCourt Appearances at least one business day before the hearing, as directed in the Court's Order dated September 1, 2026 (ECF No. 18).

Dated: Miami Beach, Florida
September 23, 2026

Respectfully submitted,

/s/ Abraham Kleinman

**Abraham Kleinman**
Creditor and Party in Interest, Pro Se
407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com

**TO:**

Paul A. Rubin, Esq. *
Hanh V. Huynh, Esq.
Rubin LLC
11 Broadway, Suite 715
New York, New York 10004
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com
Proposed Counsel for the Debtor

Greg M. Zipes, Esq., Trial Attorney *
Office of the United States Trustee, Region 2
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004-1408
USTPRegion02.BR.ECF@usdoj.gov
greg.zipes@usdoj.gov

Aviva Francis, Esq. *
Jacobowitz Newman Tversky LLP
377 Pearsall Avenue, Suite C
Cedarhurst, New York 11516
afrancis@jntllp.com
Counsel for Ridgeview Lender LLC

The Ridgeview Realtor LLC
Attn: Joseph Doppelt, Manager
23 Heyward Street, #1B
Brooklyn, New York 11249

Yeshivah and Mesivta Arugath Habosem
Attn: Joseph Doppelt, President / Administrator
40 Lynch Street
Brooklyn, New York 11206

Joseph Doppelt
23 Heyward Street, #1B
Brooklyn, New York 11249

Moshe Zev Doppelt

41 Francis Place
Monsey, New York 10952

U.S. Small Business Administration
Office of Disaster Recovery & Resilience, Loan Servicing
14925 Kingsport Road
Fort Worth, Texas 76155
Re: SBA Loan No. 5889139106

Jeffrey Kaplan, Esq.
Kalter, Kaplan, Zeiger & Forman
47 N. Main Street, P.O. Box 186
Ellenville, New York 12428

Ulster County Department of Finance
P.O. Box 1800, 244 Fair Street
Kingston, New York 12402

Central Hudson
284 South Avenue
Poughkeepsie, New York 12601

Eliezer Friedman
c/o Subin LLP, Attn: Simon Hannanian
150 Broadway, 16th Floor
New York, New York 10038

Michael Banach, Code Enforcement Officer, Town of Rochester
c/o Mary Lou P. Christiana, Esq.
P.O. Box 3505
Kingston, New York 12402

New York State Department of Taxation and Finance
Bankruptcy Unit
P.O. Box 518
Albany, New York 12205-5189

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, Pennsylvania 19101

**ABRAHAM KLEINMAN**
407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com
*Creditor and Party in Interest, Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------x | |
| In re: | Chapter 11 |
| THE RIDGEVIEW REALTOR LLC, | Case No. 26-43491 (ESS) |
| Debtor. | |
| ------------------------------------------------------------x | |

**MOTION OF ABRAHAM KLEINMAN FOR AN ORDER (I) DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a), OR, IN THE ALTERNATIVE, (II) CONVERTING THE CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b), AND (III) EXTENDING THE PERIOD UNDER 11 U.S.C. § 362(d)(3)**

**TO THE HONORABLE ELIZABETH S. STONG, UNITED STATES BANKRUPTCY JUDGE:**

Abraham Kleinman ("Kleinman"), a creditor and party in interest, pro se, respectfully moves for entry of an order (i) directing the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(2), § 1104(a)(3) or § 1104(a)(1); or, in the alternative, (ii) converting this chapter 11 case to chapter 7 pursuant to 11 U.S.C. § 1112(b); and (iii) extending the period under 11 U.S.C. § 362(d)(3) for cause. A proposed order is annexed as Exhibit A. In support, Kleinman relies on the annexed Declaration of Abraham Kleinman dated September 23, 2026 and on Exhibits 1 through 36, including Exhibit 24, annexed to that Declaration and listed in the Schedule of Exhibits at the end of this Motion (cited "Ex. 3" and so forth), and states as follows:

## PRELIMINARY STATEMENT

1. One document should be read before anything else in this case. On February 11, 2026, five months before the petition, Joseph Doppelt signed for the Debtor a Commercial Lease Agreement letting the entire Property, "5 Ridgeview Road ... which consists of a 15 acre resort," to Bais Ruchel D'Satmar Inc. d/b/a Central UTA and Affiliated Entities, of 76 Rutledge Street, Brooklyn, for ten years from March 1, 2026, at $600,000 for the first year, $50,000 a month, rising 3% every second year to $675,305 in the tenth, for use as an "Educational campus," with the first month's rent in advance and a $100,000 security deposit "paid upon signing." Ex. 1 at 1, 3, 4, 26, 28. Central UTA is the institution at which Doppelt's own curriculum vitae, the one he filed with the Ulster County Department of Health, records his employment from 2005 to 2012. Ex. 5. Six days after signing that lease, on February 17, 2026, the Debtor, through the same counsel it now asks this Court to retain, consented to an order of the Supreme Court, Ulster County, that the Property "shall not be occupied until" the Town's list of violations was rectified. Ex. 23. Five months after that, Doppelt signed under penalty of perjury Schedules listing no lease, no tenant, no executory contract and no income; an affirmation that the Property has been vacant since August 2025; two Monthly Operating Reports reporting receipts of $0; and, at the meeting of creditors, answered "Correct" when asked whether the Property was locked down and secured, and, asked what the Debtor intends to do with the Property, described a camp that "financially, this did not work out" and a drug rehabilitation deal his attorney was negotiating, without a word about the ten-year lease he had signed seven months earlier. Schedules A/B, G; SOFA ¶ 1; ECF No. 16 ¶ 4; ECF Nos. 25, 26; Ex. 17. On the face of the lease, $150,000 was payable on signing and $50,000 on the first of every month from March 1, 2026: $350,000 before the petition, and $50,000 a month since, out of more than $6,300,000 over the term. None of it appears anywhere

in the Debtor's sworn record. The lease was not disclosed to this Court, to the United States Trustee, or to the Lender. It was circulated by the Doppelts themselves: on February 26, 2026, Yanky Doppelt e-mailed the signed lease from yanky@ymah.org to Kleinman, with Yoseph Doppelt at ydoppelt@ymah.org copied, under the subject line "LEASE WITH UTA_R." Ex. 1 at 1; Kleinman Decl. ¶ 20. The Debtor's manager thus had the Debtor's lease in hand, on YMAH's e-mail system, five months before he swore to this Court that the Debtor had no lease and no income. Either the Debtor has been collecting rent it has sworn does not exist, or its manager let a ten-year lease of the estate's only asset go uncollected and unmentioned while the Lender moved to foreclose. There is no version of those facts in which the person who signed both the lease and the Schedules can remain in possession of this estate.

2. Two more documents should be read with it. On June 4, 2026, five weeks before the petition, Kalter, Kaplan, Zeiger & Forman, the firm the Debtor now asks this Court to retain, wrote to the Town of Rochester "on behalf of my client," with "Yoseph Doppelt" copied, that "[a]s has been the case the last two summers, my client would like to operate the facility this summer for religious education with an emphasis of alcohol and drug abuse," and that "[f]ollowing this summer, my client will consent to terminate the use of the property as a alcohol and drug rehabilitation center." Ex. 2 at 2. Attached to that letter, as the "letters and documents from my clients confirming the continuing use of the property," was a letter dated June 2, 2026 on Yeshivah Mesivta Arugath Habosem letterhead, signed "Joseph Doppelt, Administrator": "We operate a year-round organization for children ages twelve to eighteen. Within our organization we have a program to assist kids in abstaining from alcohol and drugs. … At this time, we want to take the kids to our facility in Kerhonkson, NY and continue with our activities there for the next two months." Ex. 2 at 3. "Our facility in Kerhonkson" is 5 Ridgeview Road, the Debtor's only asset.

The "last two summers" are 2024 and 2025, and the second of them ended with the death of a child in the ritual bath on the Property. The "kids" are twelve to eighteen years old. The credentials attached for the director of this "year-round" program were a master's degree conferred on May 22, 2026, eleven days before the letter, and a printout dated June 1, 2026 of three online assignments in a course titled "Drug and Alcohol." Ex. 2 at 4-6.

3. Set those two documents beside what the same people told everyone else. To this Court, under penalty of perjury, the Debtor has no business, no income, no lease, no tenant and no affiliate, and the Property has been vacant since August 2025. ECF Nos. 1, 11, 16. To the Ulster County Department of Health, the same operation at the same Property was a "children's camp" for 172 campers under Subpart 7-2 of the State Sanitary Code, with Joseph Doppelt as camp director, and the words alcohol, drug and rehabilitation appear nowhere in the application. Exs. 3, 4, 5. Under New York Mental Hygiene Law § 32.05, no one may operate a substance use disorder treatment program without an operating certificate from the Office of Addiction Services and Supports; none is claimed anywhere in the record and none is scheduled. If the June 4 letter is true, an uncertified alcohol and drug rehabilitation center for minors was run on the Debtor's Property for two summers, one of them the summer of the death, by the entity the Debtor swears is a stranger to it, and the Debtor proposed to run it a third time while telling this Court the Property was empty. If the June 4 letter is not true, the Debtor's counsel put a false account of the use of the estate's only asset before a municipal prosecutor to settle a code enforcement action, at Doppelt's direction and with Doppelt copied. Either way, the firm that wrote it cannot be the estate's counsel, the man who directed it cannot be the estate's fiduciary, and the records behind it must be produced.

4. This case comes on the heels of a tragic death. In August 2025 a child attending a summer camp at the Debtor's only asset, 5 Ridgeview Road, was electrocuted in a ritual bath on

the property. ECF No. 16 ¶ 4. Six weeks earlier, on July 6, 2025, the Accord Fire District had found approximately 150 people inside buildings "supposed to be vacant," with exit doors padlocked or screwed shut, sprinkler and alarm heads taped over, spent extinguishers and propane in the kitchen, and no manager on site; the fire chief recorded that "Joseph Doppelt … had taken responsibility for all occupants," and the Town's fire constable recorded Doppelt's statement that "he is person responsible for the facility and participants of the camp." Exs. 6, 7. The camp was permitted by Ulster County in the name of "The Ridgeview Realtor LLC / Yeshiva and Mesivta Arugath Habosem." Exs. 3, 8. A wrongful-death action is pending. SOFA Exh. 7. The Debtor's sworn account to this Court is that the camp was run by a different entity, that the Debtor earned nothing from it, and that the Property has been vacant ever since. ECF No. 16 ¶¶ 2-3; SOFA ¶ 1.

5. That account cannot be squared with the Debtor's own documents, and it leads to the threshold question in this case, which the Debtor has answered four different ways, to the IRS, to its lender, to a federal agency and, under oath, to this Court, and answered wrongly even the last time, by attributing 40% of the Debtor to the estate of a man who had sold a quarter of that interest to Kleinman on March 15, 2024: who owns The Ridgeview Realtor LLC? The answer matters because it decides who is entitled to speak for the Debtor, whose money has been running through it, who its insiders are, who bears responsibility for what happened on the Property, and whether the Schedules this Court has been given can be believed.

6. On August 15, 2023, the Debtor was formed by a Monsey filing service, with Doppelt's apartment as its address, and on August 16, 2023, the Internal Revenue Service issued the Debtor's employer identification number to "Ridgeview Realtor LLC, Joseph Doppelt MBR," classifying it as a partnership, that is, a company with more than one member. Ex. 9. On November 20, 2023, the Debtor's $3,200,000 note to the Lender was signed by "David Braun, Managing

Member." ECF No. 19-2 at 26. On December 3, 2024, in a closing package that Joseph Doppelt submitted to the United States Small Business Administration in the Debtor's name, the Debtor certified that "the following are all of the Members of the Limited Liability Company: MOSHE ZEV DOPPELT [and] YESHIVAH AND MESIVTA ARUGATH HABOSEM", and on that certificate offered 5 Ridgeview Road as mortgage security for YMAH's $995,000 loan for YMAH's building on Lynch Street. Ex. 10 at 1-2, 7, 25, 36. On August 11, 2026, Joseph Doppelt swore to this Court that the Debtor's members are himself (10%, Manager), Raizel Doppelt (10%), Moshe Doppelt (40%) and the Estate of David Braun (40%); that YMAH is not a member, creditor, codebtor, affiliate or source of funds; that there is no lien on the Property but the Lender's; and that the Debtor guaranteed nothing. ECF Nos. 11, 14; SOFA ¶¶ 4, 13, 25, 28-30; Schedules D, G, H.

7. Those statements cannot all be true. Either YMAH's membership interest in the Debtor was moved to the Doppelt family between December 2024 and August 2026 without disclosure to this Court, without any board approval and without any record of consideration; or no transfer occurred, YMAH remains a member, and the Schedules are false; or the Debtor's principals made a false statement to a federal lender in order to offer the estate's only asset as security for an entity they run. Every branch of that fork ends in the same place: the person now in possession of this estate cannot be trusted to tell the Court who he is acting for.

8. The rest of the record confirms it. The Debtor swore to zero income for two and a half years. SOFA ¶ 1. In that period YMAH's audited financial statements report "Summer Camp Tuition" of $1,529,243 for fiscal 2024 and $2,220,906 for fiscal 2025, the two seasons YMAH ran at the Property, up from $1,241,885 in fiscal 2023, before the Property was bought. Ex. 11. Meanwhile $494,000 was wired to the Lender on the Debtor's mortgage from an entity that swears it has no bank account, ECF No. 19-5, and in June 2026, four weeks before the petition, Joseph

Doppelt, writing on YMAH letterhead as its "Administrator," told the Town "we want to take the kids to our facility in Kerhonkson," while he, writing as "Yoseph Doppelt" from ydoppelt@ymah.org, and Yanky Doppelt scheduled the Town's inspections and paid the Debtor's electrician through YMAH. Exs. 12, 13. Two years earlier, on June 17, 2024, Upscale Interiors of Spring Valley issued an $18,350 order confirmation to "MESIVTA ARUGATH HABOSEM, 5 Ridgeview road, Kerhonkson NY" for the setup, nine-week rental and removal of a ritual bath at the Property, with a water heater, benches for twenty and four showers plumbed into the house drain, and the same day Doppelt signed YMAH check No. 12034 for the $9,000 deposit on that ritual bath, drawn on YMAH's account ending 7049, routing number 026013576, a routing number issued to Signature Bank and now operated by Flagstar Bank, N.A. as its successor, which Arugath Habosem's own remittance advice identifies as its "Signature 7049 Gener" account, its general operating account. The further payments on that order were made the same way, by YMAH checks signed by Doppelt on the same account. Ex. 14; Kleinman Decl. ¶ 14. That ritual bath, the mikvah, is where the child died on August 20, 2025. That document does three things at once. It shows YMAH occupying and outfitting the Property for a summer season in 2024, a full year before the permits and the death, while the Debtor was swearing to zero income from formation. It shows YMAH holding itself out to a vendor as the customer at the Debtor's address. And it shows the Manager of the Debtor signing Arugath Habosem's check to pay for it. Doppelt's sworn account to this Court is that the camp was run by a different entity, Yeshiva Toras Chaim, and that the Debtor had nothing to do with it. ECF No. 16 ¶ 3. What that ritual bath became is a matter of public record. The New York State Police reported that on August 20, 2025 at approximately 8:15 p.m. troopers responded to Ridgeview Road in the Town of Rochester and that "a 17-year-old victim entered a large tank of water, referred to as a Mikvah, and grabbed a handheld pool heater, resulting in

electrocution and loss of consciousness." Ex. 15. The equipment Arugath Habosem rented, installed and paid for at the Debtor's Property is the equipment in which a child died, and the manager now in possession of this estate signed the check for it.

9. This is not a Debtor that can be left in possession. Kleinman asks first for a chapter 11 trustee under section 1104(a)(1) and (a)(2), who can take the books, identify the true equity, pursue the estate's claims against the insiders and YMAH, and sell the Property for what it is worth, and only in the alternative for conversion to chapter 7.

## JURISDICTION

10. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the Eastern District of New York. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested are 11 U.S.C. §§ 105(a), 362(d)(3), 1104(a) and 1112(b), and Bankruptcy Rules 1017, 2007.1 and 9014.

## BACKGROUND

### A. The Debtor, the Property and the Filing

11. The Debtor is a New York limited liability company formed in 2023. Its only asset is 5 Ridgeview Road, Kerhonkson, New York (SBL 68.1-1-27.700, 68.3-1-16.200 and 68.3-1-16.300) (the "Property"), an approximately 85-acre former treatment campus with a 55,612-square-foot, 83-room facility, purchased November 20, 2023 for $5,050,000 and scheduled at $5,200,000. Schedule A/B ¶ 55.1; ECF No. 16 ¶ 1; ECF No. 19-2. The purchase was financed by a $3,200,000 nine-month bridge loan from Ridgeview Lender LLC (the "Lender") at 18%, guaranteed by David Braun and Moshe Zev Doppelt, which matured August 20, 2024. ECF No. 19-2. The Lender obtained a judgment of foreclosure and sale for $4,555,600 in June 2026; the

Debtor filed this case on July 21, 2026, the day before the sale, and designated itself a single asset real estate debtor. ECF No. 1; ECF No. 17 ¶¶ 4, 6-7; ECF No. 19-6.

12. The Debtor scheduled the Lender as its only secured creditor; four unsecured creditors totaling $122,151.50 (Ulster County taxes, Central Hudson, Kalter, Kaplan, Zeiger & Forman ("KKZF"), and the wrongful-death claimant Eliezer Friedman, "unknown"); no executory contracts or leases; no codebtors other than Braun's estate and Moshe Zev Doppelt on the Lender's debt; no income for 2024, 2025 or 2026; no bank account, receivables, employees, accountant, bookkeeper or financial statements; and no interest in any other business. Schedules A/B, D, E/F, G, H; SOFA ¶¶ 1, 25, 26. Joseph Doppelt signed the petition, the Schedules and the SOFA as Manager. Doppelt alone holds the Debtor's books. SOFA ¶ 26c.

13. The Schedules omit a lease. On February 11, 2026, Doppelt executed for the Debtor, as Landlord, a Commercial Lease Agreement with Bais Ruchel D'Satmar Inc. d/b/a Central UTA and Affiliated Entities, as Tenant, demising "the entirety of 5 Ridgeview Road" (Schedule A: "Entire Property") for a term of ten years commencing March 1, 2026, at base rent of $600,000 for lease years one and two, $618,000 for years three and four, $636,540 for years five and six, $655,636 for years seven and eight and $675,305 for years nine and ten, payable monthly, for the permitted use "Educational campus," with the first month's rent in advance and two months' rent, $100,000, as security "paid upon signing." Ex. 1 at 1, 3, 4, 26, 28. The lease puts every carrying cost of the Property on the Tenant: real estate taxes, water and sewer, utilities, insurance in stated minimum amounts, maintenance of the common areas and parking, and all permits and licenses, and states that the Landlord "makes no representation as to the permitted use of the Premises." Ex. 1 at 3-6, 11-12. It was signed six days before the Debtor consented, in the Code Enforcement Action, to an order that the Property "shall not be occupied until" the Town's violations were

rectified, and its March 1, 2026 commencement date fell twelve days after that order. Ex. 23. Schedule G lists no unexpired lease; Schedule A/B lists no rent receivable, no security deposit held and no cash; SOFA ¶ 1 reports no income for 2026; ECF No. 16 states that the Property has been vacant since August 2025; the Monthly Operating Reports for July and August 2026 report receipts of $0; and at the meeting of creditors Doppelt confirmed under oath that the Property was locked down and secured. ECF Nos. 11, 16, 25, 26; Ex. 17. Rents of the Property are property of the estate under section 541(a)(6), and, to the extent the Lender's mortgage reaches them, its cash collateral under section 552(b)(2), which the Debtor may not use without the Lender's consent or an order of this Court. 11 U.S.C. § 363(c)(2). The copy annexed as Exhibit 1 was scanned on February 26, 2026 and e-mailed that day to Kleinman by Yanky Doppelt from yanky@ymah.org, with Yoseph Doppelt (ydoppelt@ymah.org) copied, as "Document*02262026*001.pdf" under the subject "LEASE WITH UTA_R." Ex. 1 at 1; Kleinman Decl. ¶ 20. The lease of the Debtor's only asset was thus transmitted by YMAH personnel, from YMAH's system, with the Debtor's manager copied, which is one more document showing the Debtor and YMAH run from the same desk.

**B. Five Sworn Accounts of Who Owns the Debtor**

14. IRS, August 16, 2023. The IRS issued the Debtor's EIN to "RIDGEVIEW REALTOR LLC, JOSEPH DOPPELT MBR." Ex. 9. Doppelt was thus the Debtor's designated member and responsible party before the Property was bought.

15. Lender, November 20, 2023. The note and mortgage were executed by "David Braun, Managing Member." ECF No. 19-2 at 26. The SOFA states Braun was Manager "2023 to 2026." SOFA ¶ 29.

16. SBA, December 3, 2024. In connection with SBA Disaster Loan No. 5889139106, a $995,000, 2.375%, fifteen-year loan to YMAH to rehabilitate YMAH's building at 40 Lynch

Street, Brooklyn, damaged in September 2023, Joseph Doppelt applied to the SBA on YMAH's behalf and submitted, in the Debtor's name, a closing package that included a Certificate of Authority stating that "the following are all of the Members of the Limited Liability Company: MOSHE ZEV DOPPELT [and] YESHIVAH AND MESIVTA ARUGATH HABOSEM," an Unconditional Guarantee (SBA Form 148) of YMAH's note by the Debtor, and a Mortgage on the Property in favor of the SBA securing YMAH's debt. Ex. 10 at 1-2, 7-10, 17, 25-36. The instruments are drawn for signature by Moshe Zev Doppelt as Member and by YMAH as Member, acting through Joseph Doppelt, President, Joel Friedman, Trustee, and Yoel Salcer, Trustee. Ex. 10 at 2, 10, 36. Each of those submissions carried a certification. SBA Form 5, the Disaster Business Loan Application, states above the signature line that "[b]y signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future," and warns that "[a]ny false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions," including "[f]ines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571," and "[t]reble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729." Ex. 10 at 56-57. The closing certifications say it again: "All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan." Ex. 10 at 22. The Certificate of Authority naming Arugath Habosem as a member of the Debtor was such a supplementary submission. The Loan Authorization also required, as a condition of any disbursement, that the Borrower "not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its

employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower." Ex. 10 at 21. The SBA conditioned disbursement on proof that its mortgage was recorded. Ex. 10 at 18. The closing set ends with an Affidavit as to Exemption from Mortgage Tax, sworn and notarized on December 5, 2024 by Christopher A. Wood, an attorney of the United States Small Business Administration, certifying that the SBA "is making a loan in the amount of $995,000.00 to YESHIVAH AND MESIVTA ARUGATH HABOSEM secured by a Real Estate Mortgage executed by THE RIDGEVIEW REALTOR LLC covering property located at 5 RIDGEVIEW RD, ROCHESTER, NY 12446 to be offered herewith for recording," and that "[t]he total amount secured by this Security Instrument at any one time shall not exceed $2,000,000.00." Ex. 10 at 62-63. An affidavit of that kind exists for one purpose: it is what a lender files with the county clerk, together with the mortgage, to claim the mortgage-recording-tax exemption at the moment the mortgage is presented for recording. A federal officer swore to it under oath. Whether the instrument reached the Ulster County Clerk is a matter of public record that a trustee can settle in an afternoon, and the answer cuts against the Debtor either way. If it was recorded, then a lien on the estate's only asset, securing an affiliate's debt, is missing from Schedule D. If it was not recorded, then the Debtor executed and delivered a mortgage of its only asset for an affiliate's benefit, from which it was to receive nothing, and the Schedules disclose neither the instrument, nor the obligation, nor the affiliate. The obligation was incurred either way: section 548(a)(1) reaches any "obligation ... incurred" by the debtor, and New York Debtor and Creditor Law section 273 reaches an obligation incurred without reasonably equivalent value. Perfection is not the question. The set in Kleinman's possession is the closing set as submitted, and the copy reproduced here does not bear signatures. Kleinman is informed by the SBA's loan servicing center that the agency's file contains an application signed by Joseph Doppelt carrying the same information

reproduced in Exhibit 10. The Debtor's Schedules disclose none of this. What is not in doubt is that the Debtor's manager submitted to a federal agency a certificate of the Debtor's membership that omits every member the Debtor now swears to, offered the estate's only asset as collateral for YMAH's debt, and certified the whole submission as true to induce a federal agency to lend. The Debtor was to receive nothing: the loan proceeds were for Lynch Street.

17. The operating agreement, November 2023. The only operating agreement of the Debtor that exists, an unsigned form dated "the __ day of November 2023," names four members, David Braun (40%), Moshe Doppelt (40%), Raizel Doppelt (10%) and Joseph Doppelt (10%), and provides that "the business and affairs of the Company shall be managed by David Braun (the Manager)" and that "all decisions of the company shall be made by the Manager." Ex. 16 ¶¶ 4-6. It names no successor manager. Joseph Doppelt filed this case as "Manager" on the strength of a certificate reciting a "special meeting" of July 20, 2026 attended by himself, Raizel Doppelt and Moshe Doppelt, the three of whom together held, on the operating agreement's own figures, 60% of the Debtor; no instrument appointing Doppelt as Manager has been produced, and neither Kleinman, who holds 10%, nor the Estate of David Braun, which holds the remaining 30%, received notice of the meeting or signed the certificate. ECF No. 1 at 6-7. To remove any question, Kleinman, as the holder of a 10% interest, joins in and ratifies the decision to seek relief under chapter 11. What he does not join, and has never consented to, is Joseph Doppelt acting as Manager of the Debtor or exercising the powers of a debtor in possession. A child died on the Property during the camp season that YMAH conducted there under Doppelt's control; a wrongful-death action, Friedman v. Yeshiva Toras Chaim LLC, et al., Index No. 515104/2026 (Sup. Ct. Kings County), is pending, and the circumstances of the death remain under inquiry. The person whose conduct is at issue in that inquiry should not be the person deciding, on the estate's behalf, what is

disclosed, what is preserved and what is pursued. The point of the July 20, 2026 resolution is not that the case should end; it is that the two members who are not Doppelts were not told the company was going into bankruptcy, and that is a reason to put the estate in the hands of a trustee.

18. This Court, August 11, 2026. The Schedules, the Statement of Corporate Ownership and the List of Equity Security Holders identify the members as Joseph Doppelt (10%), Raizel Doppelt (10%), Moshe Doppelt (40%) and the Estate of David Braun (40%). ECF Nos. 11, 14. YMAH does not appear as a member, former member, affiliate, creditor, codebtor, guaranteed party or lienholder. Nothing about the SBA application, the certificate of membership submitted with it, the guarantee and mortgage offered, or the October 2025 request to modify the loan appears anywhere in the Schedules or the SOFA, and the SBA is not on the creditor matrix. ECF Nos. 11, 13.

19. The United States Trustee, September 14, 2026. At the meeting of creditors, under oath, Doppelt gave another account, and a different one. Asked to explain his relationship to the Debtor, he answered: "The owners of this property are my father-in-law who passed away. My father, me, and my wife." He then described the holdings: "The original partnership was 40 my father-in-law, 40 my father, 10 me, and 10 my wife. My wife is an only child, so the whole 40% goes down. So basically, we are the 60% owner." Ex. 17. Three things follow. First, the answer identifies David Braun as Doppelt's father-in-law and Raizel Doppelt as Braun's only child, a relationship disclosed nowhere in the Debtor's papers, and it makes every member of this Debtor a member of one family. Second, it describes four individuals, and not the Debtor, as "the owners of this property," which the Debtor owns of record. Third, it states that Braun's 40% has already passed to Doppelt's wife, while the Schedules filed three weeks earlier, and left unamended at that same meeting, still report that 40% as held by the Estate of David Braun. ECF Nos. 11, 14. Neither

the Schedules nor the testimony accounts for the interest Braun sold to Kleinman on March 15, 2024.

20. YMAH's own audited financial statements for the fiscal years ended June 30, 2023, 2024 and 2025, each certified by Joseph Doppelt as YMAH's chief executive, report no investment in the Debtor and no SBA loan of $995,000. Ex. 11 (Notes 8-13). YMAH reported total assets of $23,955,457 at June 30, 2025. Id.

21. Kleinman's own relationship to the Debtor. Kleinman is a member of the Debtor and its largest creditor. He paid for the Debtor's formation in August 2023. On March 15, 2024, he purchased from David Braun a 10% membership interest in the Debtor, carved from the 40% that Braun held under the operating agreement; that interest equals Joseph Doppelt's and Raizel Doppelt's. The same day, KKZF engaged Kleinman as its client for the Property and Kleinman signed the Debtor's zoning application as a member. Exs. 18, 19. The interest was sold, not pledged. The Schedules attribute the full 40% to the Estate of David Braun and do not mention Kleinman. Kleinman received no notice of the July 20, 2026 "special meeting" and was not asked to consent to the filing. He joins in and ratifies the decision to seek chapter 11 relief; he does not consent, and never has, to Joseph Doppelt acting as Manager or exercising the powers of a debtor in possession. Between November 20, 2023 and June 2026, MAA Capital Management LLC ("MAA"), an entity Kleinman owns and controls, advanced not less than $3,500,000 to and for the benefit of the Debtor, approximately $1,500,000 for construction and rehabilitation, due in full on June 15, 2026, and approximately $2,000,000 for the Debtor's vendors and for payments on the Lender's mortgage, expressly as loans at 21% and not as capital contributions; on June 15, 2026, before the Petition Date, MAA assigned its entire claim to Kleinman. Those advances were made to and for the benefit of the Debtor and of YMAH together, at Doppelt's request, and a substantial

part of the money was received and applied by YMAH for the Property it occupied and used as its own. Kleinman holds his claim against the Debtor and against YMAH and Doppelt jointly and severally. The claims against YMAH and Doppelt are Kleinman's own property, not property of this estate, and are asserted in the adversary proceeding he has commenced; nothing in this Motion waives them. Outside the summer seasons Kleinman personally managed the Property's rehabilitation and maintenance; once each season began, Doppelt took full control, and Kleinman had no role in the camp YMAH conducted there in 2024 or 2025. Doppelt was involved in the construction, maintenance and operation of the Property from the beginning: he personally signed the YMAH check that paid the deposit for the ritual bath and showers installed for the 2024 season, a project ordered in YMAH's name, paid for in full by YMAH checks he signed, and operated by YMAH. Ex. 14. Kleinman Decl. ¶¶ 3-12.

**C. The Undisclosed Operation of the Property by YMAH**

22. On June 20, 2025 and June 27, 2025, the Ulster County Department of Health issued Permit No. 55-5882 (Temporary Residence, 56 rooms, through November 30, 2025) and Permit No. 55-10121 (Children's Camp, capacity 172, through August 29, 2025) to "THE RIDGEVIEW REALTOR LLC / YESHIVA AND MESIVTA …" as "the operator of CAMP YESHIVA AND MESIVTA ARUGATH HABOSEM at 5 Ridgeview Road." Exs. 3, 8.

23. On July 6, 2025, the Accord Fire District responded to an alarm at the Property and found that "the buildings were supposed to be vacant, but … there were approximately 150 individuals on scene," that "many doors were padlocked, and many others were screwed shut," that "sprinkle heads & alarm heads were taped over," and that "Joseph Doppelt … had taken responsibility for all occupants." Ex. 6. The Town's Fire Constable recorded that Doppelt "came to the scene upon receiving a call from Abraham who is the owner" and "stated he is person

responsible for the facility and participants of the camp." Ex. 7. The next morning Doppelt, writing as "Yoseph Doppelt" from ydoppelt@ymah.org and signing as "Administrator, Yeshivah And Mesivta Arugath Habosem," wrote to the Town's Code Enforcement Officer that "we've since corrected" the violations. Ex. 12.

24. On August 14, 2025, the Town sued the Debtor and YMAH as "the owner and operator of the premises." Ex. 20 ¶¶ 2, 4. The Verified Answer filed by KKZF on September 26, 2025 admitted those allegations. Ex. 21 ¶ 3. On October 7, 2025, the Supreme Court, Ulster County (Schreibman, J.), ordered that the Property "shall not be occupied, except for the sole purpose of rectifying the violations, with no overnight occupancy." Ex. 22. A consent order to the same effect was signed in February 2026. Ex. 23. On May 4, 2026, KKZF moved by order to show cause to be relieved as counsel to the Debtor and YMAH in that action for non-payment of its fees, and on September 9, 2026 the Debtor applied to retain that same firm as special counsel to this estate. Ex. 24; ECF No. 23.

25. On June 2, 2026, Doppelt wrote on YMAH letterhead, as "Administrator," that "we want to take the kids to our facility in Kerhonkson, NY and continue with our activities there for the next two months." Ex. 2. On June 4, 2026, KKZF proposed to the Town, on behalf of "my client" and with "Yoseph Doppelt, Yeshivah Mesivta Arugath Habosem" copied, that "as has been the case the last two summers, my client would like to operate the facility this summer." Ex. 2. Between June 9 and June 29, 2026, Yanky Doppelt and Yoseph Doppelt, from @ymah.org addresses and over the signature block "Yeshiva And Mesivta Arugath Habosem, 40 Lynch Street," scheduled the Town's inspections, submitted sprinkler reports the Town found to be blank, and forwarded an electrician's certification bearing YMAH's payment link. Ex. 13. On June 12, 2026, a Brooklyn addiction-treatment provider delivered to "Ridgeview Realtor LLC, Joseph

Doppelt" a letter of intent to lease the entire Property for $450,000 per year, triple net, for fifteen years. Ex. 25. On June 24, 2026, the Town issued a Notice of Non-Compliance with corrections due July 22, 2026, the day after the petition. Ex. 26.

26. None of this appears in the Debtor's filings. The Debtor's sworn account is that the Property was used by "Yeshiva Toras Chaim" to run a camp until September 2025 and has been vacant since. ECF No. 16 ¶¶ 2-3. Schedule G lists no lease, license or letter of intent. SOFA ¶ 25 lists no affiliate. SOFA ¶ 1 lists no income.

27. The State of New York and the United States both carry a record of who supplies water to this Property, and it is not the Debtor. The Ulster County Department of Health's water system inspection of June 24, 2025, produced from the Department's own file, identifies the supply at "5 Ridgeview Road" under facility code 55-5882, the same code as the Temporary Residence permit, as the "YESHIVA AND MESIVTA ARUGATH HABOSEM Water Supply," carrying New York State Public Water Supply ID NY5505564. Ex. 27. In the federal Safe Drinking Water Information System that system is named YESHIVA AND MESIVTA ARUGATH HABOSEM, its organization and administrative contact is DOPPELT, JOSEPH at 23 Heyward Street, Apartment 1B, Brooklyn, the address to which the Debtor's own debtor in possession bank statement is mailed, its contact email is ridgeviewtower@gmail.com, it serves a population of 150 through 40 connections, its operating season runs January 1 to December 31, and it is listed as active, with no deactivation date. Ex. 28. New York cited that system for failing to file an operations report for each month from June through October 2024, and again for September and October 2025, the second pair returned to compliance on December 16, 2025. Id. The permit dates line up with those two months. The Children's Camp permit ran nine weeks, June 27 to August 29, 2025. The Temporary Residence permit for the same Property, issued under facility code 55-5882,

the same code the Department assigns to this water supply, ran from June 20 through November 30, 2025. Exs. 3, 8. The two operations reports the State says were never filed are for September and October 2025, inside that window and after the month in which the Debtor says the Property went dark. The Debtor swears the Property has been vacant since September 2025 and that it has no affiliate, no lease and no income. ECF No. 16 ¶¶ 2-3; SOFA ¶¶ 1, 25. The State has been regulating an active public water supply at the Property in the name of the affiliate the Debtor says does not exist, administered by the Debtor's own manager, at the Debtor's own address, into the fall of 2025.

28. And the Property was not vacant after the petition either. On February 17, 2026, in the Code Enforcement Action, Justice Schreibman entered an Order on Consent, consented to by Kalter, Kaplan, Zeiger & Forman for both the Debtor and Arugath Habosem, that 5 Ridgeview Road "shall not be occupied until the list of violations set forth on the Town of Rochester letter dated October 15, 2025 ... have been rectified." Ex. 23. On June 24, 2026 the Town found that "numerous deficiencies remain," including standalone battery smoke alarms still installed in the sleeping units, and set July 22, 2026 for corrections. Ex. 26. The petition was filed July 21. On August 3, 2026, thirteen days into this case, at about 12:30 in the afternoon, Kleinman recorded school buses on the Property, groups of young people on the grounds, and a marked New York State Police vehicle in the driveway. Ex. 29; Kleinman Decl. ¶ 19. The young people on the grounds were girls or young women. Arugath Habosem's schools are for boys, and every counselor named in Doppelt's June 2 letter to the Town is a man. Ex. 2; Kleinman Decl. ¶ 19. Who was using the Property on August 3, and under what arrangement with the estate, the Debtor has never said. Ten days later Doppelt swore to this Court that the Property was vacant. ECF No. 16. Forty-two days later, asked by the United States Trustee whether "this is a debtor that's not operating right in

any way" with "nobody on premises," he answered "Correct," and when the Trustee told him that any occupancy during the case must be brought to his office's attention immediately, he answered "Absolutely." Ex. 17. The July operating report, signed September 10, reports no activity of any kind. ECF No. 25.

29. Two documents obtained since the petition settle who the employer at the Property was, and who was building there. The first is Form DB-120.1, the Certificate of Insurance Coverage required by section 220(8) of the New York Disability and Paid Family Leave Benefits Law, issued May 30, 2024 by ShelterPoint Life Insurance Company. The insured named in Box 1a is "YESHIVAH AND MESIVTA ARUGATH HABOSEM, 40 LYNCH STREET, BROOKLYN, NY 11206," federal employer identification number 11-1754036, under policy No. DBL159621 for January 30, 2024 to January 29, 2025. Box 4A is checked for both disability and paid family leave benefits and Box 5A for "All of the employer's employees." The certificate holder named in Box 2 is the Ulster County Department of Health. Ex. 30. A DB-120.1 is filed with a permitting agency to obtain a permit, and the only permits that Department issues for the Property are the temporary residence and children's camp permits. Exs. 3, 8. The certificate was furnished to the Department on May 30, 2024, at the express request of its Environmental Health Manager, who had asked for the permit application for the Property "with insurance and fee." Arugath Habosem obtained that policy and paid its premium. Kleinman Decl. ¶ 12. Arugath Habosem thus certified to a county agency that it is an employer with employees, in connection with the Property, in May 2024, three weeks before it ordered and paid for the ritual bath there and a year before the 2025 permits. Exs. 14, 15. The Debtor swears it has no employees and no operations. Both statements cannot describe the same enterprise.

30. The second is the Town of Rochester building permit file. On May 21 and 22, 2025 the Debtor applied in its own name for two permits, granted June 3, 2025. Miscellaneous Permit Application 25/394 names "Ridgeview Realtor LLC" as property owner and PSI Concrete as builder, gives the intended use of a two-story, 3,600 square foot space as a "Prayer Room," and states the cost at $11,000; Application 25/395 sought to demolish a 3,000 square foot interior room; and plan sheet A-101, signed by Eric Knute Osborn, R.A., calls for the former in-ground pool basin to be backfilled with crushed stone and finished with a five inch concrete slab. Ex. 31. So the Debtor was the applicant and the owner of record on construction at the Property in the same months for which it swears it had no income, no operations and no business; it had no bank account from which to pay the contractor, and the contractor was in fact paid by Kleinman: every dollar of the PSI Concrete work was paid by Kleinman, on the express guarantee of Doppelt, given on behalf of himself, Arugath Habosem and the Debtor, that it would be repaid, and none of it has been, Kleinman Decl. ¶ 12; and the Workers' Compensation and Disability Benefits section of its own application is blank, with no policy number and no exemption claimed, the only certificate of insurance in the Town's file being the contractor's, which reached the Town from an Arugath Habosem e-mail address and was paid for by Arugath Habosem. Kleinman Decl. ¶ 12. A debtor in possession whose construction was paid for by a creditor it does not schedule, on a guarantee by its manager that it does not schedule either, and whose contractor was insured by an entity it swears is a stranger, is not keeping books anyone can rely on.

31. Arugath Habosem also paid the premiums on the insurance carried for the Debtor and the Property, $49,396 of them, out of five different accounts of its own: $11,656 from the account ending 9134, $5,828 from the American Express account ending 1000, $7,451 from the account ending 8172, $7,060 from the account ending 7873, and $17,401 from the general

operating account ending 7049 on which check No. 12034 was drawn. Each of the five is an account of Arugath Habosem. Kleinman Decl. ¶ 13. An entity that insures another company's building out of five of its own accounts is not a stranger to that company. Doppelt has said as much himself. When Kleinman asked him which entity the advances were for, Doppelt told him that "they are all one," that "they all share the same accounts," and that they use the same credit cards. Kleinman Decl. ¶ 6.

32. There is now a fourth sworn statement that cannot stand. Question 7 of the Statement of Financial Affairs requires the Debtor to list every legal action, administrative proceeding, investigation and governmental audit in which it was involved in any capacity within the year before filing. Doppelt answered with an exhibit listing three proceedings, the Lender's foreclosure, the Town of Rochester's code enforcement action, and the wrongful-death action in Kings County, and no others. ECF No. 11, SOFA ¶ 7 and SOFA Exhibit 6. Within that year the Ulster County Department of Health preferred charges against the Debtor on November 4, 2025 and again on April 1, 2026; served a Notice of Preliminary Conference; convened that conference on April 23, 2026; and took from Doppelt a signed Stipulation of Settlement for "THE RIDGEVIEW REALTOR LLC / YESHIVA AND MESIVTA ARUGATH HABOSEM" reciting that "the Respondent accepts responsibility for such violations and the need to take corrective measures," the violations being the wiring over the pool and, in Charge 2, that "the incident which occurred at Mikvah was not reported and no medical log was on site," imposing corrective action and exposing the Debtor to a fine of up to $4,000 for continued noncompliance during the 2026 operating year. Ex. 4. None of it appears anywhere in the Schedules, in Schedule E/F as a contingent liability, in Schedule G as an executory obligation, or in the Statement of Financial Affairs as a proceeding. The omission was not a failure to understand the question. The same

exhibit lists the Town of Rochester's code enforcement action over the same property, and the Schedules list the Ulster County Department of Finance as a creditor for $51,376 in taxes. The Debtor knew how to disclose a proceeding about this Property and how to name a county agency. It disclosed the ones that did not carry Doppelt's signature accepting responsibility. If the Debtor now amends the Statement of Financial Affairs to add the proceeding, that will be an amendment made only after a creditor obtained the County's file under the Freedom of Information Law and put it before the Court. It will confirm the omission, not cure it, and it will say nothing about the other subjects on which the Schedules are contradicted by the Debtor's own documents.

33. The charges themselves describe the condition of this estate's only asset. Charge 1 states that at the inspection of August 22, 2025 the Department observed "modifications to electrical wiring done ... in a garage converted to a Mikvah room without building department approval," wires "in poor condition," "extension cords ... taped with electrical tape," "double extension cords," and "[o]verhead wiring ... within three (3) feet above religious pool." Ex. 4. Those are the findings of the permitting agency, made two days after a child died there, about a room the Department describes as a converted garage. The same inspection found that State and national sex offender registry checks and staff reference checks had not been completed, that camper and staff orientation had not been done, that the aquatics director had not signed off on the safety plan, that there was no medical log on site, and that the incident at the Mikvah had not been reported to the Department. Ex. 27. Nineteen days earlier the Department had cited, as a public health hazard, an exit door from the synagogue basement screwed shut and a smoke detector not functioning. Ex. 27. The manager now in possession of this estate is the man who signed the settlement of those charges for both entities and then left it out of a sworn statement in which he listed the Town's enforcement action over the same property and the wrongful-death action arising

from the same death. He is not a fiduciary this estate can rely on to evaluate its own exposure, to preserve the evidence of that condition, to pursue the insurance that may respond to it, or to decide whether the estate has claims against him and against the entity he heads.

34. Who ran the Property is no longer open either. Doppelt gave the Department his own curriculum vitae, from Ydoppelt@ymah.org at 23 Heyward Street, the Debtor's service-of-process address: "Head of School" of Yeshiva Mesivta Arugath Habosem since 2012, with oversight of "all aspects of school operations, including ... staff hiring and supervision, budgeting," and "Assist Camp Director" of "Camp Arugath Habosem" since 2016, "overseeing daily operations for a summer camp serving over 750 campers and 80 staff members" and assisting with "staff training, health & safety compliance, and emergency procedures." Ex. 5. The Department's own intake sheet for the 2025 season, in the Department's hand, reads "Camp Director: Name Joseph Doppelt." Ex. 5. Every 2025 inspection report the Department issued for the Property is directed "To the Attention of: Joseph Doppelt," the report of August 25, 2025 names "Joseph Camp Director" as the responsible person who received it, and they record violations including fire safety cited as a public health hazard, Item 15, qualified director and counselors, and Item 17, personnel records, resumes on file and Criminal Justice Services, State Education and State Central Register checks. Ex. 27. Three certificates of employer coverage furnished to that Department across two seasons each name Arugath Habosem as the insured employer. Exs. 30, 32. The certificates for the 2025 season were submitted to the Department by Doppelt himself, with the 2025 camp application that named him as camp director. Ex. 5; Kleinman Decl. ¶ 12. Against all of that the Debtor swears it had no income, no operations, no employees and no business of its own, and that some other entity ran the camp. ECF Nos. 11, 16, 25, 26.

**D. The Money**

35. The Lender's payment history shows wires to the Lender on the Debtor's account of $48,000 (January 16, 2024), $48,000 (February 7, 2024), $30,000 and $18,000 (March 6 and 7, 2024), $50,000 (May 28, 2024) and $300,000 (April 10, 2025, "Partial Interest Payment - Accrued Balance"), $494,000 in all, from a Debtor with no bank account. ECF No. 19-5; Ex. 33. The Debtor does not say whose money that was. YMAH's audits show "Loans Payable - Related Parties" rising from $120,131 (June 30, 2024) to $1,295,982 (June 30, 2025) and "Loans Payable - Third Parties" of $1,047,580, alongside a $750,000 M&T Bank line of credit "secured by all assets of the Organization." Ex. 11. Kleinman's Rule 2004 Motion seeks the bank records that will show the path of every dollar.

36. Part of that path is no longer a matter of inference. On April 3, 2025, seven days before the $300,000 wire, Doppelt sent Kleinman a text message: "The rest send to the Ridgeview realtor routing 026013673 Account [ending 0416]." Ex. 34. Routing number 026013673 is TD Bank, N.A. Kleinman was providing money to pay the Lender. Doppelt directed part of it to himself and "the rest" to an account he identified as the Debtor's, and told Kleinman the money was for Arugath Habosem and the Debtor together. Kleinman Decl. ¶ 18. No account at TD Bank, N.A. appears anywhere in the Debtor's filings. Schedule A/B line 3, which asks the Debtor to "[i]dentify all" checking and savings accounts, is blank. SOFA question 18, which asks whether any financial account "held in the debtor's name, or for the debtor's benefit" was "closed, sold, moved, or transferred" in the year before the petition, is answered "None." The July 2026 operating report attaches no bank statement, and the only statement the Debtor has ever produced is for an account opened August 7, 2026. ECF Nos. 11, 25, 26-1. One of three things is true. The TD Bank account was open on July 21, 2026, and Schedule A/B is false. Or it was closed between July 21, 2025 and July 21, 2026, and SOFA 18 is false. Or it was closed before July 21, 2025, in which

case the Schedules survive on this point and every dollar that passed through that account in 2024 and 2025, including whatever part of the $494,000 paid to the Lender, moved through an account of the Debtor that the Debtor has never mentioned, in a period for which it swore to no income and no payments to anyone. Each branch ends in the same place. TD Bank, N.A. is not among the parties to be subpoenaed under the proposed Rule 2004 order, ECF No. 31, because Kleinman did not know of the account when he filed it; it should be.

37. One more consequence of two summers of occupancy has never been addressed on this record. New York imposes sales tax on the rent for occupancy of a room in a hotel, Tax Law section 1105(e), and Ulster County imposes a four percent occupancy tax on hotels, motels and short-term rentals, Tax Law section 1202-l, which requires the operator to register with the County and to hold a certificate of authority before collecting it. The Ulster County Department of Health permitted this Property as a <u>Temporary Residence</u> of 56 rooms from June 20 through November 30, 2025, and as a children's camp for 172 persons, in both cases naming "The Ridgeview Realtor LLC / Yeshiva and Mesivta Arugath Habosem." Exs. 3, 8. Schedule E/F lists Ulster County for real property taxes and lists no New York State taxing authority at all, and the Debtor swears it had no income, no bank account and no receivables. Schedules A/B, E/F; SOFA ¶ 1. Either charges for occupancy at the Property were collected, in which case the estate may carry a trust-fund tax obligation, New York Tax Law section 1132(a), and a priority claim under 11 U.S.C. section 507(a)(8) that appears nowhere in the Schedules; or they were collected by another entity operating under permits issued in the Debtor's name, which is the same diversion of the Property's income described above. Kleinman does not know which, and neither does any other creditor, because the person who holds the books is the person on both sides of the question. A trustee can answer it, and the Court can determine any tax liability under 11 U.S.C. section 505(a).

**E. The First Monthly Operating Report**

38. On September 10, 2026, the day after the KKZF retention application, the Debtor filed its first Monthly Operating Reports, for July and August 2026, signed by Doppelt as "Responsible Party." ECF Nos. 25, 26. The July report states cash of $0, receipts of $0, disbursements of $0, "[d]isbursements made by third party for the benefit of the estate" of $0, and no bank statements. ECF No. 25, Part 1. In the Part 7 questionnaire Doppelt certified that no "payments [were] made to or on behalf of insiders" (Question c: "No"), and, three lines later, that the Debtor has casualty/property insurance and general liability insurance and that "premiums [are] current" (Question i: "Yes," "Yes"). Id. at 8. The August report is the first to show any money at all. On August 7, 2026, seventeen days after the petition, the Debtor opened the first bank account it has ever had, a debtor in possession checking account ending 0253 at Flagstar Bank, N.A., the institution that acquired Signature Bank from the Federal Deposit Insurance Corporation in March 2023 and operates the former Signature branches, and the same institution that carries YMAH's general operating account ending 7049, on which Doppelt drew check No. 12034. The statement is addressed to 23 Heyward Street in Brooklyn, not to the Property. Nothing in either report states who opened that account, on whose authority, who signed the signature card, who the authorized signatories are, or whether an existing YMAH banking relationship, officer or branch was used to open it. One deposit has been made into it, $100 on August 11, 2026, wired from a JPMorgan Chase account ending 9093 in the names of Jacob Doppelt or Rose Friedlander, neither of whom is identified anywhere in the Debtor's papers, whose relationship to Doppelt, to the Debtor and to YMAH is nowhere disclosed, whose advance is not characterized as a loan, a capital contribution or a gift, and for which no application was made under section 364. Jacob Doppelt appears in the Town's records as the on-site contact and manager at the Property for the fire-alarm responses of June 2026, when the Debtor swore it had no operations, no employees and no income. Ex. 26. The

report shows receipts of $100, disbursements of $0, no employees, no operations, and no professional fees approved or paid. ECF Nos. 26, 26-1. A debtor two months into a chapter 11 case whose entire treasury is one hundred dollars sent by a relative, and which has no employees, no receipts, no disbursements and no operations, is not reorganizing. It is holding an asset while other people litigate.

39. Both answers cannot be true. The Debtor has no bank account and reports $0 of disbursements by anyone. The Property's commercial-property policy, Lexington Insurance Co. No. 019764690-00, effective June 16, 2026, brokered by P&G Brokerage, Inc., is issued to "The Ridgeview Realtor LLC, Habosem Home LLC," an entity that appears nowhere in the Schedules, and the broker's invoice is dated September 9, 2026. Ex. 35. Someone other than the Debtor is paying to insure the estate's only asset, in the name of an undisclosed "Habosem" entity, and the Manager has certified under penalty of perjury that no one is. That is not a historical omission from a schedule filed in August; it is a false statement to the United States Trustee made on September 10, 2026 about the current month.

## ARGUMENT

### I. A CHAPTER 11 TRUSTEE SHOULD BE APPOINTED UNDER SECTION 1104(a)

#### A. Cause Under Section 1104(a)(1): Management Has Not Told the Court Who Owns the Debtor

40. Section 1104(a)(1) provides that the court "shall order the appointment of a trustee, for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." Once cause is found the appointment is mandatory. In re V. Savino Oil & Heating Co., 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989); In re Marvel Entm't Grp., Inc., 140 F.3d 463, 472-73 (3d Cir. 1998). The remedy is extraordinary and requires clear and convincing evidence. Adams v.

Marwil (In re Bayou Grp., LLC), 564 F.3d 541, 546 (2d Cir. 2009); Taub v. Taub (In re Taub), 427 B.R. 208, 227-30 (Bankr. E.D.N.Y. 2010). Pre-petition conduct counts. 11 U.S.C. § 1104(a)(1); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

41. The lease alone is cause. Concealment of assets and of income from the Court, the United States Trustee and creditors is the paradigm of the "fraud" and "dishonesty" that section 1104(a)(1) names, and the failure to schedule a ten-year lease of the estate's only asset, and the rent and security deposit due under it, is at the least gross mismanagement. The same facts are cause under section 1112(b)(4): the Debtor has either used cash collateral without authorization, section 1112(b)(4)(D), or failed to collect and account for the rent, which is gross mismanagement under section 1112(b)(4)(B); and Monthly Operating Reports that report $0 of receipts while a $50,000 monthly rent is contractually due do not satisfy the reporting requirement, section 1112(b)(4)(F). A debtor in possession is a fiduciary that must disclose all relevant information, In re V. Savino Oil & Heating Co., 99 B.R. at 526, and a manager who signs a lease in February and swears to no lease in August has not done so. Whether the rent was collected and diverted, or never collected at all, is a question a trustee will answer within a week by demanding it from the Tenant; the Debtor has had five months and has said nothing. Nor is this a lease the Debtor in possession can be trusted to enforce. The Tenant does business as Central UTA, the institution where Doppelt was employed for seven years, Ex. 5; the signed lease reached Kleinman through YMAH's e-mail system with Doppelt copied, Ex. 1 at 1; and since March 1, 2026 the Debtor has neither collected the rent into any account of its own, nor sued for it, nor mentioned it, while its manager told the United States Trustee under oath that the Property "did not work out" financially and that the plan was a drug rehabilitation deal. Ex. 17. A manager who will not disclose a $600,000-a-year lease of the estate's only asset will not enforce it against his own former employer, and has not said

where its rent has gone. Only a trustee independent of Doppelt can demand an accounting from the Tenant, collect the rent or terminate the lease, and decide, free of Doppelt's loyalties, whether it is an asset to be assumed and sold with the Property under section 365 or an insider arrangement to be rejected. That decision belongs to a fiduciary, and the Debtor in possession has disqualified himself from making it.

42. The evidence here is documentary and comes from the Debtor's own hand. The Debtor told the SBA in December 2024 that its members were Moshe Zev Doppelt and YMAH and nobody else, and on that representation gave the estate's only asset as security for YMAH's benefit, by a mortgage that an attorney of the United States swore two days later the Debtor had executed. It told this Court in August 2026 that its members are three Doppelts and the estate of David Braun and that YMAH is a stranger. One of those statements is false, and the one made to this Court was sworn. If the SBA certificate was true, then (i) YMAH's membership interest in the Debtor was transferred to the officers' own family in a related-party transaction with no disclosed board approval, no written findings and no record of consideration; (ii) the transfer was concealed from this Court in SOFA ¶¶ 4 and 13; and (iii) the Debtor's guarantee of YMAH's $995,000 note and its mortgage to the SBA, if executed, were transfers of estate property for the benefit of an insider for no consideration, 11 U.S.C. §§ 548(a)(1)(B), 544(b), and were concealed in Schedules D, E/F and H. If the SBA certificate was false, the Debtor's principals submitted a false certificate to a federal agency in order to obtain a $995,000 loan. Either way, "current management" has been dishonest with a court or a lender about the most basic fact concerning the Debtor, and has done so to benefit an entity it controls.

43. The same pattern runs through the occupancy of the Property, and it can be traced in Doppelt's own signature. Writing on Arugath Habosem letterhead as its "Administrator" on June

2, 2026, he told the Town that Arugath Habosem "operate[s] a year-round organization for children ages twelve to eighteen," and that "we want to take the kids to our facility in Kerhonkson, NY and continue with our activities there for the next two months." Ex. 2. Two months from June 2 runs past July 21, 2026, the day the petition was filed. Two days later his special counsel wrote to the Town that "as has been the case the last two summers, my client would like to operate the facility this summer." Id. On September 14, 2026, asked by the United States Trustee to confirm that "this is a debtor that's not operating right in any way. There's no nobody on premises that's locked down and secured and everything else, right?", Doppelt answered "Correct." Ex. 17. Asked in the same breath who owns the Debtor, he named his father-in-law, his father, himself and his wife, and said "basically, we are the 60% owner." Id. He did not mention Arugath Habosem, on whose letterhead he had signed fifteen weeks earlier and whose "facility" he had called the Property. To the SBA he had said the opposite, certifying that Arugath Habosem was a member and that the rest of the Doppelt family was not. Ex. 10. Each audience has been given the answer that audience needed. That is not a dispute about characterization. It is a reason no one should be asked to take this management's account of the estate on trust, and it is why the investigation belongs to someone else.

44. The post-petition record is the shortest way to cause. Section 1104(a)(1) reaches dishonesty and gross mismanagement "either before or after the commencement of the case," and section 1112(b)(4)(B) reaches gross mismanagement of the estate after it. On August 3, 2026 the estate's only asset, a building the Town had found unsafe for occupancy two months earlier and a state court had ordered not to be occupied, was in use, with school buses in the driveway, groups of young people on the grounds, and a State Police vehicle present. Ex. 29. Whoever ran that operation had no lease from the estate, no authorization from this Court, and paid the estate

nothing, and the estate carried the liability for every person on the grounds one year after a child died there. A camp does not run on the $100 that the Debtor reports as its entire cash history. Buses, food, staff and insurance were paid for by someone. Either the Debtor had money it has not disclosed, or another party operated on estate property for nothing; the Schedules, the operating reports and the testimony deny both, which is the point. The Debtor's response to that state of affairs was a sworn affirmation of vacancy ten days later, an operating report showing nothing, and an answer of "Correct" to the United States Trustee. That is not a dispute about ownership or accounting. It is the debtor in possession telling this Court and the Trustee, under oath, the opposite of what was happening on the property it holds in trust for creditors. No further finding is needed for a trustee, and the Court cannot leave the investigation of what happened on August 3 to the person who swore it did not.

45. The same management has represented that the Debtor had no income while it held two county permits to operate a 172-person camp, that its occupant was "Yeshiva Toras Chaim" while it admitted in a verified state-court pleading that YMAH was the owner and operator, and that the Property was vacant and had no prospects while it was negotiating a $450,000-a-year lease and preparing to reopen the camp over a state-court order forbidding occupancy. And in the first operating report of the case he certified that no insider is paying anything for the estate while an undisclosed "Habosem" entity insures the Property. ECF No. 25 at 8; Ex. 35. Concealment of that character is precisely the "deceit" for which this Court and others have displaced a debtor in possession. In re Ridgemour Meyer Props., LLC, 413 B.R. 101, 108-12 (Bankr. S.D.N.Y. 2008) (single-asset LLC; principal "failed to disclose" a transaction and "created the opposite impression"); Taub, 427 B.R. at 229-30.

46. The undisclosed account is cause by itself, and this Court's own decisions say so. "One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." In re V. Savino Oil & Heating Co., 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). That disclosure "begins on day one, with the filing of the Chapter 11 petition," and "[w]here, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." Id. Judge Feller so held on facts that included the movement of the debtor's operations to a related entity, finding that "pre-petition conduct, post-petition non-disclosures and misrepresentations," "singularly and in the aggregate, constitute 'cause'" under section 1104(a)(1). Id. at 527. This Court has stated the rule the same way: "a debtor seeking shelter under the bankruptcy law must disclose all assets and potential assets," the obligation "is a continuing one and does not end with the filing of the bankruptcy petition," and "the importance of full disclosure cannot be overemphasized." In re Arana, 456 B.R. 161, 168-69 (Bankr. E.D.N.Y. 2011) (Stong, J.) (quoting In re Lowery, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008)). The Second Circuit agrees: "[b]ecause full disclosure by debtors is essential to the proper functioning of the bankruptcy system, the Bankruptcy Code severely penalizes debtors who fail to disclose assets." Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (per curiam); BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC, 859 F.3d 188, 192-93 (2d Cir. 2017) ("an express, affirmative duty to disclose all assets"). A debtor in possession owes that duty as a fiduciary whose managers "bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985). "To reap the benefit of chapter 11, the debtor must pay the price of disclosure." In re Tornheim, 181 B.R. 161, 164 (Bankr. S.D.N.Y.

1995) (dismissing where the debtors "misrepresented the true ownership of their only asset" and "after filing materially false schedules ... made virtually no financial disclosure," id. at 169-70).

47. The closest case on its facts is Ridgemour Meyer: a single-asset LLC whose principal had received $85,500 in payments that "were not listed in the SOFA." Judge Bernstein found dishonesty under section 1104(a)(1) and, under section 1104(a)(2), that he "cannot expect Rotonde to investigate, and if appropriate, sue to recover these transfers." 413 B.R. at 114. What is omitted here is not a payment but the account the payments moved through, and the person who directed money into it, part of it to himself, is the person who swore to this Court that no such account existed. Dealings of that kind between a fiduciary and the entity he controls are "subjected to rigorous scrutiny," and "the burden is on the [insider] not only to prove the good faith of the transaction but also to show its inherent fairness." Pepper v. Litton, 308 U.S. 295, 306 (1939). Nor is this the case of an honest omission cured at the meeting of creditors, which is what distinguishes decisions declining a trustee on that ground. See In re Futterman, 584 B.R. 609 (Bankr. S.D.N.Y. 2018). Asked at the meeting of creditors whether any amendment to the Schedules or Statement of Financial Affairs was needed, the answer given for the Debtor was "[n]ot at this time," and Doppelt affirmed the filings under penalty of perjury. Ex. 17. The omission was made in the Schedules, repeated in the first operating report, and affirmed under oath. Once cause is shown, "there is no discretion; an independent trustee must be appointed." Savino Oil, 99 B.R. at 525; In re Bonded Mailings, Inc., 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982); accord In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988) ("a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee"; prepetition conduct may be considered).

48. The United States Trustee has already told the Court that "[a]bsent a clear and consistent explanation of the source of funding for counsel and the authority of the individual directing the actions of the Debtor, it cannot be determined if proposed counsel is disinterested." ECF No. 17 at 2. The record now supplies the answer: there is no clear and consistent explanation, because the individual directing the Debtor has given four inconsistent ones. The cure is not a different lawyer. It is a different fiduciary.

**B. The Interests of Creditors Under Section 1104(a)(2)**

49. Independently, section 1104(a)(2) authorizes a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." The test balances "the debtor's past and present performance and prospects for rehabilitation, the confidence of the business community and creditors in the debtor's management, and the benefits to be derived from the appointment of a trustee balanced against the costs." Taub, 427 B.R. at 227 (citing Ridgemour, 413 B.R. at 112; Ionosphere, 113 B.R. at 168; Savino Oil, 99 B.R. at 525). A trustee should be appointed "to replace a debtor-in-possession who suffer[s] from material conflicts of interest." Id. at 227-28 (quoting Ridgemour, 413 B.R. at 113); In re Eurospark Indus., Inc., 424 B.R. 621, 627-29 (Bankr. E.D.N.Y. 2010).

50. The estate's most valuable claims run against the people in possession of it: (i) determination of who holds the Debtor's equity, and whether YMAH's certified membership interest was transferred to the Doppelt family without board approval or consideration, together with avoidance under §§ 544, 548 and 550 of any obligation the Debtor incurred for YMAH's benefit, including any instrument delivered in connection with the SBA loan application; (ii) recovery of the camp revenue YMAH collected from the Debtor's Property, § 541(a)(6), § 542, Taub, 427 B.R. at 220-22, and an accounting for and recovery of the rent and security deposit due

under the undisclosed Central UTA lease since March 1, 2026, from whoever received them, Ex. 1; (iii) claims against Doppelt, Moshe Zev Doppelt, Raizel Doppelt and the Braun estate arising from the mortgage payments and whatever else passed between the Debtor, YMAH and the insiders; and (iv) the estate's position in the wrongful-death action, in which Doppelt was a member when a child died on the Property. Doppelt is on the other side of every one of those claims. He is YMAH's President and Administrator, its certifying officer on the audits that omit the Debtor, the person who paid the Debtor's counsel, and the manager whose family holds, on his account, 60% of the equity. He will not investigate himself, and the Court cannot expect him to. A trustee also unlocks the one file that settles the SBA question. Kleinman is informed by the SBA's loan servicing center that the agency holds the signed application and will produce it to this Court once a fiduciary independent of the Debtor's present management asks for it. No one now in control of the Debtor has any reason to ask. The claims are real ones. A bankruptcy court in this Circuit, on facts materially identical to these, a title-holding shell with a single asset, no employees and no income, whose principal's operating companies used the property as their own and paid its obligations, held that the elements of alter ego liability were satisfied against the operating companies and the principal alike, and that the affiliates' use of the property without consideration was a continuing constructively fraudulent conveyance avoidable under § 544(b). Messer v. Bentley Manhattan Inc. (In re Madison Bentley Assocs., LLC), Adv. No. 10-03487 (SHL) (Bankr. S.D.N.Y. Oct. 16, 2015); see In re Madison Bentley Assocs., LLC, 516 B.R. 724, 728-31 (S.D.N.Y. 2014) (trustee has standing to assert the alter ego claim because it seeks a declaration that the affiliates' property is property of the estate). Those claims were brought by a chapter 7 trustee. They will not be brought by Joseph Doppelt against Joseph Doppelt.

51. Two further features of this record bear directly on section 1104(a)(1). The first is the custody and the integrity of the estate's books. The Debtor swears that Doppelt holds all of them and identifies none as unavailable. SOFA ¶ 26c.1. The Town of Rochester's Code Enforcement Officer has found that inspection reports furnished to the Town on the Debtor's behalf were blank and suspected to be fraudulent. Exs. 13, 26. A fiduciary whose own conduct the records document, and whose submissions in the Debtor's name a public official has already questioned, should not remain the sole custodian of those records while the estate's claims against him go uninvestigated. Section 1104(a)(1) does not require a finding of dishonesty; gross mismanagement of the affairs of the debtor by current management is sufficient, and so is incompetence. The second is the estate's exposure and its rights arising from the death on the Property. The defense of any claim, the pursuit of insurance and contribution, and the preservation of the physical and documentary evidence all belong to the estate, and all of them are in the hands of a manager who was a member when it happened and who controls the entity that ordered and paid for the equipment at the Property. Exs. 14, 15. An independent trustee is the only way this estate gets an advocate of its own on that subject.

52. The cost side is negligible. There is no operating business to disrupt, a locked building, an insurance question, a Property to market, and books to be collected from the one person who has them. As this Court said in Taub, a trustee "can stand in the Debtor's shoes and survey the estate free from the complex, familial, reflexive, and often acrimonious relationships" among the parties and "provide some answers regarding income and expenses." 427 B.R. at 230 (internal quotation marks omitted).

53. This Court has addressed a conflicted debtor in possession on facts of the same shape. In In re Taub, 427 B.R. 208 (Bankr. E.D.N.Y. 2010), aff'd, 2010 WL 8961434 (E.D.N.Y.

Aug. 31, 2010), the Court held that "[a] trustee should also be appointed to replace a debtor-in-possession who suffer[s] from material conflicts of interest," and that "a conflict of interest can arise where a debtor has multiple roles that give rise to conflicting duties and obligations." The debtor there was "weighed down by conflicting roles and conflicts of interest": she owed fiduciary duties to creditors and the estate while standing as landlord to the insiders and litigating against them as both plaintiff and defendant. The Court appointed a trustee who "can fulfill the Debtor's fiduciary obligations to the estate and its creditors without any prospect of favoritism or animus." Doppelt occupies that position twice over. He manages the Debtor, which owns the Property. He is the President and Administrator of Arugath Habosem, which used the Property, held the permits for it and collected what it produced. He signed the Debtor's schedules, which do not mention Arugath Habosem at all.

**C. Section 1104(a)(3): Grounds Exist to Convert, and a Trustee Serves Creditors Better**

54. Section 1104(a)(3) directs the appointment of a trustee where "grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate." It fits a debtor that should not remain in possession but whose estate should not be liquidated out from under its creditors either. This Court has used it. In In re Taub, 427 B.R. 208 (Bankr. E.D.N.Y. 2010), aff'd sub nom. Taub v. Adams, No. 10-CV-02600 (CBA), 2010 WL 8961434 (E.D.N.Y. Aug. 31, 2010), the Court directed the appointment of a chapter 11 trustee under both section 1104(a)(2) and section 1104(a)(3), quoting section 1112(b)(4)(A) and observing that "continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" show that a debtor in possession "has failed in its stewardship."

55. Both halves of section 1112(b)(4)(A) are satisfied on the Debtor's own filings. There is continuing loss to and diminution of the estate: the Debtor reports no income and no operations, the mortgage has been in default long enough to produce a judgment of foreclosure, taxes and insurance are carried by someone other than the estate, the Property sits under a county enforcement file and a town notice of non-compliance, and the estate's entire treasury is the $100.00 deposited on August 11, 2026. ECF Nos. 11, 19, 25, 26; Exs. 4, 26, 27. And there is no reasonable likelihood of rehabilitation on anything the Debtor has told this Court or the United States Trustee. The only plan Doppelt has described under oath is to "refinance the ASAP and get rid of the debt" against a value that depends on a 176-bed drug rehabilitation permit that has not issued, for a use the Debtor is not certified to make. Ex. 17. No plan has been filed, no exclusivity motion made and no disclosure statement prepared; the plan deadline is November 18, 2026. ECF No. 9.

56. Grounds to convert therefore exist. But conversion is not what creditors need first. The estate's most valuable assets other than the Property are claims against the people who control the Debtor, and those claims carry a limitations horizon and a spoliation risk. A chapter 11 trustee can be appointed at once, secure the books, evaluate the claims and market the Property, while conversion adds a step to no one's benefit. That is the judgment section 1104(a)(3) commits to the Court, and it is the judgment this Court made in Taub. If the Court prefers conversion, Kleinman does not oppose it, because a chapter 7 trustee reaches the same claims. What cannot continue is management of this estate by the person those claims run against.

**D. The Property Has Value Worth Protecting**

57. The Debtor's own valuation, September 14, 2026. At the meeting of creditors the United States Trustee stated that the Property is "appraised at $5.2 million." Doppelt then testified

that the Property "used to be a drug rehabilitation many years ago," that "our attorney Jeff Kaplan has figured out that in the last few years, drug rehabilitation businesses went up dramatically, and he got a deal with the town that they would give back for us the drug rehabilitation permit, 176 beds," and that "based on this information, the value of this property will go up from 10 to $25 million," there being "55,000 square feet" of existing buildings on "88 acres." Ex. 17. The Debtor's management therefore swears that the Property is worth at least twice what the Debtor scheduled and at least three times what the Lender says it is worth. Compare ECF No. 11 ($5,200,000) with ECF No. 19 ($3,200,000 and "no equity in the Property"). Whichever figure is right, the asset is worth protecting, and the person to protect it is not the person whose own sworn valuations cannot be reconciled with one another.

58. The Debtor's plan for that value, stated under oath, is to "refinance the ASAP and get rid of the debt." Ex. 17. That refinancing would be underwritten against a 176-bed drug rehabilitation use that the Debtor is not certified to make. A substance use disorder program of that size cannot lawfully operate in New York without an operating certificate issued under Mental Hygiene Law § 32.05, and nothing in the Debtor's papers states that the Debtor, or anyone else, has applied for one. A trustee should evaluate that plan before the estate's only asset is encumbered again.

59. The Lender says the Property is worth roughly what it is owed. ECF No. 19. The record says otherwise. A licensed treatment provider offered $450,000 a year, absolute triple net, for fifteen years with escalations, five weeks before the petition. Ex. 25. At capitalization rates of 7% to 9%, that income supports a value of approximately $5.0 million to $6.4 million as-is, before any premium for the 85 acres, the improvements or the permitted camp use. A trustee can test that

value in a section 363 process with real bidders; a referee's auction on the Lender's judgment will not. Kleinman is obtaining an appraisal and will supplement the record.

60. Kleinman asks for the trustee on this record, which consists of the Debtor's own sworn filings, the Debtor's own documents and the files of two government offices. If the Court concludes that an evidentiary hearing is required before a trustee is appointed, Kleinman asks that it be set after the Rule 2004 examination of Doppelt sought in his motion filed herewith, so that the hearing proceeds on the Debtor's sworn answers and its produced records rather than on inference. The order of those two steps is the difference between a hearing about the Debtor and a hearing about its creditor.

## II. IN THE ALTERNATIVE, CAUSE EXISTS UNDER SECTION 1112(b)

61. Section 1112(b)(1) requires conversion or dismissal for cause unless the Court finds that appointment of a trustee under section 1104(a) is in the best interests of creditors and the estate. 11 U.S.C. §§ 1112(b)(1), 1104(a)(3); In re BH S&B Holdings LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010). "Cause" includes "gross mismanagement of the estate," § 1112(b)(4)(B), "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," § 1112(b)(4)(A), and a bad-faith filing. C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1310-11 (2d Cir. 1997). The movant's burden is a preponderance. In re St. Stephen's 350 E. 116th St., 313 B.R. 161, 170 (Bankr. S.D.N.Y. 2004).

62. Every C-TC factor is present: one asset; four small unsecured creditors against a $4.55 million secured claim; a foreclosure that had reached the eve of sale; a two-party dispute; a petition filed the day before the auction; no cash flow; unpaid taxes and utilities; no employees. Schedules A/B, D, E/F; SOFA ¶ 1; ECF No. 16 ¶ 2; ECF No. 17 ¶¶ 6-7. There is no business to

rehabilitate: the state court has forbidden occupancy, the Town has an open non-compliance notice, and the only "plan" on the record is Doppelt's June 2026 plan to reopen YMAH's camp in defiance of that order. And the Schedules are materially false in the respects set out in Part I, which is both "gross mismanagement of the estate," § 1112(b)(4)(B), and an "unexcused failure to satisfy timely any filing or reporting requirement," § 1112(b)(4)(F). In re Ionosphere Clubs, 113 B.R. at 169 (full disclosure is "the price of the automatic stay").

63. Because cause exists, the only question is remedy. A trustee (Part I) serves creditors best; conversion to chapter 7 achieves the same result at greater cost; dismissal returns the Property to a credit-bid auction and leaves the County, Central Hudson, the wrongful-death claimant and Kleinman to whatever surplus a distressed sale produces, while YMAH's claimed interest, the SBA episode and the insider transfers go uninvestigated. Kleinman asks for a trustee first and conversion second. Dismissal, which would end the stay and send the Property to the referee's sale that the petition was filed to stop, is the one disposition that serves no creditor but the Lender and is therefore not in the best interests of creditors and the estate within the meaning of section 1112(b)(1). 11 U.S.C. § 1104(a)(3); Taub, 427 B.R. at 230-31.

## III. THE § 362(d)(3) PERIOD SHOULD BE EXTENDED FOR CAUSE

64. The Debtor designated itself a single asset real estate debtor. Absent a plan with a reasonable possibility of confirmation or the commencement of monthly interest payments by October 19, 2026, the Lender will be entitled to stay relief. 11 U.S.C. § 362(d)(3). The Court may extend that period "for cause by order entered within that 90-day period." Id. A trustee appointed on this Motion will need time to take possession of the Property and the books, obtain the SBA's file, obtain an appraisal, and formulate a plan of sale. Kleinman requests that any order appointing a trustee extend the section 362(d)(3) period to a date not less than 90 days after the trustee's

appointment. If the hearing on this Motion is continued past October 19, 2026, Kleinman asks that the Court, on the papers and by order entered before that date, extend the period pending the hearing on this Motion and on the Lender's motion for relief from the stay. Cause is set out above: the Debtor in possession has concealed the lease, the rent and the true ownership of the Debtor, and the Lender, whose own motion is returnable November 12, 2026, is not prejudiced by a short extension.

## IV. THE SMALL BUSINESS ADMINISTRATION SHOULD BE HEARD

65. The United States Small Business Administration holds the file on a loan for which the Debtor's only asset was offered as collateral, and the certificate of the Debtor's membership that contradicts the Schedules was submitted to it. The SBA is a party in interest on the question of who owns this Debtor and what was pledged in its name. 11 U.S.C. § 1109(b). Kleinman has served the SBA and respectfully requests that the Court direct the Debtor to serve all further papers in this case on the SBA.

## NOTICE

66. Notice of this Motion has been given to (i) proposed counsel for the Debtor; (ii) the Office of the United States Trustee; (iii) counsel for Ridgeview Lender LLC; (iv) the Debtor; (v) each creditor on the Debtor's creditor matrix (ECF No. 13); (vi) Joseph Doppelt and Moshe Zev Doppelt; (vii) Yeshivah and Mesivta Arugath Habosem; (viii) KKZF; (x) the U.S. Small Business Administration; and (xi) all parties that have filed a notice of appearance. Bankruptcy Rule 2002(a)(4) requires 21 days' notice by mail of a hearing on dismissal or conversion, and E.D.N.Y. Local Bankruptcy Rule 9006-1(a) requires that motion papers be served at least 14 days before the return date. This Motion is filed and served on September 23, 2026, twenty-one days before the October 14, 2026 return date, which is the notice both rules require. Answering papers

are to be served so as to be actually received not later than October 7, 2026, seven days before the return date, and reply papers not later than 4:00 p.m. three days before the return date. Local Bankruptcy Rule 9006-1(b). Kleinman has noticed the Motion for the earliest date the rules allow and defers to the Court on the date on which it is heard; if the Court sets a later date, the objection deadline will run from that date under the same rule, and Kleinman consents to the continuance under section 1112(b)(3).

## CONCLUSION

WHEREFORE, Kleinman respectfully requests that the Court enter an order (i) directing the United States Trustee to appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(2), or pursuant to 11 U.S.C. § 1104(a)(3) on the ground that cause to convert exists under 11 U.S.C. § 1112(b) but a trustee better serves creditors and the estate, or pursuant to 11 U.S.C. § 1104(a)(1); or, in the alternative, (ii) converting this chapter 11 case to a case under chapter 7 pursuant to 11 U.S.C. § 1112(b); (iii) extending the period under 11 U.S.C. § 362(d)(3) for cause; (iv) directing service of all further papers on the U.S. Small Business Administration; (v) in the alternative, if the Court determines that an evidentiary hearing is required before a trustee is appointed, directing that the Rule 2004 examination of Joseph Doppelt sought in Kleinman's motion filed herewith proceed first and setting the evidentiary hearing after its completion; and (vi) granting such other and further relief as is just and proper.

Dated: Miami Beach, Florida
September 23, 2026

Respectfully submitted,

/s/ Abraham Kleinman
**Abraham Kleinman**
Creditor and Party in Interest, Pro Se

407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com