Hearing Date: November 12, 2026 at 10:30 a.m. (ECF No. 54)
Objection Deadline: None (the Motion is unopposed; ECF No. 48)

**ABRAHAM KLEINMAN**
407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com
*Creditor and Party in Interest, Pro Se*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE RIDGEVIEW REALTOR LLC, | Case No. 26-43491 (ESS) |
| Debtor. | |

# SUPPLEMENTAL DECLARATION OF ABRAHAM KLEINMAN IN FURTHER SUPPORT OF THE MOTION TO APPOINT A CHAPTER 11 TRUSTEE (ECF NO. 36) AND IN RESPONSE TO ECF NOS. 68 AND 71

I, Abraham Kleinman, declare under penalty of perjury under 28 U.S.C. § 1746:

1. I am a creditor and party in interest and the movant on the Motion to Appoint a Chapter 11 Trustee (ECF No. 36) (the "Motion"). The Debtor's time to oppose the Motion expired on October 7, 2026, and it has never opposed it. What it did instead, on October 28, with the hearing two weeks away, was file a plan and disclosure statement built on a nonbinding letter of intent, signed by an unidentified person, from the congregation that Joseph Doppelt's father, Moshe Zev Doppelt, a 40% member of the Debtor, founded and leads (ECF No. 66, which the Clerk has directed counsel to refile under the correct event); a motion to lock in exclusivity until July 2027 (ECF No. 67); an application to employ its third set of lawyers retroactively (ECF Nos. 64, 69); a bar date motion (ECF No. 65); and a letter asking that, if the Court will not take testimony, Joseph

Doppelt be excused from the hearing (ECF No. 68 at 1). None of those papers answers the Motion. Together they are its best evidence: a sale to a buyer the Debtor will not identify, funded by an insider it will not name, administered by a plan administrator it has not named, all designed to keep the one man a trustee would investigate in control of the only asset a trustee would recover. The message of this declaration is simple. Joseph Doppelt runs the Debtor out of the pocket of Yeshivah and Mesivta Arugath Habosem ("YMAH"), the Debtor's alter ego; the Debtor's money, its lease, its borrowing and its insurance move through accounts and entities that its sworn schedules say do not exist; every paper the Debtor filed on October 28 continues that concealment; and only an independent trustee can trace the money and recover it.

2. I submit this declaration as evidence of cause for a trustee under § 1104 and in response to ECF Nos. 68 and 71. It is not my objection to the retention application, the plan and disclosure statement, or the exclusivity motion (ECF Nos. 64, 66, 67, 69), whose objection deadline is December 10, 2026; I reserve every objection to those papers for that date, and what I say about them here is said because it is cause for a trustee.

## I. THE MOTION IS UNOPPOSED, AND THE UNITED STATES TRUSTEE DOES NOT OPPOSE IT

3. On October 14, 2026, the United States Trustee's trial attorney wrote that the United States Trustee has no objection to the appointment of a trustee. Exhibit 1. The Debtor has not opposed the Motion, and the United States Trustee does not oppose it. The proposed order has been on the docket since September 23 (ECF No. 36-2) and went to chambers in Word on October 12 with my emergency letter motion (ECF No. 53). The proposed order should be entered on November 12 and the Motion granted in its entirety.

## II. THE DEBTOR'S MONEY RUNS THROUGH BANK ACCOUNTS ITS SCHEDULES SAY DO NOT EXIST

4. Every other falsehood in this case runs through one bank account. On April 3, 2025, Joseph Doppelt sent me a text message, in his own words, directing a payment: "The rest send to the Ridgeview realtor routing 026013673 Account [xxxxxx]0416." ECF No. 36-37. Routing number 026013673 is TD Bank, N.A. Doppelt called the account "the Ridgeview realtor" account, gave me its full number, and told me to send to it the rest of the money I was providing to pay the Lender, money he said was for YMAH and the Debtor together. ECF No. 36-1 ¶ 18. Seven days later, on April 10, 2025, a $300,000 payment landed on the Debtor's mortgage with Ridgeview Lender. ECF No. 36-36.

5. Sixteen months later Doppelt signed the Debtor's schedules under penalty of perjury. To Schedule A/B, Part 1, question 1, which asks whether the Debtor has any cash or cash equivalents, he answered "No." Line 3, which asks him to "Identify all" checking, savings and other accounts, he left blank. To question 18 of the Statement of Financial Affairs, which asks for any account in the Debtor's name or for its benefit closed, sold, moved or transferred in the year before filing, he answered "None." To questions 3 and 4, which ask for payments to creditors in the ninety days and to insiders in the year before filing, he answered "None." ECF No. 11. His July operating report states cash of $0, receipts of $0 and disbursements of $0, and attaches no bank statement. ECF No. 25. The Debtor's first disclosed account was a debtor-in-possession account opened August 7, 2026. ECF No. 26-1. At the meeting of creditors Doppelt affirmed the schedules and amended nothing. ECF No. 36-20.

6. There is no honest way to reconcile those documents. Either the TD Bank account was open on July 21, 2026, and Schedule A/B is false; or it was closed in the year before the petition, and the answer "None" to question 18 is false; or it was closed earlier, and whatever part

of the April 2025 payment moved through it, and whatever else moved through it, is money of the Debtor that has never been accounted for anywhere. Each branch is a false answer in a sworn schedule or an undisclosed account of the estate, and each raises a substantial question under 18 U.S.C. § 152(1) and (3). There is no fourth branch.

7. Doppelt has had since April 2025 to pick one. He has never produced a statement for the account, never identified its holder, never said when it was opened or closed, and never explained why an entity that swore it had no bank account was telling its creditor to wire money to one. My trustee motion put the text message on the docket on September 23. ECF No. 36 ¶ 36; ECF No. 36-37. Doppelt's answer, filed October 28, is a discovery demand on me: produce "records within your control supporting your identification of the TD Bank account ending in 0416, limited to the account holder, authorized signatories and relevant transfers." ECF No. 68, Ex. A at 5, Request 39. The Debtor is asking its creditor to tell it who owns the Debtor's bank account. The man who wrote out the account number with his own hands on April 3, 2025 now wants the Court to believe he knows nothing about it.

8. And 0416 is not the only one. The Debtor had a second TD Bank account, and this one was in its own name. On May 2, 2024, at 2:29 p.m., Doppelt, from his address ydoppeltymah.org, paid $7,060.36 of the Debtor's insurance premium to P&G Brokerage, Inc. by electronic check drawn on a TD Bank checking account ending 7873, "Name on Check: The Ridgeview Realtor LLC," billing address 23 Heyward Street, Brooklyn, the Debtor's own address of record; four minutes later he forwarded the broker's payment acknowledgment to me and to the broker's staff. Exhibit 2. The same e-mail chain shows the broker warning him on May 3 that the policy would be cancelled for non-payment "over the weekend," and on May 13 that it was "in cancellation effective 5/18/2024" for the unpaid $17,401.74 down payment, which was then paid

from YMAH's operating account ending 7049. Id.; ECF No. 36 ¶ 31. The insurance on the estate's only asset has been running to its cancellation date since 2024.

9. The closing documents for the Ridgeview Lender loan show the same account at the beginning: the wire of loan proceeds is to beneficiary "The Ridgeview Realtor LLC," beneficiary bank "TD BANK, NA," account ending 7873. Exhibit 3. So the Debtor opened a checking account at TD Bank in its own name no later than the closing of the loan that bought the Property, received the loan proceeds into it at that closing on November 20, 2023 (ECF No. 36 ¶ 15), and was paying its insurance out of it in May 2024 through Doppelt's YMAH e-mail address. Exhibits 2, 3. That is the account the schedules say never existed. Doppelt has never said what became of it. Its statements were demanded in my Rule 2004 motion on September 17 (ECF No. 31, item 18) and it was identified in my declaration of September 23 (ECF No. 36-1 ¶ 13); his only answer is Request 39, which does not even mention it.

10. My declaration of September 23, 2026 described the account ending 7873 as one of five YMAH accounts from which premiums were paid (ECF No. 36-1 ¶ 13); the payment record annexed as Exhibit 2 shows the name on the account to be the Debtor's, and I correct that description here. The correction does not help the Debtor. It means the premium was paid from an account bearing the Debtor's own name, by the Debtor's own manager, who now swears under penalty of perjury that the Debtor had no bank account of any kind. What a ruthless lie.

11. A credit card paid the Debtor's insurance too. Of the premiums on the insurance carried for the Debtor and the Property, $5,828 was charged to an American Express card ending 1000. ECF No. 36 ¶ 31; ECF No. 36-1 ¶ 13. Doppelt told me that the Debtor and YMAH "are all one," that "they all share the same accounts," and that they use the same credit cards. ECF No. 36-1 ¶ 6. The Debtor schedules no credit card, names no cardholder, and reports no credit-card

charge in its schedules, its statement of financial affairs or any operating report. ECF Nos. 11, 25, 26. The statements for that card would show whose card it is, every charge ever run on it for the Property, by whom, and who pays the bill. They have never been produced, and the Debtor has never mentioned the card in this case. Doppelt has never answered.

12. Joseph Doppelt knows. He called account 0416 the Debtor's and told me the money was for YMAH and the Debtor together. ECF No. 36-1 ¶ 18; ECF No. 36-37. The inference the record supports is that 0416 is an account he controls in YMAH's name: he is YMAH's president (Section VII), he tied the money to YMAH and the Debtor together, and the Debtor swears it had no account at all. If so, the Debtor's money ran through it because Doppelt ran the Debtor out of YMAH's pocket, the arrangement that kept the Property's income off the Debtor's books and out of this Court's sight. That would explain why the schedules say "None," why the lease described in Section V is not scheduled, and why the premiums are paid by YMAH and the future carrying costs promised by an "individual owner" with no name. And it is why he asks to be excused from the witness stand on November 12 (ECF No. 68 at 1): the first question is "whose account is 0416," and there is no answer he can give under oath that does not end this case for him.

13. I ask the Court to order Doppelt to state, under oath and in open court on November 12, as to each of TD Bank accounts 0416 and 7873, the name of the holder, the names of the authorized signatories, the date it was opened, the date, if any, it was closed, and every transfer into or out of it that involved the Debtor, the Property or Ridgeview Lender; and to order the Debtor to produce, within seven days, the signature card and every monthly statement for each account from January 1, 2023 forward. The full account numbers are already known to the Debtor and to me and need not be recited in open court beyond their last four digits, Fed. R. Bankr. P.

9037(a)(4). What cannot be permitted is one more month of a debtor in possession that refuses to tell the Court where its money is.

## III. THE PLAN WOULD SELL THE ONLY ASSET TO THE DOPPELTS' OWN CONGREGATION ON A LETTER THAT BINDS NO ONE

14. The plan rests on one transaction: a sale of the Property for $7,500,000 to "Talmud torah ohel yochanan" under a "Letter of Intent." ECF No. 66-3. The document is not an offer. It binds no one to anything. Paragraph 17 of the letter of intent states that it "creates no sale obligation, exclusivity, reimbursement right or authority to occupy or operate," and that "[n]o party is bound to purchase or sell." Paragraph 18 states that the signatures "acknowledge[] receipt as a basis for negotiation, not acceptance of a binding purchase." Paragraph 5 states that "[n]o deposit is represented as paid." Paragraph 4 defers proof of the buyer's ability to pay to some later day. ECF No. 66-3. There is no contract, no deposit and no proof of funds.

15. The Debtor admits it. The disclosure statement concedes the price "does not establish full payment or an equity distribution," and the exclusivity motion concedes the proposal "is nonbinding and requires verified buyer identity, financing and definitive terms." ECF No. 66-1 at 5-6; ECF No. 67-2 ¶ 5.

16. The letter does not identify the buyer. It names "Talmud torah ohel yochanan" with no address, no state of organization, no form of entity, and no name or title for the person signing. The buyer's signature and printed name are illegible; the first name appears to begin with "Rob." Annexed as Exhibit 4 is an enlargement I prepared of the signature block on page 3 of the letter of intent as filed at ECF No. 66-3. Who signed for the buyer, which corporation the buyer is, and what Doppelt's father's role in it is are questions raised by the Debtor's own filing of ECF No. 66-3. Joseph Doppelt has answered none of them.

17. On October 28, 2026, I obtained from the Kings County Clerk's business records the certificate of incorporation and the certificate of amendment of the only entity of that name on file in New York, Talmud Torah Ohel Yochanan; true copies are annexed as Exhibit 5. They show a religious corporation formed under Article 10 of the Religious Corporations Law by a certificate filed March 12, 2003, whose trustees are Jacob Rawicki, Jacob Zenwirth and Yisucher Dov, and whose officers, per the December 2016 amendment, are Moshe Y. Kramer, President, and Shlomo Kernkraut, Secretary. Exhibit 5. No one by any of those names signed this letter. No trustee resolution authorizing a $7.5 million purchase exists, and under N.Y. Religious Corporations Law § 5 a religious corporation acts only through its trustees. A $7,500,000 letter signed by an unnamed person with no shown authority binds the buyer to nothing, which is exactly what the buyer intended and exactly what the Debtor accepted.

18. The buyer is the Doppelts' own congregation. I say that not on belief but on the Rockland County Clerk's recorded instruments and index and a verification sworn in the Supreme Court of the State of New York, confirmed by my own knowledge (next paragraph). Two religious corporations carry the name: the Brooklyn "Talmud Torah Ohel Yochanan" (Exhibit 5), and "Talmud Torah Ohr Yochanan" of Monsey, which the Rockland County Clerk indexes under the alias "Yeshiva Ohel Yachanan." Exhibit 6. The two are interrelated and serve the same Rachmistrivka religious community, of which Moshe Zev Doppelt, Joseph Doppelt's father, is a founding member and President. Exhibit 7. Moshe Zev Doppelt is also the Debtor's scheduled 40% member and the co-obligor on the Ridgeview Lender mortgage. ECF No. 11, Schedule H.

19. Exhibit 6 consists of true copies of the instruments described below as recorded with the Rockland County Clerk, and of the Clerk's index entries for them; Exhibit 7 is the petition, with Moshe Zev Doppelt's verification as President, and Exhibit 8 is the Town of Ramapo's

response, both from the NYSCEF docket of *Talmud Torah Ohr Yochanan v. Town of Ramapo*, Index No. 033663/2014 (Sup. Ct. Rockland Cnty.), Doc. Nos. 1 and 7. The documents confirm what I know personally, from my own membership in that community, from my dealings with the Rachmistrivka congregation over the years, and from what Joseph Doppelt himself told me: Moshe Zev Doppelt is one of the founding pillars of the Rachmistrivka congregation, also known as Ohel Yochanan Rachmistrivka or Ohr Yochanan; he has been involved in every aspect of it; he is the President of that congregation; and he and his family are among its largest benefactors.

20. On June 5, 2007, Moshe Doppelt of 41 Francis Place, Monsey signed, as one of its five incorporating trustees, the Certificate of Incorporation of "Congregation Rachmistrivka of Monsey," recorded June 8, 2007 as Instrument No. 2007-00028835; twelve weeks later the same corporation renamed itself "Talmud Torah Ohr Yochanan" (Instr. No. 2007-00044367). Exhibit 6. On December 10, 2008 the Town of Ramapo issued Building Permit No. 08-0381 to "DOPPELT MOSHE, 41 Francis Pl" as owner and applicant for 97 Highview Road, for "interior alterations, conversion of garage," work the Town's certificate of occupancy describes as "conversion of garage to convert to school." Exhibit 8. He was turning his own house into the congregation's school before he had given it the deed.

21. On February 20, 2009 he deeded 95 and 97 Highview Road, bought in 2008 for $675,000 each, to "Talmud Torah Ohr Yochanan, a New York Religious Corporation" at a reported price of $0, directing that the tax bills keep coming to him. Exhibit 6. On July 29, 2014, "MOSES Z. DOPELT, the President of petitioner," verified under penalty of perjury a petition in the name of Talmud Torah Ohr Yochanan against the Town of Ramapo, swearing that the corporation "was and is the owner" of 97 Highview Road and that "[t]he property is a school." Exhibit 7. In 2014 he bought the adjoining house, 93 Highview Road, for $993,000; in January 2015 he formed another

religious corporation at a meeting in his own home, with himself presiding and himself and Silky Doppelt of the same address among its six trustees; and five weeks later he deeded 93 Highview to it, again for a reported $0. Exhibit 6.

22. The Brooklyn and Monsey corporations are two arms of one Rachmistrivka congregation under one umbrella. Whatever corporate name ends up on a closing statement, the buyer is the Doppelts' own congregation, and the money that would have to pay for the Property is that congregation's money. So "the verified purchasing entity" of the letter of intent (ECF No. 66-3 at 1), the buyer in what the plan calls a "market-tested sale" (ECF No. 66-2 at 1), is, on the face of the public record, the congregation of the Debtor's own 40% member. *Nemo judex in causa sua*. The Debtor has filed a letter of intent from its manager's father's congregation as a sale of the estate's only asset. That is not a sale. It is a transfer from the right pocket to the left, dressed up as a plan.

23. Three houses, $2,343,000, given away for nothing to congregations Moshe Zev Doppelt founded and ran. That history is the measure of the $7,500,000 in this letter of intent. A family that has three times conveyed real property to its own congregation for a reported $0 is not a seller that will hold out for $7,500,000 from it. The price is a number for this Court; the deed, if one is ever delivered, will be for whatever is left after the Lender is paid, or for nothing, and nothing in this plan or this letter prevents that. The Debtor's manager is not acting in good faith toward this estate, and a plan proposed by him is not proposed in good faith. 11 U.S.C. § 1129(a)(3).

24. What the family did with those three houses after it gave them away is the same thing it is doing with this one. In the Rockland proceeding, the Town of Ramapo answered through its Town Attorney that 97 Highview Road "was in violation of applicable zoning codes, certificate

of occupancy," and that the congregation "was operating a school without the necessary planning and zoning approval." Exhibit 8. The Town's building file shows that the two-story wood-frame house was permitted only "temporarily" as a school. Id. A neighbor told the Planning Board on February 8, 2011 that the applicant had opened "an illegal school without proper planning and zoning" and was "trying to legalize something that is illegal, after the construction has already taken place," while the "caretaker's residence" had been turned into a rental. Id.

25. On March 16, 2016, when the FBI and the Rockland County District Attorney executed twenty-two search warrants across the Town of Ramapo in a federal fraud investigation into E-Rate technology funds paid to yeshivas, FBI agents were reported at "a yeshiva at 93, 95 and 97 Highview," described as "all converted single-family homes." Exhibit 9. Those are the three houses Moshe Zev Doppelt gave away for $0. That investigation was no false alarm. It ended in the Southern District of New York with seven defendants pleading guilty to conspiracy to commit wire fraud, the vendor at its center, Peretz Klein, sentenced to 48 months in prison, and the Department of Justice recording that "certain schools and school officials received a variety of improper benefits" from the scheme. Exhibit 10. Which schools, and whether the yeshiva at 93, 95 and 97 Highview was among them, is a question for a trustee with subpoena power, not for Joseph Doppelt's father.

26. The method is the one on display in this case: build first and legalize later; occupy first and disclose never; run a camp without approvals until a child is killed and the Town sues (ECF Nos. 16 ¶ 4, 36-26, 36-29); sign a ten-year lease of the Property and then tell the United States Trustee it is unused (Section V). That history is cause under 11 U.S.C. § 1104(a)(2).

27. The congregation cannot pay. Its own audited financial statements, those of the Brooklyn corporation named in the letter, Talmud Torah Ohel Yochanan and Affiliates (excerpts

annexed as Exhibit 11), report, for the year ended August 31, 2025, cash of $938,432 against long-term debt of $17,060,015, of which $2,789,504 falls due in fiscal 2027. Exhibit 11. A congregation with $938,000 in the bank, nearly all of it already spoken for by $2.8 million of debt coming due, has no cash with which to pay $7,500,000 "cash" or to post a $750,000 deposit (ECF No. 66-3 ¶ 5).

28. Nor can it borrow the price on the letter's timetable. A religious corporation may not mortgage its real property without leave of the Supreme Court or the Attorney General, N.Y. Relig. Corp. Law § 12(1); N.Y. Not-for-Profit Corp. Law §§ 510, 511, 511-a, a process that in my experience takes nine to fifteen months. The letter gives the buyer sixty days to arrange financing and promises a closing thirty days after confirmation. ECF No. 66-3. Those deadlines are impossible for a religious corporation, and anyone who had ever closed a loan for one would know it. The only explanation is that they were never negotiated, because the letter was never meant to be performed, only filed.

29. The buyer cannot pay cash, cannot borrow in time, and the Debtor never asked it to show either. Every term of this letter that is tested breaks, and it breaks on a different front each time: the signature, the entity, the cash, the financing, the dates. The Debtor knew this before it filed the plan. A debtor in possession that files a plan it knows cannot close is grossly mismanaging the estate. 11 U.S.C. § 1104(a)(1). The plan has no arm's-length buyer and no buyer that can pay.

30. The buyer also has no use for the Property. Paragraph 14 of the letter disclaims any "rehabilitation license, prior nonconforming use, County approval, Town zoning or certificate of occupancy." ECF No. 66-3. The Property is the former Villa Veritas rehabilitation facility in the Town of Rochester, used as a camp without approvals and the subject of a pending Town enforcement action (Ulster County Index No. EF2025-2829). ECF Nos. 36-26, 36-29. Nothing in

the buyer's charter, its financial statements or the letter explains what a Borough Park house of worship and elementary school would do with an 85-acre unlicensed facility upstate.

31. Nothing was marketed. The plan calls this a "market-tested sale." ECF No. 66-2 at 1. No broker was retained, no appraisal obtained, no listing made, no other offer solicited, no auction proposed. And the price contradicts Doppelt's own sworn valuations. The Debtor scheduled the Property at $5,200,000 (ECF No. 11), a number it now calls "historical" (ECF No. 67-2 ¶ 1). At the meeting of creditors, Doppelt swore that "the value of this property will go up from 10 to $25 million," and the Debtor's counsel confirmed on the same record that the permit driving that value was being negotiated. ECF No. 36-20. The Debtor's papers do not mention the $25 million. Doppelt now contradicts that testimony.

32. Doppelt now proposes to sell the same asset for $7,500,000, to a buyer he will not identify, with no competing bid sought, at a price the Debtor's own disclosure statement says leaves a $1,174,235.24 shortfall if my claim is allowed and nothing for equity, his own 10% included. ECF No. 66-1 at 5-6. A manager does not dump his only asset for a fraction of what he swore it was worth unless the price is not the point.

33. The point is time. A letter that binds no one can never be enforced, defaulted on or tested. Its only function is to exist: so that a plan can be filed before the November 18 exclusivity deadline, so that the Debtor can claim on November 23 that § 362(d)(3) is satisfied, and so that this Court can be asked to leave Doppelt in control until July 19, 2027 while a "sale" that no one is obligated to close is "market-tested." The exclusivity motion asks for time to "conduct a meaningful market test" and to "identify the transaction and funding on which creditors will actually vote," and it concedes "absent current operating cash" and "incomplete funding evidence."

ECF No. 67-2 ¶¶ 8, 10. A debtor that has not yet identified the transaction or the funding has no plan; it has a placeholder, and it filed the placeholder to stop the clock.

34. That placeholder is exactly what this Court's decisions under § 362(d)(3)(A) reject. The debtor "must establish that a reorganization based on its plan is in prospect"; the plan "must delineate a credible path to reorganization," and "[u]nless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk." *In re RYYZ, LLC*, 490 B.R. 29, 37 (Bankr. E.D.N.Y. 2013) (Feller, J.), *quoted in In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R. 196, 203 (Bankr. E.D.N.Y. 2014) (Craig, C.J.). Section 362(d)(3)(A) "requires a debtor to show its hand" and "does not permit a wait-and-see approach," *RYYZ*, 490 B.R. at 37; "a debtor may not file a token plan within the 90-day period and then defend a lift stay motion by arguing that its late-filed amended plan can be confirmed," *id.* at 37 n.9; and a debtor "cannot establish a reasonable possibility of confirming a plan based on the *possibility* of investments or refinancing" where it "has not identified any investor or source of financing that has provided a funding commitment." *231 Fourth Ave.*, 506 B.R. at 204.

35. A plan that leaves feasibility "to be resolved" later is an "attempt to woolgather [its] way to a confirmation hearing," which "is exactly what Section 362(d)(3) is designed to guard against." *RYYZ*, 490 B.R. at 45. That is this plan: a letter that binds no one, from a buyer with no funding commitment, under a plan that describes itself as "to be completed with the transaction, funding and reserve exhibits identified below before solicitation or a representation of feasibility." ECF No. 66-2 at 1. And the plan has not even been properly filed: the Clerk directed counsel on October 28 to refile it under the correct event, and as of this declaration counsel has not. ECF No. 66 (docket text). The Debtor cannot carry its burden under § 362(g)(2) on November 23 with that

record, and the § 362(d)(3) extension entered on an interim basis (ECF No. 54) should not be made permanent on it.

36. The exclusivity motion asks the Court to give this management until July 19, 2027 to solicit acceptances of that plan. ECF No. 67; ECF No. 67-2 at 1. A plan that refuses to represent its own feasibility is not one with "a reasonable possibility of being confirmed within a reasonable time." 11 U.S.C. § 362(d)(3)(A). Exclusivity ends the moment a trustee is appointed. 11 U.S.C. § 1121(c)(1). The exclusivity motion should not be heard until the Motion is decided; if the Motion is granted, it is moot.

37. The dates show how the placeholder was made. On October 26, 2026, there was no letter of intent. Yet on that day the plan and the disclosure statement were dated October 26 and signed by counsel, and each describes a $7.5 million sale to "Talmud Torah Ohel Yochanan" under a letter of intent. ECF Nos. 66-1, 66-2. The same day, Doppelt signed a declaration under penalty of perjury that the Debtor "has prepared a proposed chapter 11 plan and accompanying disclosure statement," while conceding in the next sentence that counsel still needed "the remaining information needed to complete those documents," under a jurat that reads "I declare under penalty of perjury that the foregoing, as completed, is true and correct," the oath of a man signing a form. ECF No. 67-2 at 6 ¶ 2, and at 6 (jurat). The exclusivity motion he supported, also dated October 26, priced the sale at $7.5 million on the strength of an "October 7 sale proposal currently in counsel's possession." ECF No. 67-2 at 2 ¶ 5. The letter of intent was not signed until October 27. ECF No. 66-3.

38. On this record, the papers did not follow the deal; the deal was made to fit the papers. A plan built around a $7.5 million sale was sworn to as "prepared" before any buyer had signed anything, and the next day someone obtained a signature on a document that could be

stapled to the back as "Exhibit A." No October 7 proposal has ever been produced, filed or described, and Doppelt has said nothing about it. The only letter the Debtor did file is dated October 27. Either the October 7 proposal exists and the Debtor is hiding it, or it does not exist and the Debtor's motion says it does.

39. That sequence raises a substantial question of a fraud on this Court and on every creditor in this case: a plan written around a transaction that did not exist, a sworn declaration that the plan was "prepared," a "buyer" produced the next day from the declarant's own father's congregation, and a request that the Court lock in exclusivity until July 2027 on the strength of it. It raises, in particular, the question whether the papers preceded any agreement at all, and whether documents were created for the purpose of filing them in this case, conduct that would implicate 18 U.S.C. § 152(1) and (3). I ask the Court to refer that question to the United States Trustee and to the United States Attorney for this District. See 18 U.S.C. § 3057(a).

40. The Court should expect more of it. Doppelt has now put before this Court, in five weeks, a vacancy affidavit, a sworn "no bank account," a sworn "the Debtor paid" $25,000 it did not have, a "never came into fruition," an October 7 proposal that no one has seen, and a letter of intent signed by no one the Debtor will identify. Every time the record closes in, a new document appears. A manager who will create whatever paper he believes will keep him in control will create more of it with every day he is left in control, and only a trustee will stop it.

41. None of it is disclosed. Not in the plan, not in the disclosure statement, not in the letter of intent, and not in the Rule 2014 declaration of proposed counsel, who swears she has no connection with any party in interest. ECF No. 64 at 6-7. The sale the plan describes, whose buyer's identity the exclusivity motion admits is still unverified (ECF No. 67-2 ¶ 5), is an unmarketed transfer of the estate's only asset to an insider's congregation, under a plan to be run by a "Plan

Administrator" the plan will not name. That is exactly the transaction a debtor in possession may never negotiate with itself, and exactly why a trustee must be appointed now.

## IV. PROPOSED COUNSEL CERTIFIED THESE PAPERS WITHOUT INQUIRY AND WILL NOT SAY WHO PAID HER

42. This case has now produced two $25,000 retainers, and the Debtor has not disclosed the true source of either. The first went to Rubin LLC. The United States Trustee objected that "[t]he source of the retainer is Joseph Doppelt individually" and that the firm's disinterestedness could not be assessed (ECF No. 17 at 2); I objected again (ECF No. 52). Doppelt never answered. The firm withdrew its retention application (ECF No. 39) and has moved to withdraw as counsel, a motion set for November 12 (ECF Nos. 42, 59).

43. The second went to Sobers Law PLLC. The application, Doppelt's declaration and Ms. Sobers's declaration each say that the Debtor paid the $25,000 on or about September 24, 2026; the two declarations say that "[t]he Debtor paid Sobers $25,000.00." ECF No. 64 at 4, 6; see id. at 2. I asked who paid it in my objection (ECF No. 52) and in my demand under 11 U.S.C. § 329(a) and Fed. R. Bankr. P. 2016(b). The only answer is "[t]he Debtor paid" (ECF No. 64 at 4), from a company that by its own reports had $100.

44. The Debtor could not have paid it. As shown in Section II, the Debtor swore it had no bank account; its only account, opened at Flagstar on August 7, 2026, held $100 in August. ECF Nos. 26, 26-1. Its disclosure statement says "[t]he Debtor reports no current capital." ECF No. 66-1 at 6. And the September operating report, due October 21, the one report that would show whether $25,000 left the Debtor's account on September 24, has not been filed (Section X).

45. Either the money never passed through the Debtor, in which case three statements made to this Court are false and the true source of counsel's retainer has been concealed in violation

of Bankruptcy Rules 2014(a) and 2016(b); or it did, in which case $25,000 came into the Debtor's account from an undisclosed source and went out again with neither transaction reported. Either way it is cause under 11 U.S.C. § 1104(a)(1) and § 1112(b)(4)(F) and (H). Where the money came from is addressed in Section VI.

46. The application seeks retroactive employment back to September 24. ECF No. 64 at 8 ¶ 2. It cannot even agree with itself on the date: its body asks for employment "effective as of the filing of this application," that is, October 28 (ECF No. 64 at 2), while its proposed order says September 24 (ECF No. 64 at 8 ¶ 2).

47. In this Circuit retroactive approval "should only be granted in narrow situations and requires that . . . the delay in seeking court approval resulted from extraordinary circumstances." *In re Keren Ltd. P'ship*, 189 F.3d 86, 87 (2d Cir. 1999) (per curiam). The application offers no circumstance at all. Counsel has acted for five weeks without an order, filed a substitution that stands objected to (ECF Nos. 50, 52), and filed a plan, all before asking to be employed.

48. Ms. Sobers is not the only lawyer acting for the Debtor without an order. The disclosure statement refers to "separate state-court counsel" handling the Town's enforcement action and concedes that representation is "not described here as court-approved estate employment." ECF No. 66-1 at 5-6. Who is paying that lawyer, and under what authority, the Debtor does not say.

49. Her Rule 2014 declaration discloses nothing: no connection to Doppelt, YMAH, the proposed buyer or the notary, no engagement letter, no statement of who negotiated or paid the retainer. ECF No. 64 at 6-7. The application itself concedes the gap. It says it "addresses employment, compensation arrangements, source of funds and connections separately," that

counsel's qualifications are "set out in the accompanying declaration and supporting professional statement to be completed by counsel," and that the Debtor "requests approval only after all required connections and funding disclosures are supplied to the Court and United States Trustee." ECF No. 64 at 2. That is an admission, in the application's own words, that the funding disclosures have not been supplied.

50. Yet the proposed order would let counsel "apply any unapplied portion of the $25,000.00 payment received from this Debtor and held for fees and expenses" to its fees upon approval. ECF No. 64 at 9 ¶ 6. The Court cannot approve the application of money whose source counsel refuses to state. Both retainers, the $25,000 paid to Sobers Law PLLC and the $25,000 paid to Rubin LLC, should be turned over and held in a segregated escrow account for the benefit of the estate, untouched, pending a determination under 11 U.S.C. § 329(b) and the Motion, and upon appointment delivered to the chapter 11 trustee. That money belongs to the estate, not to counsel.

51. The lawyer certifying these papers has done this before. In *In re Devani*, No. 13-45106 (CEC) (Bankr. E.D.N.Y.), Ms. Sobers filed a chapter 7 petition and schedules for a debtor and then, in January 2014, told this Court in a signed affirmation that her client "made full and candid disclosure" and "did not favor insiders." Exhibit 12 (*Devani*, ECF No. 32) at 5. Four months later, moving to get out of the case in the middle of contested discovery, she affirmed "under the penalties of perjury" the opposite: that "the case law is not in his favor due to the various misstatements and inadvertent omissions as well as incomplete responses to interrogatories," and that "pursuing this matter would only end up in a decision against him." Exhibit 13 (*Devani*, ECF No. 45, Ex. A) ¶¶ 15, 22-23.

52. The schedules she certified were the basis on which the creditor moved for sanctions against her personally under Rule 9011 and 28 U.S.C. § 1927. Exhibit 14 (*Devani*, ECF Nos. 31, 31-1, 31-2). The debtor she left was denied a discharge under § 727(a)(3) for record-keeping failures. Exhibit 15 (*Desiderio v. Devani*, Adv. No. 14-01025, ECF No. 27). Judge Craig conditioned her withdrawal on refunding her client $500. Exhibit 16 (*Devani*, ECF No. 47 ¶ 2). I ask the Court to take judicial notice of those filings, orders and transcripts as records of this Court, Fed. R. Evid. 201, for what was filed, sworn and ordered.

53. The pattern in *Devani* is the pattern here: certify first and inquire later. In one week in this case Ms. Sobers has signed a plan and disclosure statement built on a sale that did not exist when she signed them (ECF Nos. 66-1, 66-2; Section III); a Rule 2014 declaration that discloses no connection to anyone while the application it supports concedes the connection and funding disclosures have not been supplied (ECF No. 64 at 2, 6-7); a letter vouching for insurance the Debtor's own disclosure statement said it did not yet have (Section VI); and an e-mail to the United States Trustee vouching for coverage "to my knowledge" (Exhibit 17). A lawyer who certified one debtor's disclosures as "full and candid" and then swore they rested on "misstatements" is now certifying this Debtor's. The estate's creditors should not have to wait for the second affirmation.

54. None of this is a matter of style. Counsel's signature on every one of those papers is a certification, under Fed. R. Bankr. P. 9011(b), that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the factual contentions "have evidentiary support." This Court has held that the rule "requires an attorney to conduct an inquiry 'reasonable under the circumstances' prior to filing" bankruptcy papers; that "[a]t a minimum, Rule 9011(b)(3) places on attorneys a duty to make at least some affirmative investigation into the facts represented in documents submitted to the court"; that a "signer must

explore readily available avenues of factual inquiry"; and that while a lawyer may rely on a client's representations, "the attorney must independently verify publicly available facts to determine if the client representations are objectively reasonable." *Desiderio v. Parikh (In re Parikh)*, 508 B.R. 572, 578, 585 (Bankr. E.D.N.Y. 2014) (Grossman, J.) (sanctioning debtor's counsel under Rule 9011(b)(3) for schedules that were "incomplete and/or inaccurate" when "if [counsel] had conducted a reasonable inquiry, he would have known that").

55. The New York Rules of Professional Conduct, which this Court enforces, add a continuing duty: once on notice, counsel must "correct a false statement of material fact or law previously made to the tribunal by the lawyer." 22 N.Y.C.R.R. § 1200.0, Rule 3.3(a)(1).

56. Measure the October 28 papers against that standard. The "readily available avenues of factual inquiry" here were not hidden. Who signed the letter of intent for the buyer: counsel's own client handed her the document. Which corporation the buyer is: a name search at the Rockland County Clerk and on NYSCEF, which I ran in one day as a pro se creditor, returns Moshe Zev Doppelt's certificate of incorporation and his verified petition as President (Section III). Whether the buyer can pay: its own audited financial statements, Exhibit 11. Who paid the $25,000: counsel received it; the payor's name is on the check or wire in her own files. Whether the Debtor has a bank account that could have paid it: the Debtor's own operating reports, on this docket, say it had $100. Whether insurance "is in place": the policies, which her disclosure statement admits the Debtor did not have two days earlier.

57. Every one of those inquiries takes less time than it took to draft the papers that avoided them. A plan and a disclosure statement describing a sale to the letter's "verified purchasing entity" (ECF No. 66-3 at 1) that counsel had not verified, under a letter of intent that did not exist, are not papers signed after a reasonable inquiry. They are papers signed instead of