one. The creditors of this estate are entitled to a plan whose proponent's counsel has looked before she signed, and to a fiduciary who is not the client she is signing for.

## V. THE DEBTOR HID A TEN-YEAR, $600,000-A-YEAR LEASE OF ITS ONLY ASSET AND NOW DISOWNS IT

58. The Debtor's most valuable contract is a lease its schedules do not mention. On February 11, 2026, Doppelt signed a ten-year lease of the entire Property to Central UTA for $600,000 a year. ECF Nos. 36-4, 51. Issac Berkowitz signed for the tenant. ECF No. 51 at 28; ECF No. 36-1 ¶ 20. The tenant's audited statements show $81,210,426 in annual revenue and $134,500,385 in assets. Exhibit 18. The lease has been on this docket since September 23 (ECF No. 36-4) and again since October 8 (ECF No. 51). The Debtor concealed it from its schedules, its creditor matrix, its statement of financial affairs, its operating reports, the United States Trustee and this Court. ECF Nos. 11, 25, 26.

59. On October 13, 2026, the United States Trustee's trial attorney reported that the United States Trustee holds a sworn statement from Doppelt that the premises "are not being used for any purpose." Exhibit 19. Doppelt had signed the lease of the entire Property five months earlier. ECF No. 51. The Property was in use on August 3, 2026, when school buses and a State Police vehicle were on it. ECF No. 36 ¶ 28 & Ex. 29; ECF No. 36-1 ¶ 19. The Debtor's only response is a disclosure statement that calls Doppelt's own vacancy affidavit and my photographs "competing accounts" that "remain unresolved." ECF No. 66-1 at 2. A statement to the United States Trustee that estate property is unused, from the man who signed its lease and ran the camp on it, is not a lapse. It is concealment of the estate's principal asset, and it is cause under 11 U.S.C. § 1104(a)(1).

60. The Property should have produced income in 2024, 2025 and 2026 from two camp seasons and a $600,000-a-year lease. ECF No. 36 ¶¶ 20-31. The Debtor has never said what that income was. Its disclosure statement says only that the statement of financial affairs "reports no revenues" (ECF No. 66-1 at 2), a sentence about what a form says, not about what happened. A lease omitted from Schedule G makes the schedule false, and a knowing omission would implicate 18 U.S.C. § 152(3); rent collected and not reported is estate property, 11 U.S.C. § 541(a)(6), that has not been accounted for.

61. On October 26, 2026, Doppelt swore that "[t]he Debtor's factual basis for disputing the alleged Central UTA lease is that the lease never came into fruition." ECF No. 67-2 at 6 ¶ 3. One sentence. No document, no date, no explanation. That sentence does not say the lease is a forgery. It does not say Doppelt did not sign it. It does not say the signature of Issac Berkowitz for the tenant is not genuine, or that the terms on its pages are not the terms that were agreed. Not a word about the signature.

62. In five weeks the Debtor has not disputed the lease's authenticity once. Not in the disclosure statement, which calls it a "document . . . purporting to lease the Property" that never "became operative," but never says it is false. ECF No. 66-1 at 4-5. Not in the exclusivity motion. Not in Doppelt's declaration. The Debtor concedes, by its silence, that the document is what it appears to be: a ten-year lease of the Debtor's only asset, signed by the Debtor's manager, for $600,000 a year.

63. What it offers instead is the word "fruition," which is not a legal term, not a defense, and not a fact. A lease that is genuine and signed is in effect. Doppelt's one-sentence answer admits nothing and explains nothing. It attaches not one document showing that the lease was ever cancelled, because it was not; it is in full force and effect.

64. A debtor in possession that holds a signed ten-year lease of its only asset, at $600,000 a year, when it has no other income, a $4.9 million mortgage in default (ECF No. 19-6; ECF No. 67-2 ¶ 4), insurance in cancellation (Section VI) and a plan to fund, enforces the lease. It sends a default notice. It demands the first month's rent and the $100,000 deposit. It sues. That is not strategy; it is the duty of a fiduciary that holds the estate's most valuable contract, 11 U.S.C. §§ 1106(a), 1107(a), and it is the one thing this Debtor has refused to do in the nine months since the lease was signed. Instead it hid the lease from its schedules and told the United States Trustee the Property was unused. I asked who received the first month's rent and the $100,000 security deposit. ECF No. 36 ¶ 13; ECF No. 36-1 ¶ 20; ECF No. 51. Doppelt has never answered.

65. There is only one explanation for a landlord that will not enforce a $6 million lease against a solvent tenant: the landlord's manager has already been paid, outside the estate, and enforcing the lease would force him to say so. That is a debtor whose manager has a $6 million conflict with his own creditors, and it is why a trustee must be appointed to enforce the lease that Doppelt will not. On the first day of an independent trustee's tenure the estate will learn where the first month's rent and the $100,000 deposit went, and the trustee's counsel will enforce a lease that is signed by both parties and valid in every term. The Debtor has put before this Court not one document and not one fact to the contrary.

66. Even more concerning, within two days after swearing that the lease "never came into fruition," the Debtor now asks leave to subpoena its own tenant for "every version of the purported February 11, 2026 Ridgeview lease . . . including any version claimed to have been executed," for "records of first rent, security deposit and required tenant insurance delivered or withheld," and for "records of actual rent, deposit, additional rent and reimbursements for the Property from February 1, 2026 through production, identifying recipient and payment date." ECF

No. 68, Ex. B at 4. On one page the Debtor swears there is no lease; on the next it asks this Court for a subpoena to find out whether its own tenant paid the first month's rent, posted the $100,000 deposit, bought the insurance, and paid "actual rent" every month since February.

67. The Debtor cannot have it both ways. Either the lease never came into effect, in which case there is nothing to subpoena, or there is rent to trace, in which case the lease is in effect and Doppelt's sworn declaration is false. A manager who cannot say, or will not say under oath, where the rent on his company's only asset went, and who swears in one paper that there is no lease while asking in the next for a subpoena to his own tenant to collect under it, cannot be trusted with this estate.

## VI. AFTER THE PETITION, YANKY DOPPELT BORROWED IN THE DEBTOR'S NAME WITHOUT AN ORDER, AND THE INSURANCE STILL LAPSED

68. The concealment did not stop at the petition. In the first month of this case, Joseph Doppelt's own son borrowed in the Debtor's name, YMAH paid the lender, and the Debtor swore there had been no borrowing. Yanky Doppelt is Joseph Doppelt's son, as I know personally, and he works for YMAH; he is neither a member nor a manager of the Debtor. ECF No. 11 (SOFA question 28); ECF No. 36 ¶ 25 & Ex. 13; ECF No. 38-1 ¶ 4. On August 17, 2026, twenty-seven days after the petition, Yanky Doppelt signed a Premium Finance Agreement in the Debtor's name with First Insurance Funding, borrowing $36,593.63 to finance the premium on the Lexington Insurance Co. property policy on the Property. ECF No. 38-1 ¶ 2; ECF No. 38-2.

69. He signed on the line for the "Insured or Authorized Agent," by electronic signature reading "yanky doppelt (Aug 17, 2026 14:24:47 EDT)." ECF No. 38-2 at 1. The agreement grants the lender "a first priority lien on and security interest in the financed policies" and their unearned premiums, and appoints the lender the Debtor's attorney-in-fact with an

irrevocable power to cancel the policies. Id. §§ 1, 6. And in it the Debtor warrants that it "is not insolvent nor presently involved in any insolvency proceeding." Id. § 18(d).

70. No motion under 11 U.S.C. § 364(c) was ever filed, no notice was given, and no order was entered. The August operating report, signed by Joseph Doppelt on September 10, 2026, answers "No" to the question "Was there any postpetition borrowing, other than trade credit?" ECF No. 26, Part 7(g). That is post-petition credit outside the ordinary course, secured by a lien on estate property, obtained without the notice, hearing and order that 11 U.S.C. § 364(b) and (c) require; a false warranty of solvency made in the Debtor's name to a lender while the Debtor was in chapter 11; and a sworn operating report that discloses neither. Because the agreement makes a bankruptcy proceeding by or against the insured an event of default, the lender has held from the moment of signing a contractual right, backed by that power of attorney, to cancel the only property insurance on the estate's only asset. ECF No. 38-2 §§ 6, 10.

71. The Debtor did not pay for the loan either. The down payment and the installments paid under the agreement were paid by YMAH, out of its general operating account ending 7049, and not by the Debtor. ECF No. 38-1 ¶ 5. When YMAH stopped paying, the policy went into default (below). This has been on the docket since September 23. Who authorized Yanky Doppelt to sign for the Debtor? Joseph Doppelt has never answered. Yanky Doppelt's other dealings with the Property, and the plan's reservation of claims against him, are described in Sections VII and VIII.

72. The borrower on that loan was not the Debtor alone. The agreement names the "Insured and Borrower" as "The Ridgeview Realtor LLC, Habosem Home LLC." ECF No. 38-2 at 1. The same entity is the co-insured on the Debtor's property policy, ECF No. 36 ¶ 39, Ex. 35, and on the lender's notice of cancellation, ECF No. 53, Ex. 1. Habosem Home LLC appears in no

schedule, no statement of financial affairs and no corporate disclosure the Debtor has filed. ECF No. 11. Who or what it is, who owns it, and why it shares the Debtor's insurance and the Debtor's debt has been before Doppelt since September 23 (ECF Nos. 36, 38-1). Doppelt has never answered.

73. The insurance lapsed anyway. On September 25, 2026, First Insurance Funding, the lender under the August 17 agreement, sent the Debtor a Notice of Intent to Cancel: the Lexington property policy, the same policy financed by that agreement, and the CM Vantage liability policy on the Property, financed in the name of "The Ridgeview Realtor LLC, Habosem Home LLC," were $7,374.32 past due on the installment due September 16, and both would be cancelled on October 12, 2026 unless the past-due amount was received first. ECF No. 53, Ex. 1; ECF No. 38-2 at 1. It was not received first.

74. On October 13, the day after the scheduled cancellation and hours after my emergency letter motion was docketed (ECF No. 53), Doppelt, writing from his YMAH account and signing as "Administrator, Yeshivah And Mesivta Arugath Habosem," asked the broker: "Can I still make payment now to avoid interruption." Two minutes later he wrote: "Ok will do it soon taday." Exhibit 17. That is the Debtor's manager, in his own words, confirming that the coverage on the estate's only asset had run to its cancellation date unpaid, and that he was going to pay it, if at all, from YMAH. The next morning proposed counsel told the United States Trustee that "to my knowledge there is coverage in place." Exhibit 17.

75. This Court then directed the Debtor to file "a status letter as to insurance" by November 5. ECF No. 54. What it filed, on October 28, is three sentences: coverage "is in place," and documentation "has been provided to the Office of the United States Trustee and is available upon the Court's request." ECF No. 71. No insurer, no policy number, no policy period, no

premium, no receipt, no cancelled check, no reinstatement notice, and no name of the payor. It does not mention Doppelt's October 13 e-mail. Id.; Exhibit 17. Two days before that letter, the Debtor's own disclosure statement said that "[t]he Debtor will obtain the relevant insurance policies and coverage information." ECF No. 66-1 at 4.

76. A debtor that on October 26 does not have its own insurance policies cannot on October 28 vouch that coverage is in place; it can only repeat what someone told it. The documents went to the United States Trustee and not to the docket, where the creditors whose collateral this is could read them. If the premiums on the estate's only asset are being paid by someone the Debtor will not identify, from an account the Debtor will not disclose, the Debtor should not expect this Court to take its word that the coverage exists.

77. Who is paying, the Debtor will not say; it says only who will pay next. The disclosure statement says that "[f]uture carrying costs are expected from an individual owner without repayment or remuneration." ECF No. 66-1 at 6. The same unnamed "individual owner" appears in the plan and in the exclusivity motion Doppelt supports. ECF No. 66-2 at 7; ECF No. 67-2 ¶ 6. Doppelt's answer to who that owner is: a description without a name.

78. That sentence explains the case. The two $25,000 law-firm retainers described in Section IV, the insurance premiums, the carrying costs of an 85-acre property: all of it paid by YMAH, by Doppelt individually, or by an "individual owner" the Debtor will not name, from accounts the Debtor will not identify, as a gift with "no repayment or remuneration." ECF No. 17 at 2; ECF No. 38-1 ¶ 5; ECF No. 66-1 at 6. No one gives a bankrupt company tens of thousands of dollars anonymously and asks nothing back. Money that arrives with no name on it and no strings attached is not charity; on this record it is money that is not shown to the Court because showing it would show where it came from.

79. The Code does not permit that. A debtor in possession must account for every dollar it receives and spends, 11 U.S.C. §§ 1106(a)(1), 1107(a), 704(a)(8); Fed. R. Bankr. P. 2015(a)(3); and insider money flowing into a chapter 11 estate without a court order is unauthorized post-petition credit, which the Code forbids outside the ordinary course except on notice and a hearing, 11 U.S.C. § 364(b). Every payment to counsel, and its source, must be disclosed. Fed. R. Bankr. P. 2014(a), 2016(b). Instead the Debtor has taken undisclosed insider money, spent it on lawyers and premiums, and kept the source, the account and the amounts off every schedule and operating report. On this record, the only candidate for the "individual owner" is the man who ran the Debtor's money through the TD Bank account described in Section II and has refused since April 2025 to produce a statement for it. The Debtor is being funded off the books by the people whose books a trustee would open. That is the exact reason to remove them.

80. Two more things follow from that sentence, and both are fatal. First, the Debtor is not in the business of accepting charity. It is a single-asset real estate company that owes its creditors more than $5 million. ECF No. 67-2 ¶ 4. Every dollar that comes into it after the petition is property of the estate, 11 U.S.C. § 541(a)(7), held for all creditors in the order the Code fixes, 11 U.S.C. § 726(a), and not a private fund from which Doppelt pays his own lawyers first. If an "individual owner" has decided to put tens of thousands of dollars into this company as a so-called "donation," that money still belongs to the estate the moment it arrives, and not to Doppelt, and the Debtor's diversion of it to counsel and premiums without an order is an unauthorized post-petition transfer, 11 U.S.C. § 549(a).

81. Second, there is no such thing as an untaxed anonymous gift to a business. The Debtor files partnership returns, or is supposed to (ECF No. 36 ¶ 6 & Ex. 9): the Internal Revenue Service has filed a $4,500 claim for the 2023, 2024 and 2025 returns the Debtor never filed. Claim

No. 5. Money put in by a member is a capital contribution that must be booked, carried on the member's capital account and reported, 26 U.S.C. § 721; money put in by anyone else is gross income to the Debtor, 26 U.S.C. § 61(a). Either way it has to appear on a return and on a monthly operating report, and it appears on neither, because the Debtor has filed no return for three years and no operating report since August. A company that has never filed a tax return, taking unreported cash from an unnamed source to pay the lawyers who are keeping its manager in control, is not a debtor in possession. It is the reason § 1104 exists.

## VII. YMAH PAYS THE DEBTOR'S BILLS, CLAIMS NOTHING, AND APPEARS IN NO SCHEDULE

82. Every account, card and check described in Sections II, V and VI leads to one place: YMAH, the Debtor's alter ego, which pays the Debtor's bills, claims nothing, and appears in no schedule. Doppelt is YMAH's president, its chief executive and its administrator. ECF No. 36-1 ¶ 13; ECF No. 36 ¶¶ 20, 25; ECF No. 36-5; Exhibit 17. The Debtor's business is done from YMAH's e-mail addresses: its lease was sent from yankyymah.org, its premium was paid from ydoppeltymah.org, and its dealings with the Town were conducted from ymah.org addresses. ECF No. 36-1 ¶¶ 12, 20; ECF No. 38-1 ¶ 4; ECF No. 36 ¶ 25 & Ex. 13; Exhibit 2.

83. The SBA loan application shows that the loan was made to YMAH, that the Debtor is its mortgagor and guarantor, and that Joseph Doppelt signed on behalf of both YMAH and the Debtor. ECF No. 36-13. In the same loan papers the Debtor certified to the SBA that its only two members are Moshe Zev Doppelt and YMAH. Id. Its schedules omit YMAH entirely. ECF No. 11 (SOFA question 28). Asked who signed the SBA application, guarantee, mortgage and certificate, the Debtor answered only that "[n]o $995,000 current debt or enforceable lien is

conceded." ECF No. 66-1 at 4. Not a word about who signed, or why the schedules omit an entity the Debtor itself certified is one of its only two members.

84. The proof that YMAH paid the Debtor's bills is not an allegation; it is YMAH's own cancelled checks and account records, already on this docket. $49,396 of premiums on the insurance carried for the Debtor and the Property were paid from five accounts the Debtor has never disclosed: $42,336 from four YMAH accounts, $5,828 of it charged to the American Express card described in Section II, and $7,060 from the TD Bank account ending 7873 described in Section II. ECF No. 36 ¶ 31; ECF No. 36-1 ¶ 13; Exhibit 2. YMAH paid the Debtor's insurance until it stopped (Section VI). YMAH paid for the ritual bath and showers installed at the Property, the same ritual bath that was later the site of the tragic electrocution and death of a child (ECF No. 16 ¶ 4; Section X); the checks were drawn on YMAH's general operating account ending 7049 and personally signed by Joseph Doppelt. ECF No. 36, Ex. 14. The $300,000 paid on the Debtor's mortgage on April 10, 2025 followed by seven days Doppelt's instruction to send money to the TD Bank account ending 0416 described in Section II, which he called the Debtor's and which the Debtor has never disclosed. ECF Nos. 36-36, 36-37. Joseph Doppelt or his son signed every one of those payments or the papers behind them.

85. The Debtor says it owes YMAH nothing. Schedule E/F lists no debt to YMAH. Schedule H lists no codebtor but the Lender's. The statement of financial affairs reports no payment to or from an insider. ECF No. 11. YMAH is not on the creditor matrix. The disclosure statement, which lists every claim down to a $2,187.50 law firm bill, lists no YMAH claim. ECF No. 66-1 at 2-4. The bar date motion proposes notice to "all creditors and other known holders of claims" and lists, by category, lease counterparties, litigation parties, the SBA, the Town, the tort claimant and me; it does not name YMAH. ECF No. 65 ¶ 14; ECF No. 65-2 ¶ (e). YMAH itself, which on this

record paid the Debtor's premiums, its ritual bath and its post-petition premium financing, has filed no proof of claim and asserted none. I put the question why the Debtor owes YMAH nothing at ECF No. 36 ¶ 31, Ex. 14, and ECF Nos. 36-36, 36-37. Doppelt has never answered it.

86. There are only two ways to read that silence, and both end this case. Either YMAH's payments were loans or advances, in which case YMAH is the Debtor's largest unsecured creditor after the Lender, Schedule E/F is false, the insider-payment answers in the statement of financial affairs are false, and the "individual owner" funding the case is an undisclosed insider lender, 11 U.S.C. §§ 364(b), 101(31); see 18 U.S.C. § 152(3). Or the payments were not YMAH's money at all, but the Property's own income, collected by YMAH and spent on the Debtor's bills through YMAH's accounts, in which case the Debtor has had income every year since 2024 that its schedules, its statement of financial affairs and its operating reports swear it never had, and YMAH files no claim because a claim would require it to prove, with its own bank records, that the money was ever YMAH's to lend. Doppelt, as YMAH's chief executive (ECF No. 36 ¶ 20), has every reason to keep YMAH out of these papers: naming YMAH as a creditor would open YMAH's books and records, and with them a Pandora's box showing where all of the money has flowed. That is why he has refused to list YMAH as a creditor, codebtor or insider in any schedule, statement of financial affairs, operating report or creditor matrix the Debtor has filed, or on the bar-date notice list.

87. The man who decides whether YMAH files a claim is Joseph Doppelt. The man who decides whether the Debtor schedules a debt to YMAH is Joseph Doppelt. Joseph Doppelt has decided, on both sides, that the Court will not see the money.

88. The same merger of the two entities runs through the camps. The County permit for the 2024 and 2025 camps was issued to "The Ridgeview Realtor LLC / Yeshiva and Mesivta

Arugath Habosem" (YMAH) (ECF No. 36, Ex. 3), and the County charged that same combined operator (Section X); yet in ECF No. 16 ¶ 3 Doppelt attributes the camp to Yeshiva Toras Chaim.

89. Doppelt's son acts in the same dual capacity. Yanky Doppelt is the YMAH staff member who transmitted the Central UTA lease on February 26, 2026 (ECF No. 36-1 ¶ 20; ECF No. 36 ¶ 25 & Ex. 13), who dealt with the Town of Rochester's building inspector about the Property's fire and sprinkler compliance in June 2026 (ECF No. 36 ¶ 25 & Ex. 13; ECF No. 38-1 ¶ 4), and who signed the premium finance agreement described in Section VI (ECF No. 38-1 ¶ 2; ECF No. 38-2). The Debtor's own plan names him as a person against whom the estate holds "potential accounting or recovery claims." ECF No. 66-2 at 7. Asked what his role in the Debtor is (ECF No. 36-1 ¶ 20; ECF No. 38-1), Joseph Doppelt has said nothing.

90. I know from personal knowledge that Yanky Doppelt is Jacob Doppelt; "Yanky" is the familiar form of Yaakov, or Jacob. On October 1, 2025, Jacob Doppelt bought 1157 39th Street, Brooklyn, for $1,900,000, financing $1,520,000, with a power of attorney from Moshe Z. Doppelt recorded the same day (ACRIS Doc. Nos. 2025091601120001, -002, -003). In May 2026 he put Rose Doppelt on the title (Doc. No. 2026052000682001). By a mortgage dated July 10, 2026, eleven days before the Debtor filed this case, and recorded July 23, 2026, two days after it, they borrowed another $300,000 against the house from Citizens Bank (Doc. No. 2026072300152001). Exhibit 20.

91. Nearly $400,000 of cash went into a Doppelt house in the year before the petition, while the Debtor reported no income at all from a Property under a $600,000-a-year lease (ECF No. 11, SOFA Part 1), and another $300,000 was borrowed against it in the two weeks around the petition. If that money came from the Property, from the TD Bank account described in Section II, or from the Debtor, it is a fraudulent transfer or a preference recoverable for the estate, 11 U.S.C.

§§ 544(b), 548(a), 547(b), and the two-year clock on those claims is running now, § 546(a). A debtor in possession run by Joseph Doppelt will never ask where that money came from, let alone sue his own family to get it back. A trustee will, and must.

## VIII. JOSEPH DOPPELT NOW ASKS THE COURT TO LET HIM INVESTIGATE HIMSELF

92. The Debtor knows there is money to recover. Its plan "retains . . . potential accounting or recovery claims concerning actual Property receipts or transfers involving the identified YMAH entities, Joseph or Yanky Doppelt and other recipients." ECF No. 66-2 at 7. Its disclosure statement speaks of "entities referred to as YMAH" whose "receipt of money, obligations and relationships to the Debtor must be traced," as if they were strangers to the Debtor, and identifies Doppelt only as the Debtor's manager, as though he were not YMAH's president. ECF No. 66-1 at 2; see ECF No. 66-2 at 7 ("the identified YMAH entities"). YMAH is the Debtor's alter ego. The plan leaves the claims against YMAH, Joseph Doppelt and Yanky Doppelt in the hands of Joseph Doppelt, and it has arranged that no one but the Doppelts will ever look for the money. Joseph Doppelt cannot investigate Joseph Doppelt. That alone requires a trustee.

## IX. DOPPELT MUST TESTIFY ON NOVEMBER 12, AND THE DEBTOR'S DISCOVERY REQUEST SHOULD BE DENIED

93. The Debtor wants Doppelt excused from the hearing. ECF No. 68 at 1. Its only stated ground is that the Court may not "intend to receive testimony that day." Id. If the Debtor is to be heard at all, it must be heard through the only witness who knows the facts, under oath and subject to cross-examination on the lease, the TD Bank account, the $25,000, the insurance, the buyer, the "individual owner" paying the Debtor's bills, and the money that went into 1157 39th Street. A party may not put a witness's sworn statements before the Court and then keep the witness

out of the courtroom. Fed. R. Civ. P. 43(a); Fed. R. Bankr. P. 9014(d), 9017. If Doppelt is not willing to stand behind his declarations under oath, they must be disregarded, and the Court should draw the negative inference.

94. The Debtor let its October 7 deadline to oppose the Motion pass in silence (ECF Nos. 36, 48) and now, two weeks before the adjourned hearing, asks the Court to let it serve fifty-five document requests, twenty interrogatories and thirty-two requests for admission on the movant, and subpoenas on six third parties. ECF No. 68, Exs. A, B. Discovery in a contested matter is not a matter of right; it is permitted at the Court's discretion, Fed. R. Bankr. P. 9014(c), and only when it is proportional to the needs of the matter, Fed. R. Civ. P. 26(b)(1), and the Court must forbid it where it is sought to annoy, embarrass, oppress or burden, Fed. R. Civ. P. 26(c)(1). This request fails every one of those tests.

95. It does not go to the Motion. The Debtor's own letter says what it is after: my "asserted debt and ownership interest." ECF No. 68 at 1. The grounds for a trustee are the Debtor's own filings: the schedules, the operating reports and the insurance described in Sections II, V and VI. Requests 1 through 36, Interrogatories 1 through 14 and most of the requests for admission go instead to my claim and my membership: the purchase from David Braun, the MAA assignment, the Advances and the 21% rate. ECF No. 68, Ex. A. Those are the subjects of a claim objection, which the Debtor has never filed, and of an adversary proceeding on my membership, which the Debtor has never brought. They are not a defense to a trustee motion the Debtor chose not to answer.

96. The few requests that do touch the grounds for a trustee prove the point. They ask me, the creditor, to identify "the account holder of TD Bank account ending 0416" (Interrogatory 15; Request 39); to "[e]xplain the basis for your statement that the Debtor had no bank account

before August 2026" (Interrogatory 16; Request 40; RFA 25), when that statement is the Debtor's own, sworn in schedules Doppelt signed (ECF No. 11; Section II); and to state the facts showing that anyone "actually received rent or a deposit" under the lease (Interrogatory 17; Requests 47-48). ECF No. 68, Ex. A. The Debtor is asking its creditor to tell it about its own bank account, its own schedules and its own tenant.

97. The third-party schedules make it plainer still. Two of the six proposed subpoenas are addressed to "Arugath Habosem Inc" and "Kehilath Jakov Arugath Habosem Inc," corporations bearing YMAH's name, and ask them for "agreements allocating repayment responsibility, rent or deposits between this entity and the Debtor" and for "Property receipts." ECF No. 68, Ex. B at 6-7. The Debtor proposes to subpoena the YMAH entities, run by its own manager (Section VII), for records about the Debtor's rent and money. Doppelt does not need a subpoena to read YMAH's books. He needs only to produce them.

98. Request for Admission 32 asks me to admit that the Ulster County Department of Health permit to operate a temporary residence at the Property expired on November 30, 2025. Id., RFA 32; ECF No. 36-39 at 17. I admit it gladly: that permit names "THE RIDGEVIEW REALTOR LLC/YESHIVA AND MESIVTA ..." as the permittee and Yeshiva and Mesivta Arugath Habosem as "the operator," which is the Debtor's own regulator confirming that the Debtor and YMAH ran the camp as one. ECF No. 36-39 at 17.

99. The authority question runs the other way. The only operating agreement on the docket names David Braun as manager and requires 60% consent for admission and assignment. ECF No. 36-19. Doppelt's own papers now call him merely "an authorized signatory." ECF No. 64 at 4. I asked under what operating agreement, and by whose consent, he acts as the Debtor's

manager, filed this case, retained counsel and signed a letter to sell its only asset. ECF No. 36 ¶¶ 5-14; ECF No. 52. His answer is interrogatories to me about my membership. ECF No. 68, Ex. A.

100. It is made with unclean hands. A party that asks a court of equity for relief must come with clean hands, *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814-15 (1945); *Krohn v. Burton (In re Swift)*, 496 B.R. 89, 100 (Bankr. E.D.N.Y. 2013) (Craig, C.J.) (applying *Precision Instrument* in bankruptcy), and a bankruptcy court is a court of equity that "applies the principles and rules of equity jurisprudence." *Pepper v. Litton*, 308 U.S. 295, 304 (1939); *Young v. United States*, 535 U.S. 43, 50 (2002); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

101. This Debtor asks the Court for discovery while it refuses to produce a single statement for the bank account its manager called the Debtor's, refuses to file its September report, refuses to say who paid its lawyers, refuses to say who paid its insurance, and refuses to put its manager on the witness stand. My Rule 2004 motion has been pending since September 17 (ECF No. 30); the Debtor has never responded to it, and its October 28 letter mentions it only to note that no order has been entered. A debtor that will not answer the creditor's discovery has no standing in equity to demand its own.

102. It is designed to harass. The requests demand the portions of my tax filings and capital-account records identifying the Debtor's owners (Request 9), MAA's bank records for every Advance (Request 26), my communications with the late David Braun (Request 10), and the original photographs and video I took on August 3, 2026, with their creation metadata (Request 50). ECF No. 68, Ex. A. None of that bears on whether Joseph Doppelt concealed a lease and a

bank account from this Court. It bears on whether a creditor who exposed that concealment can be made to regret it. The Court should not lend its process to that purpose. The Debtor's stonewalling of every legitimate request for its own records, paired with a demand to rummage through the records of the creditor who caught it, is not litigation. It is retaliation, and it must stop.

## X. THE RECORD ESTABLISHES CAUSE UNDER SECTION 1104(a)(1) AND (a)(2)

103. Section 1104(a)(1) requires a trustee for "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management," and § 1104(a)(2) requires one whenever appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." Either standard is met many times over.

104. The September 2026 operating report, due October 21, has not been filed. The Debtor's own disclosure statement concedes that none "appears on the docket." ECF No. 66-1 at 2. That is a breach of the debtor in possession's most basic duty to account, 11 U.S.C. § 1106(a)(1), incorporating § 704(a)(8); Fed. R. Bankr. P. 2015(a), and it falls on the one month in which the Debtor swears it paid counsel $25,000 (Section IV).

105. The Court should see the whole of it. On July 6, 2025, the Accord Fire District found roughly 150 people inside buildings that were "supposed to be vacant," with exit doors padlocked or screwed shut, sprinkler and alarm heads taped over, spent extinguishers and propane in the kitchen, and no manager on site. The fire chief recorded that Joseph Doppelt "had taken responsibility for all occupants," and the Town's fire constable recorded Doppelt's own words: "he is person responsible for the facility and participants of the camp." ECF No. 36, Exs. 6, 7.

106. Six weeks later, on August 20, 2025, a seventeen-year-old boy at that camp stepped into a ritual bath that Doppelt had ordered and paid for with YMAH checks he signed (ECF No. 36, Ex. 14), built in a garage converted without building-department approval, under

overhead wiring "within three (3) feet above" the water, grabbed a hand-held pool heater, and was electrocuted. He died. ECF No. 16 ¶ 4; ECF No. 36, Exs. 4, 15. The New York State Police has an ongoing investigation into that death. ECF No. 36, Ex. 15. The wrongful-death action is pending. *Friedman v. Yeshiva Toras Chaim LLC*, Index No. 515104/2026 (Sup. Ct. Kings Cnty.); Claim No. 4.

107. The Ulster County Department of Health charged the camp's operator, "The Ridgeview Realtor LLC / Yeshiva and Mesivta Arugath Habosem," with the wiring violations and with failing to report the incident or keep a medical log, and Doppelt signed the settlement in which "the Respondent accepts responsibility." ECF No. 36, Ex. 4.

108. That is the man who then swore to this Court that the Property was vacant (ECF No. 16) and gave the United States Trustee the vacancy statement described in Section V (Exhibit 19). He listed the wrongful-death action in the Statement of Financial Affairs, and listed the Town's enforcement action over the same Property, but left out the County's charges and his own signed acceptance of responsibility. ECF No. 36 ¶¶ 32-33. I put that omission to him in the Motion. No amended statement has been filed, and Doppelt has said nothing. He then let the liability insurance on the Property run into cancellation until a creditor moved on an emergency basis (ECF No. 53; Section VI).

109. And Doppelt did not invent the method. His father, Moshe Zev Doppelt, the Debtor's 40% member, built and occupied first and legalized later, as the Rockland County records described in Section III show. His son, Yanky Doppelt, put nearly $400,000 of cash into a Brooklyn house in the year before the petition and borrowed $300,000 against it in the two weeks around the petition, as described in Section VII. Three generations, one method: take the property, run it as they please, disclose nothing, and when the inspector, the trooper, the agent or the creditor

arrives, deny. *Falsus in uno, falsus in omnibus*: a court may disbelieve a witness in everything once it has caught him false in one thing, and this record catches Joseph Doppelt false in a dozen. The record establishes the following:

- Doppelt directed the Debtor's money to a TD Bank account he called the Debtor's, paid its insurance from a second TD Bank account in the Debtor's own name, swore the Debtor had no bank account at all, and has not produced a single statement for either (Section II).
- He told this Court and the United States Trustee the Property was unused, signed a ten-year, $600,000-a-year lease of it, now swears the lease "never came into fruition," and asks the Court for a subpoena to learn whether his own tenant paid rent (Section V).
- He swore the Property is worth $5,200,000, then "10 to $25 million," and now signs a letter to sell it for $7,500,000 to his father's congregation, which he will not identify (Section III).
- Under his control the Debtor paid, or someone paid for it, two $25,000 retainers, $50,000 in all, without an order under 11 U.S.C. §§ 327(a) and 330(a) and with no disclosure of the source under Fed. R. Bankr. P. 2016(b) (Section IV), while his son borrowed in the Debtor's name after the petition without an order (Section VI).
- He has filed no September operating report, has never accounted for a dollar of rent from a leased Property that is the Lender's collateral, rent that may not be used without consent or an order, 11 U.S.C. § 363(c)(2), offers a plan whose own text refuses to represent that it is feasible (ECF No. 66-2 at 1), and asks to be excused from answering a single question under oath on November 12 (ECF No. 68; Section IX).

110. This Court has in the past appointed a trustee under § 1104(a)(2) and (a)(3), and has held that a non-debtor occupying estate property must account for it and pay for its use, because rent-free use is "a windfall ... at the creditors' expense." *In re Taub*, 427 B.R. 208, 223, 227-29 (Bankr. E.D.N.Y. 2010) (Stong, J.) (quoting *Schachter v. Lefrak (In re Lefrak)*, 223 B.R. 431, 440 (Bankr. S.D.N.Y. 1998)), *aff'd*, *Taub v. Adams*, No. 10-CV-2600 (CBA), 2010 WL 8961434 (E.D.N.Y. Aug. 31, 2010) (affirming under § 1104(a)(2)). YMAH, and whoever else has occupied this Property, has had exactly that windfall.

111. For the reasons in Sections II through IX, the Motion should be granted and a trustee appointed on November 12.

## XI. RELIEF

I ask that the Court, on November 12, 2026: (i) grant the Motion to Appoint a Chapter 11 Trustee (ECF No. 36) and direct the United States Trustee to appoint a chapter 11 trustee under 11 U.S.C. § 1104(d), in the form of the order at ECF No. 36-2; (ii) deny the request to excuse Joseph Doppelt from appearing in person; (iii) deny the Debtor's request to open discovery against the movant; (iv) deny any request to delay or condition the Debtor's obligation to produce the TD Bank 0416 records, the September 2026 operating report, the bank record of the $25,000 paid to Sobers Law PLLC, and the source wire or cancelled check for the $25,000 paid to Rubin LLC, and enter the Rule 2004 order requested at ECF No. 30; (v) order Joseph Doppelt to identify under oath the holder, signatories and transfers of TD Bank accounts 0416 and 7873, and the Debtor to produce the signature cards and statements for both from January 1, 2023 forward, within seven days; (vi) hold the exclusivity motion (ECF No. 67), the employment application (ECF Nos. 64, 69) and the disclosure statement (ECF No. 66) until the Motion to Appoint a Chapter 11 Trustee (ECF No. 36) is decided; (vii) direct Sobers Law PLLC and Rubin LLC each to turn over the $25,000 retainer it received, to be held in a segregated escrow account for the benefit of the estate, unapplied, pending a determination under 11 U.S.C. § 329(b), and delivered to the chapter 11 trustee upon appointment; (viii) refer to the United States Trustee and the United States Attorney for this District, under 18 U.S.C. § 3057(a), the question whether the October 26-27, 2026 papers described in Section III were created for the purpose of filing them in this case; and (ix) grant such other relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Miami Beach, Florida
November 3, 2026

Respectfully submitted,

/s/ Abraham Kleinman
**Abraham Kleinman**
Creditor and Party in Interest, Pro Se
407 Lincoln Rd, Suite 6H-1752
Miami Beach, Florida 33139
Tel.: (845) 494-9922
Email: kleinmanabraham@gmail.com